

# Mississippi Electronic Courts
## Twelfth Chancery Court District (Lauderdale Chancery Court)
## CIVIL DOCKET FOR CASE #: 38CH1:22-cv-00256-LP

HERMES HIALEAH WAREHOUSE LLC v. GFE NY LLC
Assigned to: Lawrence Primeaux

**Upcoming Settings:**

None Found

Date Filed: 03/23/2022
Current Days Pending: 29
Total Case Age: 29
Jury Demand: None
Nature of Suit: 62 Other Statutes/Rules

---

**Plaintiff**

**HERMES HIALEAH WAREHOUSE LLC**

represented by **Joshua W. Stover**
Burr & Forman LLP
190 E. Capitol Street
Suite M-100
39201
JACKSON, MS 39201
601-355-3434
Fax: 601-355-5150
Email: jstover@burr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Martin Lassiter**
Burr & Forman LLP
190 E. Capitol St., Ste. M-100
JACKSON, MS 39201
601-355-3434
Fax: 601-355-5150
Email: jlassite@burr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**GFE NY LLC**

represented by **Alan Lee Smith**
Baker Donelson
4268 I-55 North
JACKSON, MS 39211
601-351-8932
Fax: 601-974-8932
Email: asmith@bakerdonelson.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
| --- | --- | --- |

| 03/23/2022 | 1 | VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, INJUNCTION AND DISCOVERY against GFE NY LLC, filed by HERMES HIALEAH WAREHOUSE LLC. (Attachments: # 1 Civil Cover Sheet #25425 $158 ck# 5129,) (BC) (Entered: 03/23/2022) |
|---|---|---|
| 03/23/2022 | 3 | SUMMONS Issued for service upon GFE NY LLC. (BC) (Entered: 03/23/2022) |
| 03/23/2022 | 4 | AFFIDAVIT of JOSHUA W STOVER by HERMES HIALEAH WAREHOUSE LLC. (Arrington, Sandra) (Entered: 03/23/2022) |
| 03/23/2022 | 5 | TEMPORARY RESTRAINING ORDER ( Hearing set for 3/30/2022 01:15 PM in Lauderdale County Courtroom 2 before Lawrence Primeaux.) BOND : $10,000 WITHIN 3 BUSINESS DAYS OF ORDER. Signed by Charles E. Smith on 3/23/2022. (Arrington, Sandra) (Entered: 03/23/2022) |
| 03/31/2022 | 7 | AGREED ORDER Regarding Preliminary Injunction; Responsive Pleading Deadline; Etc.$10,000 BOND REQURIED. Signed by Lawrence Primeaux on 3/31/22. (BC) Modified on 3/31/2022 (BC). (Entered: 03/31/2022) |

# IN THE CHANCERY COURT OF LAUDERDALE COUNTY, MISSISSIPPI

HERMES HIALEAH WAREHOUSE, LLC )
        **Plaintiff,** )
        **v.** )    Civil Action No.: 22-256-P
GFE NY, LLC )
        **Defendant.** )
         )

## VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, INJUNCTION AND DISCOVERY

**COMES NOW** Plaintiff Hermes Hialeah Warehouse, LLC ("Hermes"), pursuant to Rules 65(a) and (b) of the Mississippi Rules of Civil Procedure, and files this Verified Complaint against GFE NY, LLC ("GFE" or the "Defendant") seeking a temporary restraining order, an injunction, certain discovery, and other relief as set forth below. In support hereof, Hermes would show the Court the following:

### I. The Parties

1.     Plaintiff Hermes is a limited liability company formed under the laws of Florida.

2.     Defendant GFE NY, LLC ("GFE" or the "Defendant") is a New York limited liability company that may be served with process via certified mailing to its principal place of business at 27-01 Queens Plaza North, Suite 802, Long Island, NY 11101.

### II. Venue and Jurisdiction

3.     This Court has jurisdiction over this matter pursuant to Art. 6, § 159 of the Mississippi Constitution and Miss. Code Ann. § 9-5-81. Venue is proper in this Court pursuant to Mississippi Code Annotated § 11-5-1, because the to-be-foreclosed property is located in Lauderdale County.

1

### III. Factual Overview

4.       A company owned and controlled by Ted Doukas ("Mr. Doukas"), and/or his wife, has continuously owned the property located at 6522 North Frontage Road, Meridian, Mississippi ("the Subject Property"), commonly known as the "Mid-Continental Terminal," for over 13 years.

5.       The Subject Property was first acquired by 2 Lisa Court Corp. (one of Mr. Doukas' companies) for approximately $350,000 via a Special Warranty Deed from the Meridian Terminal Trust, a liquidation trust established under the Amended Plan of Liquidation *In Re: Mid Continental Systems, Inc.*, United States Bankruptcy Court for the Southern District of Mississippi, Case No. 8701827JC. A true and correct copy of the Special Warranty Deed is attached hereto as **Exhibit A**.

6.       Hermes, which was formed in May 2014, is a company owned 100% by Mr. Doukas and his wife, Giselle Teixera Doukas ("Mrs. Doukas"). True and correct copies of Hermes' Articles of Organization and Operating Agreement are attached hereto as **Exhibit B** and **Exhibit C**, respectively.

7.       Each year between 2015 and 2018, Hermes filed its Annual Report with the Florida Department of State, Division of Corporations, and, each time, identified only Mr. Doukas as the Manager/Managing Member. True and correct copies of Hermes' 2015 to 2018 Annual Reports are collectively attached hereto as **Exhibit D**.

8.       Mr. Doukas, through companies he controls, including Hermes, infused over $800,000 into the Subject Property for rehabilitation and environmental work/studies.

9.       On or about September 6, 2016, to memorialize and secure the funds that Hermes advanced to 2 Lisa Court Corp. to rehabilitate the Subject Property, 2 Lisa Court Corp. executed and delivered to Hermes a Deed of Trust for the principal amount of $800,000. A true and correct copy of the Deed of Trust is attached hereto as **Exhibit E**.

2

10.      Shortly thereafter, in October 2016, 2 Lisa Court Corp. transferred the Subject Property to Hermes, via Quitclaim Deed, to satisfy the inter-company loans from Hermes to 2 Lisa Court Corp. A true and correct copy of the Quitclaim Deed is attached hereto as **Exhibit F**.

11.      Sometime in 2018, Mr. Doukas was approached by a fellow businessman named Panagiotis Kechagias (hereafter referred to by his nickname, "Panos"). Panos stated his desire to purchase the Subject Property either via a new company or a company Panos controlled called Hellenic Petroleum, LLC ("Hellenic Petroleum").

12.      While Mr. Doukas and Panos had discussions regarding the Subject Property, no money was ever paid by Panos or Hellenic Petroleum for the Subject Property and the Subject Property was never conveyed to Panos or any company he controlled (including, but not limited to Hellenic Petroleum).

13.      In June 2018, without authorization from Mr. Doukas, Panos and Hellenic Petroleum, LLC filed an Amended Annual Report with the Florida Department of State, Division of Corporations claiming that Hellenic Petroleum was the managing member of Hermes. A true and correct copy of the Unauthorized 2018 Amended Annual Report is attached hereto as **Exhibit G**.

14.      As soon as Mr. Doukas found out this was done, he immediately (in October 2018) filed another Amended Annual Report making it clear that he was the only Managing Member or Manager of Hermes and making sure that any reference to Panos or Hellenic Petroleum as parties who controlled Hermes was not shown in the current company records on file with the Florida Department of State, Division of Corporations. A true and correct copy of the Corrected 2018 Amended Annual Report is attached hereto as **Exhibit H**.

47586376 v1

15.     When it was time to submit the 2019 Annual Report for Hermes, Mr. Doukas once again filed the 2019 Annual Report listing himself as the only authorized representative of Hermes. A true and correct copy of the Hermes' 2019 Annual Report filed by Mr. Doukas is attached hereto as **Exhibit I**.

16.     Then, in September 2019, again unbeknownst to Mr. Doukas, Panos and Hellenic Petroleum filed an Amended Annual Report wrongfully and fraudulently claiming that Hellenic Petroleum (and not Mr. Doukas) controlled Hermes. A true and correct copy of the Unauthorized 2019 Amended Annual Report is attached hereto as **Exhibit J**.

17.     Approximately 30 days later, also unbeknownst to Mr. Doukas and without authorization, Panos executed a Deed of Trust, purportedly acting on behalf of Hermes (the owner of the Subject Property) to secure an obligation allegedly owed by Hellenic Petroleum to GFE, in the amount of $1,521,540 (the "First Unauthorized Deed of Trust"). A true and correct copy of the First Unauthorized Deed of Trust is attached hereto as **Exhibit K**.

18.     Neither Mr. Doukas, Mrs. Doukas, nor any other person or company authorized to act on behalf of Hermes executed the First Unauthorized Deed of Trust.

19.     Panos was not authorized to act or sign any document on behalf of Hermes and certainly was not authorized to execute the First Unauthorized Deed of Trust.

20.     The address shown for Hermes on the First Unauthorized Deed of Trust was never the address for Hermes.

21.     Hermes did not receive any funds advanced to Hellenic Petroleum by GFE, as referenced in the First Unauthorized Deed of Trust (assuming any funds were, in fact, advanced or paid at all).

4

22.     Even the most basic due diligence (if any was performed) by GFE would have shown that Panos inserted his and Hellenic Petroleum's names on the records of Hermes only weeks before execution of the First Unauthorized Deed of Trust and the advancement of funds (assuming any funds were, in fact, advanced or paid at all) and that Mr. Doukas was the only managing member since Hermes was formed in 2014.

23.     On November 13, 2020, approximately one year later, also unbeknownst to Mr. Doukas and without authorization, Panos executed another Deed of Trust, purportedly acting on behalf of Hermes (the owner of the Subject Property) to secure an obligation allegedly owed by Hellenic Petroleum to GFE, in the amount of $1,521,450 (the "Second Unauthorized Deed of Trust"). A true and correct copy of the Second Unauthorized Deed of Trust is attached hereto as **Exhibit L.**

24.     Neither Mr. Doukas, Mrs. Doukas, nor any other person or company authorized to act on behalf of Hermes executed the Second Unauthorized Deed of Trust.

25.     Panos was not authorized to act or sign any document on behalf of Hermes and certainly was not authorized to execute the Second Unauthorized Deed of Trust.

26.     The address shown for Hermes on the Second Unauthorized Deed of Trust was never the address for Hermes.

27.     Hermes did not receive any funds advanced to Hellenic Petroleum by GFE, as referenced in the Second Unauthorized Deed of Trust (assuming any funds were, in fact, advanced or paid at all).

28.     On June 22, 2021, approximately six months later, also unbeknownst to Mr. Doukas and without authorization, Panos executed another Deed of Trust, purportedly acting on behalf of Hermes (the owner of the Subject Property) to secure an obligation allegedly owed by Hellenic

47586376 v1

Petroleum to GFE, in the amount of $750,000.00 (the "Third Unauthorized Deed of Trust" and together with the First Unauthorized Deed of Trust and the Second Unauthorized Deed of Trust, the "Unauthorized Deeds of Trust"). A true and correct copy of the Third Unauthorized Deed of Trust is attached hereto as **Exhibit M**.

29.     Neither Mr. Doukas, Mrs. Doukas, nor any other person or company authorized to act on behalf of Hermes executed this Third Unauthorized Deed of Trust.

30.     Panos was not authorized to act or sign any document on behalf of Hermes and certainly was not authorized to execute this Third Unauthorized Deed of Trust.

31.     The address shown for Hermes on the Third Unauthorized Deed of Trust was never the address for Hermes.

32.     Hermes did not receive any funds advanced to Hellenic Petroleum by GFE, as referenced in the Third Unauthorized Deed of Trust (assuming any funds were, in fact, advanced or paid at all).

33.     Unbeknownst to Mr. Doukas and without any authorization, Panos and Hellenic Petroleum filed the annual reports for Hermes in 2020 and 2021. Mr. Doukas controls about eighteen (18) different companies and did not realize that his office was not filing the annual reports for Hermes in 2020 and 2021 because notice would be sent by the State of Florida to the last known contact email/address, which here (albeit incorrectly and fraudulently) was listed as the address of Panos/Hellenic Petroleum.

34.     When reviewing his records in 2022, Mr. Doukas realized what had occurred pertaining to the annual reports and made sure that the 2022 Annual Report had the correct information: Mr. Doukas as the manager and his home and office address listed at the address for

6

Hermes. A true and correct copy of the Correct 2022 Annual Report is attached hereto as **Exhibit N.**

35.     During the entire existence of Hermes, Mr. Doukas submitted Federal Tax Returns for Hermes to the IRS. These included for the years 2019 and 2020 (2021 tax returns have not yet been filed). In all years, including 2019 and 2020, the sole members listed on the K-1s for Hermes are Mr. Doukas and Mrs. Doukas. The tax returns for Hermes never identify Panos or Hellenic Petroleum as having any ownership/membership interest because they had none. Redacted excerpts from Hermes' 2019 and 2020 tax return forms are collectively attached hereto as **Exhibit O**.

36.     Moreover, to further demonstrate that Mr. Doukas always owned and controlled Hermes exclusively (and was unaware that Panos/Hellenic Petroleum had attempted to hijack Hermes to obtain money by using the Subject Property as collateral), Mr. Doukas (through his office) was solely responsible for submitted **monthly** Network Discharge Monitoring Reports as required by the United States Environmental Protection Agency and the Mississippi Department of Environmental Quality. Mr. Doukas is the only party authorized to sign these monthly reports and the only party who has signed these reports for the last several years including during all months in 2019, 2020 and 2021. Had Hellenic Petroleum or Panos had any control or ownership interest in the Subject Property, they would have been responsible for signing and submitting these monthly environmental reports. Had Mr. Doukas known that Hellenic Petroleum or Panos owned the Subject Property during these periods, he would not have filed those monthly reports or continued to file Federal Income Tax Returns for Hermes. Redacted copies of the November 2019, 2020 and 2021 Network Discharge Monitoring Reports are collectively attached hereto as **Exhibit P** as examples of these monthly submissions.

7

37.     On the afternoon of March 21, 2022, Hermes determined through a notice in the Meridian Star that GFE intends to conduct a foreclosure sale on the Subject Property on March 24, 2022 at 11:00 am. A screenshot of the notice is attached hereto as **Exhibit Q**.

38.     GFE never sent notice of the foreclosure sale to Hermes via its registered agent on file with the Florida Department of State, Division of Corporations (Mr. Doukas), or otherwise.

39.     The injunctive relief requested herein relates to an attempt by GFE to foreclose on the Subject Property, where the Unauthorized Deeds of Trust were executed by an individual who had no authority to do so, and where GFE has no lending transaction identified in the Unauthorized Deeds of Trust, much less a bonafide lending transaction with the true owner of the Subject Property.

40.     Under the trustee's stated parameters for the sale, Hermes' rights will be obfuscated by the planned foreclosure and unauthorized acquisition of the Subject Property that Hermes invested in and improved.

41.     GFE's actions, including this planned foreclosure, have damaged and continue to damage Hermes, including obviation of its ownership interest in the Subject Property or ability to realize any value from the Subject Property.

42.     Any such sale should be enjoined until the matters in this Verified Complaint are fully adjudicated and the rights of the various parties have been determined by the Court.

### IV.  Claims for Relief

### Count I – Injunctive Relief

43.     Hermes reasserts the allegations made in the preceding paragraphs of this Verified Complaint as if fully set forth herein.

47586376 v1

44.     GFE and its agents plan to foreclose on and sell the Subject Property in violation of the rights of Hermes, who has not authorized the grant or assignment of any interest in the Subject Property to GFE.

45.     GFE and its agents' actions in unlawfully conducting the foreclosure sale are causing, and will continue to cause, irreparable harm to Hermes.

46.     Were this sale cancelled until such time as the Court can make a determination as to the Subject Property and the validity of the Unauthorized Deeds of Trust, no, or substantially less, harm would be visited upon GFE.

47.     Further, it is in the public interest that the Defendant not be allowed to conduct a foreclosure that wipes out the legitimate property ownership of Hermes, who has not authorized the transfer of any rights to the Defendant.

48.     Accordingly, Hermes is entitled to immediate injunctive relief. The balance of the equities and of relative hardships between the parties favors the grant of injunctive relief.

49.     For the reasons stated, Hermes submits that it has satisfied the four factor test for granting injunctive relief, and that it is entitled to a temporary restraining order and preliminary injunction enjoining Defendant, GFE NY, LLC, or any agents, trustees, and affiliates thereof, including, but not limited to, Alan Smith at Baker Donelson, from selling the property at 6522 North Frontage Road, Meridian, Mississippi, via foreclosure sale or otherwise, until such time as this Court has decided the matter on the merits.

### Count II– Declaratory Judgment

50.     Hermes reasserts the allegations made in in the preceding paragraphs of this Verified Complaint as if fully set forth herein.

51.     The Unauthorized Deeds of Trust in the Subject Property were not granted by anyone with corporate authority for Hermes.

9 .

52.     The Unauthorized Deeds of Trust are not supported by any lending relationship.

53.     Defendant has no relationship with Hermes, and has not provided Hermes or the Property any benefit

54.     Hermes requests that this Court enter a judgment declaring that the Unauthorized Deeds of Trust are not enforceable Agreements, that Defendant has no rights against the Subject Property, and that Hermes is entitled to its use and enjoyment of the Property without further interference or cloud.

### Count III – Clear Title

55.     Hermes reasserts the allegations made in in the preceding paragraphs of this Verified Complaint as if fully set forth herein.

56.     The claims of GFE to the property as set forth in the Unauthorized Deeds of Trust interfere with the Petitioner's free and full use and enjoyment of the premises herein described, and constitutes a cloud on the title thereto.

57.     Hermes alleges that any claims which the Defendant may assert as to the Subject Property are invalid and are of no force and effect and that all such claims have been wholly or effectually extinguished and barred by subsequent acts and occurrences and that the Plaintiff is seized and possessed of the Subject Property and free of, and wholly discharged from, any and every such claim, demand or encumbrance.

58.     A cloud exists on the title to the Subject Property, and the cloud cannot be removed without judicial intervention. Hermes is being damaged as a result of the cloud on the Subject Property's title.

59.     All persons who have or claim any interest which would be affected by this proceeding have been made parties to this lawsuit.

60.    No other persons or entities assert a claim of ownership or a lien (other than ad valorem taxes) in the Subject Property, beyond the parties to this action.

61.    This Court has jurisdiction to declare the rights, status and remove clouds on title.

WHEREFORE, PREMISES CONSIDERED, Hermes Hialeah Warehouse, LLC respectfully requests that this Honorable Court provide the following relief:

(a)    enter Judgment for Hermes and against the Defendant;

(b)    issue a Temporary Restraining Order and Preliminary Injunction and Permanent Injunction, providing the following:

    (i)    enjoining Defendant, including, but not limited to, all agents, trustees, and affiliates thereof, from selling the Subject Property at at 6522 North Frontage Road, Meridian, Mississippi, via foreclosure sale or otherwise, until such time as this Court may decide the merits of this suit; and

    (ii)    granting Hermes immediate access to all documents and corporate records GFE maintain related to the property and the parties to this suit.

(c)    enter Declaratory Judgment as follows:

    (i)    declaring that the actions by Hellenic and Panos to grant GFE the Unauthorized Deeds of Trust in the Subject Property are void;

    (ii)    declaring the rights and responsibilities of the parties related to the foreclosure sale and any collateral, as established at trial; and

    (iii)    declaring that the Defendant, both individually, and all agents, trustees, and affiliates thereof, be forever barred from all claims to an interest in the Subject Property;

(d)    enter Judgement that title be quieted so that the Hermes is deemed to be the lawful owner of the Subject Property and be vested with an absolute and unencumbered fee to the Subject Property at 6522 North Frontage Road, Meridian, Mississippi and more specifically described below:

    Beginning at the Northeast corner of Section 22, Township 6 North, Range 15 East, Lauderdale County, Mississippi, run thence South 0 degrees 27 minutes 36 seconds East 1,827.7 feet along the section line to the North right of way of the Y & M V Railroad; run thence South 73 degrees 01 minutes 24 seconds West along the North right

of way of the Y & M V Railroad 959.62 feet to the point of beginning of the land herein conveyed, which is the Southwest corner of the Shell Oil Company property; and from said beginning point run thence North 0 degrees 23 minutes seconds West 1,388.67 feet; thence run South 89 degrees 36 minutes 24 seconds West 420 feet; thence South 0 degrees 23 minutes 36 seconds East 1,513,74 feet to the North right of way of the Y & M VF Railroad; thence North 73 degrees 1 minutes 24 seconds East 438.23 feet to the point of beginning, said property comprising 14.0 acres, more or less, and being a part of the Northeast Quarter of Section 22, Township 6 North, Range 15 East, Lauderdale County, State of Mississippi;

(e)     grant Hermes compensatory and punitive damages for all actions and conduct of the Defendant, including damages for failure to conduct a valid and commercially reasonable sale;

(f)     grant Hermes its reasonable costs and expenses; and

(g)     provide such other relief as may be deemed just and proper in these premises, including equitable relief and damages to be proven.

Respectfully submitted, this the 23rd day of March, 2022.

John M. Lassiter (MS Bar #102355)
Joshua W. Stover (MS Bar #105472)
Attorney for Plaintiff Hermes Hialeah
Warehouse, LLC

**OF COUNSEL:**
BURR & FORMAN LLP
The Pinnacle at Jackson Place
190 E. Capitol Street, Suite M-100
Jackson, MS 39201
Telephone: 601-355-3434
Facsimile:  601-355-5150
jlassiter@burr.com
jstover@burr.com

12

## VERIFICATION

I, Ted Doukas, President and Managing Member of Hermes Hialeah Warehouse, LLC, having been first duly sworn, made oath that the statements contained in the foregoing Sworn Verified Complaint are true and to correct to the best of my knowledge, information and belief and that I am authorized to verify this Verified Complaint on behalf of the Company.

_____
Ted Doukas, President and Managing Member
Hermes Hialeah Warehouse, LLC

STATE OF FLORIDA
COUNTY OF _____Collier_____

PERSONALLY came and appeared before the undersigned authority in and for the aforesaid jurisdiction, Ted Doukas, who represented that he was the President and Managing Member of Hermes Hialeah Warehouse, LLC, and, having been first duly sworn by me, stated on oath that the matters and facts set forth in the above and foregoing Verified Complaint for Temporary Restraining Order, Injunction and Discovery are true and correct as therein stated.

SWORN AND SUBSCRIBED BEFORE ME, this 22nd day of March, 2022.

_____
NOTARY PUBLIC

[SEAL]

Santiago Murrieta Pendola
State of Florida
My Commission Expires 10/07/2023
Commission No. GG 920066

BOOK 2310 PAGE 673

......State of Mississippi.........
........Lauderdale County,..........
Carolyn Rooney, Chancery Clerk
JECK-;;06198    06-27-08 12:13 PM

**Indexing Instructions:**

NE ¼ of Section 22, T6 N, R15 E,
Lauderdale County, Mississippi

**Prepared by and after recording return to:**

Douglas C. Noble, MS Bar No. 10526
PHELPS DUNBAR LLP
Post Office Box 23066
Jackson, Mississippi 392225-3066
Telephone: 601-352-2300

**GRANTOR'S NAME, ADDRESS
AND TELEPHONE NUMBER:**

Meridian Terminal Trust
c/o Sheldon G. Alston, Trustee
Brunini, Grantham, Grower & Hewes, PLLC
Suite 1400, Trustmark Building
248 East Capitol Street
Jackson, Mississippi 39201
(601) 948-3101

**GRANTEES' NAME, ADDRESS
AND TELEPHONE NUMBER:**

2 Lisa Court Corp.
70 Split Rock Road
Syosset, New York 11791
Attention: Ted Doukas
(516) 589-0599

## STATE OF MISSISSIPPI

## COUNTY OF LAUDERDALE

### SPECIAL WARRANTY DEED

FOR AND IN CONSIDERATION OF the sum of Ten Dollars ($10.00) and other good

and valuable consideration, the receipt and sufficiency of all of which are hereby acknowledged,

**MERIDIAN TERMINAL TRUST**, a liquidation trust established under the Amended Plan of

Liquidation In Re: Mid Continent Systems, Inc., United States Bankruptcy Court for the

Southern District of Mississippi, Jackson Division, Case No. 8701827JC, the Order Confirming

## EXHIBIT A

BOOK 2310 PAGE 674

Plan along with said Amended Plan of Liquidation being recorded and re-recorded in the office

of the Chancery Clerk of Lauderdale County, Mississippi, respectively in Book 1490, Page 327,

and Book 1497, Page 553 ("Grantor"), does hereby bargain, sell, convey and warrant specially

unto **2 LISA COURT CORP.**, a New York corporation ("Grantee"), that certain real property,

together with all improvements situated thereon and appurtenances belonging thereto, lying and

being situated in Lauderdale County, Mississippi, and more particularly described as follows, to

wit (the "Subject Property"):

> Beginning at the Northeast corner of Section 22, Township 6 North,
> Range 15 East, Lauderdale County, Mississippi, run thence South 0
> degrees 27 minutes 36 seconds East 1,827.7 feet along the section
> line to the North right of way of the Y & M V Railroad; run thence
> South 73 degrees 01 minutes 24 seconds West along the North right
> of way of the Y&M V Railroad 959.62 feet to the point of beginning
> of the land herein conveyed, which is the Southwest corner of the
> Shell Oil Company property; and from said beginning point run
> thence North 0 degrees 23 minutes 36 seconds West 1,388.67 feet;
> thence run South 89 degrees 36 minutes 24 seconds West 420 feet;
> thence South 0 degrees 23 minutes 36 seconds East 1,513.74 feet to
> the North right of way of the Y & M V Railroad; thence North 73
> degrees 1 minute 24 seconds East 438.23 feet to the point of
> beginning, said property comprising 14.0 acres, more or less, and
> being in a part of the Northeast Quarter of Section 22, Township 6
> North, Range 15 East, Lauderdale County, State of Mississippi.

Grantor, its successors and assigns, shall forever warrant and defend the title of the

Subject Property unto Grantee, its successors and assigns, against lawful claims of all persons

claiming by, through or under Grantor, but not otherwise.

Except for the special warranty of Grantor herein, Grantor's conveyance of the Subject

Property is made "as is, with all faults," without any representation or warranty, and subject to

the following matters:

> a. That certain Temporary Easement Agreement between Shell Oil Company and
> Meridian Terminal Trust dated September 13, 1999, filed September 16, 1999, and

BOOK 2310 PAGE 675

recorded in Book 1624 at Page 341 among the land records of Lauderdale County, Mississippi.

b.  Any prior conveyance, lease, reservation and/or exception, together with any release of damages, of the oil, gas and/or other minerals lying in, on and/or under the Subject Property and all rights incidental thereto.

c.  Any and all applicable zoning ordinances or other governmental regulations.

d.  Any environmental condition existing upon the Subject Property which would cause said property to be in violation of any environmental protection laws, rules or regulations.

e.  General and special taxes and assessments for the year 2008 and subsequent years (including *ad valorem* taxes) which shall be paid in full by Grantee, with said taxes and assessments for the year 2008 to be *pro rated* between Grantor and Grantee as of the date of closing.

f.  As of the date hereof, all matters of record regarding the Subject Property, including without limitation, all rights of way and/or easements of record over, through, and across the Subject Property, and all protective covenants and restrictions regarding the Subject Property.

g.  The following matters shown on that certain survey of the Subject Property prepared by Johnson Surveying, LLC, dated March 12, 2008: (1) location of pipelines and related rights of way, (2) the location of chain link fencing, (3) the location of tanks and other structures, (4) the lack of public access to the Subject Property, and (5) such other matters that would have been shown on such survey had it been prepared with the benefit of a title report and legal description of the Subject Property.

Unless otherwise indicated, all recording data set forth herein refers to the records of the

Chancery Clerk of Lauderdale County, Mississippi.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

JO.99378251.4                          Page 3 of 4

BOOK 2310 PAGE 676

WITNESS THE SIGNATURE of Grantor on the date set forth below.

**MERIDIAN TERMINAL TRUST**

Date:  *8-28-08*        By: _____

Name:  Sheldon G. Alston
Title:  Trustee


STATE OF MISSISSIPPI

COUNTY OF Hinds

     Personally appeared before me, the undersigned authority in and for the said County and State, on this 28th day of August, 2008, within my jurisdiction, the within named SHELDON G. ALSTON, who acknowledged that he is the TRUSTEE of MERIDIAN TERMINAL TRUST and that in said representative capacity he executed the above and foregoing instrument, after first having been duly authorized so to do.

_____
NOTARY PUBLIC

My Commission Expires:
My Commission Expires October 26, 2010
_____

JO.99378251.4                                    Page 4 of 4

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L14000084018
FILED 8:00 AM
May 23, 2014
Sec. Of State
jshivers

## Article I

The name of the Limited Liability Company is:

HERMES HIALEAH WAREHOUSE LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

19202 CLOISTER LAKE LANE
BOCA RATON, FL. US  33498

The mailing address of the Limited Liability Company is:

19202 CLOISTER LAKE LANE
BOCA RATON, FL. US  33498

## Article III

Other provisions, if any:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

GARY A GOLDSTEIN ESQUIRE
1710 LANDS END ROAD
MANALAPAN, FL.  33462

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   GARY A. GOLDSTEIN

**EXHIBIT B**

## Article V

The name and address of person(s) authorized to manage LLC:

L14000084018
FILED 8:00 AM
May 23, 2014
Sec. Of State
jshivers

    Title:  MGRM
    TED  DOUKAS
    19202 CLOISTER LAKE LANE
    BOCA RATON, FL.  33498  US

Signature of member or an authorized representative

Electronic Signature: GARY GOLDSTEIN

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

## OPERATING AGREEMENT

### OF

### HERMES HIALEAH WAREHOUSE, LLC

THIS OPERATING AGREEMENT of Hermes Hialeah Warehouse, LLC, a Florida limited liability company ("Company"), is effective as of May 23, 2014, by and among the Company and the persons executing this Agreement and listed on Appendix C, as its Members.

### Recitals:

A.  The Company was formed under the laws of the State of Florida as May 23, 2014 pursuant to Articles of Organization filed with the Florida Department of State, Division of Corporations.

B.  Florida law provides that a husband and wife may hold a membership interest in a limited liability company in joint tenancy in the same manner and subject to the same restrictions, consequences, and conditions that apply to the ownership of real estate held jointly by a husband and wife under the laws of the state of Florida.

C.  The initial Members of the Company, Ted Doukas and Giselle Teixeira, are husband and wife. It is their desire that the initial Membership Interest in the Company be owned by them as tenants by the entirety.

D.  The Members of the Company desire to enter into this Agreement to establish provisions regulating the constitution and operation of the Company, as a Florida limited liability company, and to provide for its governance in accordance with this Agreement.

NOW, THEREFORE, the parties agree as follows:

## 1. ORGANIZATION OF COMPANY.

### 1.1. *Formation.*

The Company has been organized as a Florida limited liability company pursuant to the provisions of the Act and this Agreement.

### 1.2. *Name of Company.*

The name of the Company shall be Hermes Hialeah Warehouse, LLC

### 1.3. *Duration.*

The Company shall continue in existence for the period fixed in the Articles for the duration of the Company or until the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Agreement.

## EXHIBIT C

**1.4.** *Registered Office and Resident Agent.*

The Company's initial registered office shall be at 19202 Cloister Lake Lane, Boca Raton, Florida 33498 and its initial registered agent shall be Gary A. Goldstein, Esq. at 1710 Lands End Road, Manalapan, Florida 33462. The registered office and resident agent may be changed from time to time in accordance with the Act or as determined by the Manager. If the resident agent shall ever resign, the Company shall promptly appoint a successor.

**1.5.** *Nature of Initial Membership Interest.*

The initial Membership Interest in the Company shall be owned by Ted Doukas and Giselle Teixeira as tenants by the entirety and, unless otherwise specified by this Agreement, during the lifetimes of both of them they shall be considered as one Member with respect to such Membership Interest.

## 2. APPENDICES AND EXHIBITS.

**2.1.** *Definitions.*

Capitalized terms used in this Agreement and defined in this Agreement shall have the meaning given to such terms where so defined. Certain definitions of general application are in Appendix A, which is attached to and is part of this Agreement.

**2.2.** *Tax Regulatory Provisions.*

Certain provisions relating to compliance with the Code and Regulations and related definitions are in Appendix B, which is attached to and is part of this Agreement.

**2.3.** *Members, Capital Contributions, Membership Percentages.*

The names and addresses, Membership Percentages and Capital Contributions of the Members are in Appendix C, which is attached to and is part of this Agreement.

## 3. PURPOSE.

The Company may engage in any lawful business permitted by the Act or the laws of any jurisdiction in which the Company may do business. The Company shall have the authority to do all things necessary or convenient to the accomplishment of its purposes and to operate its business, including all powers granted by the Act.

## 4. CAPITALIZATION.

### 4.1. *Initial Capital Contributions of Members.*

The Members shall contribute to the Company the Capital Contributions set forth opposite their names in Appendix C. No interest shall accrue on any Capital Contribution made to the Company unless otherwise provided in this Agreement.

### 4.2. *Additional Capital Contributions.*

(a) Except as set forth in Section 4.1, no Member shall be required to make any Capital Contributions. If the Majority Interest determines that additional Capital Contributions are necessary or appropriate in connection with the conduct of the Company's business, then the Members shall have the opportunity (but not the obligation) to participate in such additional Capital Contributions on a pro rata basis in accordance with their Membership Percentages. If any Member fails to contribute his or her share, the shortfall shall be provided in such manner as the Manager may determine, through borrowings, additional Capital Contributions by one or more of the Members who are willing to contribute, or otherwise. In such event, the Membership Percentages presently held by the Members shall be reallocated among the Members in proportion to the Initial and Additional Capital Contributions of each Member made under Sections 4.1 and 4.2. Appendix C shall be amended to reflect any changes made pursuant to this Section 4.2(a).

(b) From time to time with the permission of the Manager, one or more of the Members may contribute additional cash or other assets to the Company. If this happens, the Manager shall determine the fair market value of the assets (net of liabilities) of both the Company (before the contribution) and the property contributed. The unrealized appreciation or depreciation in the value of the assets before the new contribution shall be allocated among the Capital Accounts of the Members in the manner described in Section 5.2 and Appendix B as if the assets of the Company were sold. The fair market value of the new contribution shall be allocated to the Capital Account of the contributing Member. The Membership Percentages shall then be revised such that each Member shall have a Membership Percentage equal to the balance of his adjusted Capital Account divided by the total of the balances of all adjusted Capital Accounts. Appendix C shall be amended to reflect any changes made pursuant to this Section 4.2(b).

### 4.3. *Withdrawals.*

No Member shall be entitled to be repaid any portion of his Capital Contribution or withdraw from the Company except as provided in this Agreement. A Member who withdraws in violation of this Agreement shall not be entitled to receive the fair value of his interest after the withdrawal but shall only be entitled to distributions he otherwise would have received as a nonwithdrawing Member.

**4.4. *Loans*.**

The Company may borrow money for Company purposes from any source, including any Member, as determined by the Manager, provided that such loan is not prohibited by any applicable law or regulation. Any money borrowed from a Member shall not constitute a Capital Contribution to the Company, but shall constitute debt of the Company. Any loan from a Member to the Company shall bear interest at the interest rate agreed to by the Company and the lending Member from the date of the advance until the date of payment.

## 5. CAPITAL ACCOUNTS; PROFITS AND LOSSES; DISTRIBUTIONS.

**5.1. *Capital Accounts*.**

A Capital Account shall be maintained for each Member, in accordance with Section 102 of Appendix B.

**5.2. *Allocation of Profits and Losses*.**

(a) Except as provided in Appendix B, all Profits shall be allocated as follows:

(1) First, to the Members, in proportion to, and to the extent of, the excess of any Losses previously allocated to each Member pursuant to Section 5.2(b)(1) over any Profits previously allocated to such Member under this Section 5.2(a)(1);

(2) Finally, the balance, if any, to the Members pro rata, in the proportion that such Member's Membership Percentage bears to the Membership Percentages of all Members.

(b) Except as provided in Appendix B, all Losses shall be allocated as follows:

(1) First, to the Members, in proportion to, and to the extent of, any Profits allocated to each Member pursuant to Section 5.2(a)(1) over Losses previously allocated under this Section 5.2(b)(1); and

(2) Finally, the balance, if any, to the Members pro rata, in the proportion that such Member's Membership Percentage bears to the Membership Percentages of all Members.

**5.3. *Distributions*.**

The Company shall distribute Distributable Cash of the Company to the Members from time to time, as determined by the Manager. Except as provided in Section 9, all distributions shall be made to the Members in proportion to their respective Membership Percentages on the date of the distribution.

## 6. POWERS, OBLIGATIONS, COMPENSATION, INDEMNIFICATION, ETC. OF THE MANAGERS.

### 6.1. *Number and Identification of Managers.*

The Company shall be manager-managed and shall initially have one manager. Ted Doukas shall be the initial Manager. If Ted Doukas ceases to serve as the Manager for any reason, Giselle Teixeira shall serve as the successor Manager. The number of Managers of the Company may be increased from time to time by the affirmative vote of a Majority Interest.

### 6.2. *Powers of the Managers.*

(a) The Manager shall manage, and shall have complete control over the conduct of Company affairs. If there is more than one Manager, all decisions of the Managers shall be made by majority vote (based on number) of the Managers; provided, however, if there is a deadlock, then the decision shall be made by the Majority Interest. Subject to the other provisions of this Section 6, each Manager shall have the authority, on behalf of the Company, to do all things appropriate to the accomplishment of the purposes of the Company, including (but not limited to):

(1) acquiring, exchanging, managing, leasing or selling all or part of the Company's property;

(2) obtaining financing and refinancing for, pledging, and mortgaging all or part of the Company's property, increasing or decreasing the amount of any mortgage loan, incurring indebtedness on behalf of the Company, and paying and prepaying part or all of any indebtedness of the Company or any indebtedness upon the Company's property;

(3) employing contractors, professionals and employees, defining their duties, and establishing their compensation and remuneration;

(4) collecting and receiving rents, profits or income from the property owned by the Company and to disburse Company funds for Company purposes;

(5) investing and reinvesting Company funds;

(6) entering into any and all agreements and executing contracts, notes, mortgages and other writings;

(7) paying all Company obligations;

(8) purchasing and maintaining insurance on behalf of the Company and the Manager against any liability or expense asserted against or incurred by the Company or by any Manager in its status as manager;

(9) performing all ministerial acts and duties relating to the payment of all indebtedness, taxes and assessments due or to become due with regard to the Company's property, and to give and receive notices, reports, and other communications arising out of or in connection with the ownership, indebtedness, or maintenance of the Company's property;

(10) placing record title to any Company property in the name of a nominee;

(11) transacting the Company's business under an assumed name or name other than its name as set forth in the Articles and filing a Certificate of Assumed Name with the Department;

(12) appointing any Member or other person as agent for service of process on the Company as required by the law of any state in which the Company transacts business;

(13) commencing, prosecuting or defending any proceeding in the Company's name; and

(14) doing such other acts as may facilitate the Manager's exercise of his powers.

(b) Each Member irrevocably appoints the Manager as his or her attorney-in-fact to execute, swear to and file the Articles and any amendment or revocation of it and to execute, sign any Member's name to, swear to and file any writing, and to give any notice which may be required by any rule or law which may be appropriate to the effecting of any action by or on behalf of the Company or the Members which has been taken as provided in this Agreement, which may be necessary or appropriate to enable the Company to transact business in any other state, or which may be necessary or appropriate to correct any errors or omissions. This power of attorney is coupled with an interest and shall not be revoked by the act, death or incapacity of any Member. This power of attorney shall survive an assignment by any Member of his interest in the Company; provided, however, that where a Member's entire interest is assigned to an assignee who becomes a substitute Member in his stead this power shall survive for the sole purpose of enabling such Member to effect such substitution.

(c) The Manager has filed the Articles with the Department. Any future Amendments to this document shall be reflected in Amendments to the Articles of Organization to be filed in the same manner. The Manager need not deliver a copy of each such document to each Member, but they shall provide a copy to a Member upon written request.

(d) Subject to the other provisions of this Section 6, the Manager shall have full power to act for and to bind the Company to the extent provided by Florida law.

(e) Every contract, note, mortgage, lease, deed or other instrument executed by a Manager shall be conclusive evidence that at the time of execution, this Company

was then in existence, that this Agreement had not theretofore been terminated or amended in any manner and that the execution and delivery of such instrument was duly authorized by the Manager and Members.

(f) Ted Doukas shall act as "tax matters partner" of the Company, as defined in IRC Section 6231(a)(7).

### 6.3. *Limitations on Powers.*

Notwithstanding the foregoing and any other provision contained in this Agreement to the contrary, no act shall be taken, sum expended, decision made, obligation incurred or power exercised by any Manager on behalf of the Company except by the consent of a Majority Interest with respect to: (a) any merger or consolidation of the Company; (b) any dissolution of the Company pursuant to Section 9; (c) any amendment to the Articles or this Agreement except as provided in Section 11; (d) the change in character of the business and affairs of the Company, or (e) any act that would contravene any provision of the Articles or this Agreement or the Act.

### 6.4. *Self-Dealing.*

Any Manager, Member and any Affiliate of a Manager or Member may deal with the Company, directly or indirectly, as vendor, purchaser, employee, agent or otherwise only with the consent of the Majority Interest. If the consent of the Majority Interest has been obtained as set forth in the prior sentence, no contract or other act of the Company shall be voidable or affected in any manner by the fact that a Manager, Member or his Affiliate is directly or indirectly interested in such contract or other act apart from his or her interest as a Manager or Member, nor shall any Manager or Member or his Affiliate be accountable to the Company or the other Members in respect of any profits directly or indirectly realized by him by reason of such contract or other act, and such interested Manager, Member shall be eligible to vote or take any other action as a Member in respect of such contract or other act as it would be entitled were he or his Affiliate not interested therein. Notwithstanding the foregoing provisions of this Section 6.4, (a) any direct or indirect interest of a Manager, Member or Affiliate of a Manager, Member in any contract or other act, other than his interest as a Member, shall be disclosed to all other Members, (b) such contract or other act shall be based on commercially reasonable terms and shall be approved by a Majority Interest of the Members unless the same is specifically authorized herein, and (c) the Members shall not receive or hold any property of the Company as collateral security in respect of any claim against the Company.

### 6.5. *Standard of Care; Liability.*

Each Manager shall discharge his or her management duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to the be in the best interests of the Company as required by the Act. A Manager shall not be liable for

monetary damages to the Company for any breach of any such management duties except for (i) actions constituting fraud, willful misconduct or gross negligence, (ii) actions taken by a Manager in violation of this Agreement, (iii) the receipt of a financial benefit to which the Manager is not entitled, (iv) voting for or assenting to a distribution to Members in violation of this Agreement or the Act, or (v) a knowing violation of the law.

### 6.6. *Compensation*.

A Manager may receive reasonable compensation for managing the affairs of the Company in his capacity as Manager and the Members may receive reasonable compensation for their services provided to the Company, both matters as determined by the Majority Interest. The Company shall reimburse the Manager for any reasonable out-of-pocket expenses incurred by the Manager on behalf of the Company.

### 6.7. *Devotion of Time to Company*.

The Manager shall not be required to manage the Company as his sole and exclusive function and he may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any rights, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom. A Manager shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

### 6.8. *Resignation*.

Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

### 6.9. *Removal*.

Unless agreed upon jointly by Ted Doukas and Giselle Teixeira, who hold their interest as tenants by the entireties, Ted Doukas may not be removed as Manager

### 6.10. *Vacancies*.

Except as otherwise provided in section 6.1, any vacancy occurring for any reason in the number of Managers of the Company shall be filled by the affirmative vote of the

Majority Interest.

**6.11. *Other Manager Duties.***

***(a) Books of Account.***

The Manager shall keep true and complete books of account and records of all Company transactions. The books of account and records shall be kept at the principal office of the Company. The Company shall maintain at such office (i) a list of names and addresses of all Members; (ii) a copy of the Articles together with executed copies of all powers of attorney pursuant to which the Articles has been executed; (iii) copies of the Company's Federal, state and local income tax returns and reports for the three most recent years; (iv) copies of the Company's current Operating Agreement and (v) copies of the financial statements of the Company for the three most recent years. Such Company records shall be available to any Member or his designated representative during ordinary business hours at the reasonable request and expense of such Member.

**(b) *Reports.***

The Manager will use his best efforts to furnish, or cause to be furnished, the following items on the dates indicated:

(1) an annual report consisting of an income statement for the prior year and a balance sheet as of the year ended-annually.

(2) Member information tax returns (Schedule K-1)—March 15.

**(c) *Bank Accounts and Investment of Funds.***

All funds of the Company shall be deposited in its name in such checking accounts, savings accounts, time deposits, or certificates of deposit or shall be invested in such other manner, as shall be designated by the Managers from time to time. Withdrawals shall be made upon such signature or signatures as the Managers may designate.

**(d) *Accounting Decisions.***

All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the Manager in accordance with generally accepted accounting principles consistently applied. Notwithstanding the preceding sentence, the Manager may use the cash method of accounting for the Company. Such decisions shall be acceptable to the accountants retained by the Company, and the Manager may rely upon the advice of the accountants as to whether such decisions are in accordance with generally accepted accounting principles.

**(e)** *Federal Income Tax Elections.*

The Company shall, to the extent permitted by applicable law and regulations and upon obtaining any necessary approval of the Commissioner of Internal Revenue, elect to use such methods of depreciation, and make all other Federal income tax elections in such manner, as the Manager determines to be most favorable to the Members. The Manager may rely upon the advice of the accountants retained by the Company as to the availability and effect of all such elections.

## 7. RIGHTS OF MEMBERS; VOTING; MEETINGS.

### 7.1. *Rights of the Members.*

The Members shall have no right to take part in, vote on, or interfere in any manner with the management, conduct or control of the Company or its business, and shall have no right or authority whatsoever to act for or on behalf of the Company.

### 7.2. *Voting Rights.*

#### (a) *Right to Vote.*

All Members shall be entitled to vote on any matter submitted to a vote of the Members by the Manager, any matter requiring the vote of Members entitled to vote under the Act, and as otherwise conferred, expressly or by implication, by this Agreement. Voting rights shall be determined on a percentage interest basis, such that each Member is entitled to the number of votes equal to that Member's Membership Percentage as a percentage of the total Membership Percentages held by all Members. For these purposes, any Membership Interest held by two persons as tenants by the entirety shall be treated as held by one Member and shall be entitled to the number of votes equal to the Membership Percentage represented by that Membership Interest as a percentage of the total Membership Percentages held by all Members. The voting of such Membership Interest shall be divided among the persons who hold the Membership Interest.

#### (b) *Required Vote.*

Except as otherwise provided in this Agreement, any action required or permitted to be taken by a vote shall be by a vote of the Majority Interest.

### 7.3. *Meetings.*

An annual meeting of Members for the transaction of such business as may properly come before the meeting may be held (but not required) at such place, on such date and at such time as the Majority Interest shall determine. Special meetings of Members

for any proper purpose or purposes may be called at any time by the Managers or the holders of at least 25% of the Membership Percentages of all Members. The Company shall deliver or mail written notice stating the date, time, place and purposes of any meeting to each Member entitled to vote at the meeting. Such notice shall be given not less than five nor more than 60 days before the date of the meeting. Meetings may be conducted in person, or by telephone conference of the Members upon consent of the Majority Interest.

### 7.4. *Consent.*

Any action required or permitted to be taken at an annual or special meeting of the Members may be taken without a meeting, without prior notice, and without a vote, if consents in writing, setting forth the action so taken, are signed by the Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote on the action were present and voted. Every written consent shall bear the date and signature of each Member who signs the consent. Prompt notice of the taking of action without a meeting by less than unanimous written consent shall be given to all Members who have not consented in writing to such action. In addition, the Manager may give all the Members written notice of the action, event or agreement and state in the notice that any Member who does not indicate his disapproval by written notice to the Company within a specified period of time (not less than 30 days after mailing of the notice) shall be deemed to have given his consent or approval to the action or event or to have made the agreement referred to in the notice. In such event, any Member who does not indicate his disapproval by written notice to the Company within the time specified shall be deemed to have given his written consent, approval or agreement.

## 8. TRANSFER OF MEMBERSHIP INTERESTS.

### 8.1. *Permitted Assignments.*

Except for an assignment to any other Member, a Family Member, or a Member's Revocable Trust, a Member may not assign his or her interest in Company in whole or part without the written consent of the Majority Interest. A permitted assignment shall not of itself substitute the assignee (who is not already a Member) as a Member or entitle the assignee to voting rights as a Member of the Company. Such assignee (unless the assignee is already a Member) is only entitled to receive, to the extent assigned, the distributions the assigning Member would otherwise be entitled to. Unless otherwise provided, the assignor shall remain a Member liable for payment of any remaining installments of Capital Contributions due with respect to the interest assigned. No assignment of a Company interest shall be effective with respect to the Company until written notice is given to the Company.

### (a) *Right of First Offer.*

If at any time a Member (the "Selling Member") receives a good faith offer to purchase or makes a good faith offer to sell (or transfer without full and adequate consideration)

all or any part of that Selling Member's interest in the Company (the "Offer"), the Selling Member shall make any acceptance of the Offer conditional upon the right granted in this Section to the Company and the other Members to purchase that portion of the Selling Member's interest in the Company. Notwithstanding the foregoing, this provision is not triggered by an assignment of an interest in the Company that is permitted under Section 8.1. The Selling Member shall give the Company and other Members written notice of the Offer containing a copy of the Offer, which shall be subject to reasonable verification ("Notice"). The Company shall have 60 days after receipt of the Notice to elect to purchase the Selling Member's interest in the Company at the price and terms as set forth in the Offer. If the Company does not elect to purchase the Selling Member's interest, then each of the other Members shall have an additional 30 days in which to provide written notice to the Selling Member and all other Members stating whether or not the Member desires to purchase a pro rata portion of the Company interest subject to the Offer (based on Membership Percentages of the purchasing Members) under the same terms and conditions available to the Company. If the Company and Members do not purchase the Selling Member's interest in the Company, then the Selling Member shall be free to sell his or her interest in the Company in accordance with the Offer and subject to Sections 8.2 and 8.3 below. However, any further sales of the Selling Member's interest and his assignee's interest, shall be subject to the restrictions provided under this Section 8.

## (b) _Membership Interest Owned as Tenants by the Entirety_.

Notwithstanding any provision contained in this Agreement to the contrary, any Transfer of a Membership Interest in the Company held by two persons as tenants by the entirety shall require the consent of both persons that own such interest. Any attempted Transfer of such Membership Interest in violation of this section 8.1(b) shall be null and void _ab initio_.

## 8.2. _Admission of Assignees as Members_.

An assignee who is not already a Member, shall not be admitted as a Member except upon the written consent of the Majority Interest. As a condition of such consent, the Members may require a substitute Member to comply with the following requirements: (i) the assignment instrument being in form and substance satisfactory to the Manager and the Company's counsel; (ii) the assignor and assignee named therein having executed and acknowledged such other instrument or instruments as the Manager may deem necessary or desirable to effectuate such admission; (iii) the assignee having accepted and adopted all of the terms and provisions of the Agreement, as the same may have been amended, as if the assignee were a party who joined in the execution of this Agreement; and (iv) such assignee having paid or acknowledged an obligation to pay, as the Manager may determine, all reasonable expenses (including attorneys' fees) connected with such admission. If admitted, the substitute Member has, to the extent assigned, all of the rights and powers, and is subject to all the restrictions and liabilities of a Member.

**8.3. *Restrictions on Transfers.***

Notwithstanding the other provisions of this Article, no Member shall Transfer his Membership Interest in the Company without the prior written consent of all the Members (1) if the effect of the assignment would be to terminate the Company within the meaning of I.R.C. § 708(b) and such termination would have a material adverse effect on the Company, or (2) without an opinion of counsel in form and substance satisfactory to counsel for the Company that registration is not required under the Securities Act of 1933 and applicable state law. In no event shall any Member Transfer his Membership Interest if such Transfer would violate any applicable state or Federal securities law. The Members acknowledge that their interests in the Company have not been registered under the Michigan Uniform Securities Act and agree that such interests will not be Transferred without registration under such act or exemption therefrom. Any attempted Transfer of a Member's Membership Interest in the Company in violation of this Section shall be null and void *ab initio.*

**8.4. *Section 754 Election.***

Upon the sale or exchange of a Member's Membership Interest, or upon a Member's death, if the person acquiring the Membership Interest so requests and the Manager consents (which consent may be withheld for any reason), then the Company shall make an election under I.R.C. § 754. Each Member hereby agrees to provide the Company with all information necessary to give effect to such election. The transferee shall reimburse the Company for any reasonable costs incurred as a result of such election, as determined by the Manager.

**9. DISSOLUTION AND WINDING UP.**

**9.1. *Dissolution.***

The Company may be dissolved:

(a) At any time by the written consent of the Majority Interest;

(b) The sale or other disposition by the Company of all or substantially all of the Company's property;

(c) The entry of a final judgment, order or decree of a court of competent jurisdiction adjudicating the Company to be bankrupt, and the expiration of the period, if any, allowed by applicable law in which to appeal therefrom; or

(d) As otherwise provided in the Article.

## 9.2. *Winding Up.*

(a) Upon dissolution, the Manager shall proceed to liquidate with reasonable promptness the Company's business. If there is no Manager, the Company affairs shall be concluded by a Trustee selected in writing by the Majority Interest. The Manager or the liquidating Trustee shall make a full accounting of Company assets and liabilities, shall cause the Company assets to be liquidated in an orderly fashion and any proceeds derived therefrom (or distributed in kind) shall be allocated and distributed as follows:

(1) first to the payment of all taxes, debts and other obligations and liabilities of the Company and the necessary expenses of liquidation; provided, however, that all debts, obligations and other liabilities of the Company as to which personal liability exists with respect to any Member shall be satisfied, or a reserve shall be established therefor, prior to the satisfaction of any debt, obligation or other liability of the Company as to which no such personal liability exists; and provided, further, that where a contingent debt, obligation or liability exists, a reserve, which shall be distributed only upon the termination of such contingency, shall be established to satisfy such contingent debt, obligation or liability; and

(2) then to the Members in proportion to and to the extent of their positive Capital Accounts (after taking into account the allocation of income or loss as provided in Section 5.2(b) and Appendix B).

(b) If Company assets are distributed in kind, the assets so distributed shall be valued at their current fair market values and the unrealized appreciation or depreciation in value of the assets shall be allocated to the Members' Capital Accounts in the manner described in Section 5.2 and Appendix B as if such assets had been sold, and such assets shall then be distributed to the Members in accordance with their respective positive Capital Accounts as so adjusted.

(c) To the extent that Company assets cannot either be sold without undue loss or readily divided for distribution in kind to the Members, then the Company may, as determined by a Majority Interest, convey those assets to a trust or other suitable holding entity established for the benefit of the Members in order to permit the assets to be sold without undue loss and the proceeds thereof distributed to the Members at a future date. The legal form of the holding entity, the identity of the trustee or other fiduciary, and the terms of its governing instrument shall be determined by the Members or Liquidating Trustee.

(d) The Manager or liquidating Trustee shall use reasonable efforts to distribute the proceeds from a liquidation in the same calendar year in which the sale of Company assets occurs.

## 10. LIMITATION OF LIABILITY; INDEMNIFICATION.

### 10.1. *Limitation of Liability.*

Unless otherwise provided by this Agreement, the Act, or expressly assumed, a person who is a Member or Manager, or both, shall not be personally liable for the acts, debts or liabilities of the Company beyond his respective Capital Contribution.

### 10.2. *Liability of Member to the Company.*

A Member who knowingly receives a distribution made by the Company which is either in violation of this Agreement or when the Company is insolvent, is liable to the Company for the repayment of the distribution.

### 10.3. *Indemnification.*

Except as otherwise provided in this Article, the Company shall indemnify any Manager or Member (and may indemnify any employee or agent of the Company), who was or is a party or is threatened to be made a party to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, and whether formal or informal (other than an action by or in the right of the Company) by reason of the fact that such person is or was a Manager, employee or agent of the Company against expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with the action, suit or proceeding, if the person acted in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that such person reasonably believed to be in the best interests of the Company, and with respect to a criminal action or proceeding, if such person had no reasonable cause to believe such person's conduct was unlawful. To the extent that a Manager, Member, employee or agent of the Company has been successful on the merits or otherwise in defense of an action, suit or proceeding referred to in this Section 10.3, or in defense of any claim, issue or other matter in the action, suit or proceeding, such person shall be indemnified against actual and reasonable expenses (including attorneys' fees) incurred by such person in connection with the action, suit or proceeding and any action, suit or proceeding brought to enforce the mandatory indemnification provided herein. Any indemnification permitted under this Section 10.3 (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that the indemnification is proper under the circumstances because the person to indemnify has as met the applicable standard of conduct and upon an evaluation of the reasonableness of expenses and amount paid in settlement. This determination and evaluation shall be made by the Majority Interest of the Members who are not parties or threatened to be made parties to the action, suit or proceeding. Notwithstanding the foregoing to the contrary, no indemnification shall be provided to any Manager, Member, employee or agent of the Company for or in connection with (i) actions taken in violation of this Agreement, (ii)

actions constituting fraud, willful misconduct or gross negligence in the management of the Company, (iii) the receipt of a financial benefit to which such person is not entitled, (iv) voting for or assenting to a distribution to Members in violation of this Agreement or Act, or (v) a knowing violation of law.

## 11. AMENDMENTS.

This Agreement may be amended only by the written agreement of the Majority Interest; provided, however, that (1) this Agreement may be amended by the Manager to the extent necessary to permit the allocations and distributions contained in this Agreement to be sustained under existing or future Federal income tax laws and regulations, (2) Appendix C may be modified from time to time by the Manager to reflect any change in the Members or in the interest of any Member which has been affected by assignment or other appropriate action, and (3) this Agreement may be amended by the Manager to correct any errors or omissions.

## 12. MISCELLANEOUS PROVISIONS.

### 12.1. *Arbitration*.

Any disputes arising out of this Agreement which cannot be resolved by the Members themselves or pursuant to the terms of this Agreement shall be submitted to binding arbitration in Palm Beach County, Florida in accordance with the rules of the American Arbitration Association ("AAA"). The arbitration is to be conducted by a single arbitrator in accordance with the expedited commercial arbitration rules, as existing as of the time the arbitration is commenced of the AAA. Modification to the expedited procedures may be made only for exceptional good cause, as determined by the arbitrator. Judgment upon the arbitration award may be entered in a court of competent jurisdiction. The arbitrator will be entitled to apportion the costs of the arbitration proceedings and to award the prevailing party attorney fees, and costs on such basis as the arbitrator may determine. The arbitrator shall have the authority to award injunctive relief.

### 12.2. *Investment Representation*.

Each Member represents and warrants to each other and to the Company he is acquiring his respective interest in the Company for his own personal account for investment, and without a view to transferring, reselling, or distributing such interests. In addition, no Member shall sell or dispose of his interest in the Company in a manner that violates any Federal or state securities laws. Each Member shall indemnify and hold the Company harmless from and against all liability, costs and expenses, including reasonable attorneys' fees, incurred by the Company or the Members, as a result of a breach of the representations and warranties made in this Section 12.2 by such Member.

### 12.3. *Entire Agreement.*

This Agreement constitutes the entire Agreement between the parties and may be modified only as provided herein. No representations or oral or implied agreements have been made by any party hereto or his agent, and no party to this Agreement relies upon any representation or agreement not set forth in it. This Agreement supersedes any and all other agreements, either oral or written, by and among the Company and its Members.

### 12.4. *Notices.*

All notices or other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given if (i) physically delivered, telephonically transmitted by telecopier or other similar means, (ii) one day after having been delivered to Federal Express or other delivery courier for next day delivery, with proof of delivery to the recipient received by the courier in the form of a signature of recipient, or (iii) three days after having been deposited in the United States Mail, as certified mail with return receipt requested and with postage prepaid, addressed to the Members at the addresses listed in Exhibit A. The addresses and other information so indicated for any Member may be changed by a Member by written notice to the Company.

### 12.5. *Further Execution.*

Upon request of the Manager from time to time, the Members shall execute and swear to or acknowledge any amended Articles and any other writing which may be required by any rule or law or which may be appropriate to the effecting of any action by or on behalf of the Company or the Members which has been taken in accordance with the provisions of this Agreement.

### 12.6. *Submission to Florida Jurisdiction*

During such time as any Member is not a resident of the Florida, such Member irrevocably designates any Manager as his agent to accept service of process in any action or proceeding brought by the Company or any party to this Agreement (but not any third party unless such Member is impleaded by the Company or a party to this Agreement) against him and arising out of this Agreement or any breach thereof. Such designation shall not be revoked by the act, death or incapacity of any Member and shall bind his heirs, personal representatives, successors and assigns. Any Manager accepting such service on behalf of a Member agrees to give such Member written notice thereof as soon as practicable.

### 12.7. *Binding Effect.*

This Agreement shall be binding upon and shall inure to the benefit of the parties, their successors and permitted assigns. None of the provisions of this Agreement shall be

construed as for the benefit of or as enforceable by any creditor of the Company or the Members or any other person not a party to this Agreement.

### 12.8. *Severability.*

The invalidity or unenforceability of any provision of this Agreement in a particular respect shall not affect the validity and enforceability of any other provision of this Agreement or of the same provision in any other respect.

### 12.9. *Captions.*

All captions are for convenience only, do not form a substantive part of this Agreement and shall not restrict or enlarge any substantive provisions of this Agreement.

### 12.10. *Counterparts.*

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which shall constitute one instrument. The Manager shall have custody of counterparts executed in the aggregate by all Members.

### 12.11. *Florida Law to Control.*

The validity and interpretation of, and the sufficiency of performance under, this Agreement shall be governed by Florida law.

The parties have executed this Agreement to be effective as of the date first above written.

MEMBER:

_____

Giselle Teixeira, as tenant by the entirety

_____

Ted Doukas, as tenant by the entirety

## APPENDIX A

As used in this Agreement, the following terms shall have the following meanings:

The "*Act*" means the Florida Revised Limited Liability Company Act, Chapter 605 of the Florida Statues, as from time to time amended.

"*Affiliate*" means (i) any person directly or indirectly controlling, controlled by or under common control with another person, (ii) a person owning or controlling 10% or more of the outstanding voting securities of such other person, (iii) any officer, director, member or partner of such person, or (iv) a person who is an officer, director, member, partner or holder of 10% or more of any of the voting interests of any person described in clauses (i) through (iii) of this sentence. In the case of an individual, the term shall further mean such individual's spouse, lineal descendants, lineal ancestor or siblings.

"*Agreement*" means this Operating Agreement and amendments adopted in accordance with this Agreement and the Act.

The "*Articles*" means the Articles of Organization, including any restatements or amendments, which are filed with the Department.

"*Capital Account*" is defined in Section 102 of Appendix B.

"*Capital Contributions*" means the amount of money or property, contributed or obligated to be contributed to the Company by a Member.

"*Cause*" means dishonesty, theft, intentional or gross misconduct, conviction of felony or gross neglect of duties.

The "*Code*" means the Internal Revenue Code of 1986, as amended.

"*Department*" means the Florida Department of State.

"*Distributable Cash*" means, at any time, that portion of the cash and cash equivalent assets of the Company which, in light of the Company's then current and foreseeable sources of, and needs for, cash, exceeds the amount of cash reasonably needed by the Company, as determined by the Members, to (i) service its debts and obligations in a timely fashion, (ii) maintain reasonable operating and capital reserves, and (iii) conduct its business and carry out its purposes.

"*Family Member*" means (i) Ted Doukas, (ii) Giselle Teixeira, (iii) a Member's lineal descendants, (iv) the spouse of a Member, and (v) trusts established for the exclusive benefit of the individuals described in (i) through (iv).

The "*Fiscal Year*" of the Company, and its taxable year for Federal income tax purposes, shall be the calendar year or such other year required under I.R.C. § 706.

"*Insolvent*" means (i) the inability of the Company to pay its debts as they become due in the usual course of business, or (ii) that the Company's assets are less than the sum of its liabilities plus (absent any contrary provisions in this Agreement) the amount which would be needed on distribution to satisfy any preferential rights of Members which are superior to the rights of any Members receiving a distribution.

"*Investments*" means the equity, investment or debt instrument held by the Company in a partnership, corporation, limited liability company, or real estate investment or business acquired by the Company.

"*Legal Representative*" means a Deceased Member's personal representative, executor, administrator, or other person acting in a similar capacity (or, if the Deceased Member's estate has been closed, and all of the estate's property distributed, the Deceased Member's heirs, legatees or distributees, or in the case of property held in a trust created by the Deceased Member, the trustee of such trust).

"*Majority Interest*" means those Members holding more than 50% of the Membership Percentages held by all the Members.

"*Manager or Managers*" mean one or more managers selected by the Members and their successors. The Manager of the Company at the time the Agreement is signed is Ted Doukas and he shall remain in that capacity unless he is removed or resigns pursuant to Section 5.

"*Members*" are the persons designated as such in Appendix C. Any reference to a Member, unless the context clearly requires otherwise, shall include a reference to his predecessor and successor (other than a mere assignee not made a substitute Member) in interest.

"*Membership Percentages*" means the Members' respective rights to share in allocations of Profits or Losses and in distributions in the Company as set forth in Appendix C, as amended from time to time.

*"Profits and Losses"* is defined in section 101 of Appendix B.

*"Revocable Trust"* means a self-settled trust (i) the assets of which are treated as owned by the settlor of such trust under IRC Section 676(a), and (ii) of which the grantor is a Trustee and the sole lifetime beneficiary. A Member's revocable trust shall qualify under this definition during any incapacity of the Member provided that the trust would have qualified as a Revocable Trust prior to such incapacitation.

*"Transfer"* means, when used as a noun, any sale, exchange, assignment, gift or other disposition of Membership Interests; and when used as a verb, to sell, exchange, assign, give or dispose of Membership Interests, as the context shall require, whether voluntarily or involuntarily, and whether absolutely or as a pledge of security, including, without limitation, to convey Membership Interests as a result of death, the foreclosure of a security interest in Membership Interests or any levy, or attachment; or the issuance of a charging order with respect to all or any portion of a Membership Interest.

*"Treasury Regulations"* means temporary and final Treasury regulations on Income Tax adopted by the United States Department of the Treasury under the Code and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

All references to statutory provisions shall be deemed to include reference to corresponding provisions of subsequent law.

## APPENDIX B

### 101. *Tax Regulatory Definitions.*
The following terms (a) shall have the meaning ascribed to them in this Section and (b) shall be interpreted in accordance with the Treasury Regulations.

*"Adjusted Deficit Capital Account Balance"* means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Company Fiscal Year, (1) increased by any amounts which such Member is obligated to restore under Treas. Reg. § 1.704-1(b)(2)(ii)(c), plus an amount equal to such Member's share of Company Minimum Gain and such Member's share of Member Nonrecourse Debt Minimum Gain and (2) decreased by the items described in Treas. Reg. § 1.704-1(b)(2)(ii)(d)(4), (5) and (6). This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treas. Reg. § 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

*"Book Value"* means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a) the initial Book Value of any asset contributed (or deemed contributed) to the Company shall be such asset's gross fair market value at the time of such contribution;

(b) the Book Value of all Company assets shall be adjusted to equal their respective gross fair market values at the times specified in Treasury Regulations under Code Section 704(b) if the Company so elects;

(c) if the Book Value of an asset has been determined pursuant to clause (a) or (b), such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

*"Company Minimum Gain"* means an amount determined in accordance with Treas. Reg. § 1.704-2(d) for partnership minimum gain by computing, with respect to each nonrecourse liability of the Company (as defined in Treas. Reg. § 1.752-1(a)(2)), the amount of gain (of whatever character), if any, that would be realized by the Company if (in a taxable transaction) it disposed of property subject to such liability in full satisfaction thereof, and by then aggregating the amounts so computed.

*"Depreciation"* means for each Fiscal Year of the Company or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable under the Code with respect to an asset for such year or other period, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Book Value using any reasonable method selected by the Members.

*"Member Nonrecourse Debt"* shall have the meaning, and be determined in the same manner as, partner nonrecourse debt pursuant to Treas. Reg. § 1.704-2(b)(4).

*"Member Nonrecourse Debt Minimum Gain"* means the amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability of the Company, determined in the same manner as partner nonrecourse debt minimum gain in accordance with Treas. Reg. § 1.704-2(i)(3).

*"Member Nonrecourse Deductions"* shall have the meaning, and be determined in the same manner as, partner nonrecourse deduction pursuant to Treas. Reg. § 1.704-2(i)(2).

*"Nonrecourse Deductions"* shall have the meaning set forth in Treas. Reg. § 1.704-2(c).

*"Profits and Losses"* means the Company's taxable income or loss for each Fiscal Year (or other period) determined in accordance with the accounting methods followed by the Company for federal income tax purposes (for this purpose all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703(a)(1) shall be included in taxable income or loss) as determined by the independent certified public accountants employed by the Company, with the following adjustments:

(a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss:

(b) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures under Code Section 704(b) and not otherwise taken into account in computing Profits and Losses shall be subtracted from such taxable income or loss;

(c) in the event the Book Value of any Company asset is adjusted, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d) any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property rather than its adjusted tax basis;

(e) in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period; and

(f) notwithstanding the foregoing, any items which are specially allocated pursuant to any part of this Article shall not be taken into account in computing Profits and Losses.

**102. *Maintenance of Capital Accounts.***

(a) Each Member's Capital Account shall be such Member's Capital Contribution made pursuant to this Article and, except as provided in subsections (c), (d) and (e) of this section, shall be:

(1) increased by:

(A) Profits allocated to such Member under section 5.2; and

(B) additional capital contributions by such Member (whether or not such additional capital contributions are required to be made by such Member); and

(2) decreased by:

(A) Losses (or item thereof) allocated to such Member under section 5.2; and

(B) the amount of Company distributions made to such Member under section 5.3.

(b) If property (other than cash) is contributed (or deemed contributed) under Section 708 of the Code by a Member to the Company, the computation of Capital Accounts, as set forth in subsection (a) of this section, shall be adjusted as follows:

(1) the contributing Member's Capital Account shall be increased by the fair market value of the property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or to which the property is taken subject under Code Section 752); and

(2) the adjustments required by Section 1.704-1(b)(2)(iv)(g) and (i) of the Regulations (relating to certain adjustments to reflect book value) shall be made to such Member's Capital Account.

(c) If property is distributed (or deemed distributed pursuant to the provisions of Code Section 708) by the Company to a Member, the following special rules shall apply:

(1) the Capital Accounts of the Members shall be adjusted as provided in Section 1.704-1(b)(2)(iv)(e) of the Regulations to reflect the manner in which the unrealized income, gain, loss and deduction inherent in such property (that has not already been reflected in the Members' Capital Accounts) would be allocated to such Member if there were a taxable disposition of such property for its fair market value on the date of distribution; and

(2) the Capital Account of the Member who is receiving the distribution of property from the Company shall be charged with the fair market value of the property at the time of distribution (net of liabilities secured by such distributed property that such Member is considered to assume, or to which the property is taken subject, under Code Section 752).

(d) The provisions of this section are intended to satisfy the capital account maintenance requirements of Section 1.704-1(b)(2)(iv) of the Regulations and such provisions shall be modified to the extent required by such section or any successor

provision thereto.

### 103. *Loss Limitation.*

The Losses allocated under Sections 5.2(a)(2) or (b)(2) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. If some but not all of the Members would have an Adjusted Deficit Capital Account Balance as a consequence of an allocation of Losses under Sections 5.2(a)(2) or 5.2(b)(2), the limitation set forth in this Section will be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). If all Members have Adjusted Deficit Capital Account Balances, Losses shall be allocated in accordance with Sections 5.2(a)(2) or 5.2(b)(2).

### 104. *Changes in Interests.*

If there is an addition, withdrawal or substitution of, or any other change in the interest of, any Member during the period covered by an allocation, then subject to any agreement between the persons affected, the Profits and Losses for the period shall be allocated among the varying interests consistent with the provisions of Code Section 706(d) and any regulations promulgated thereunder. If Code Section 706(d) or any regulation thereunder allow alternative methods of allocation, the Members shall determine, in its sole discretion, which alternative methods to use in allocating Profits and Losses among the varying interests.

### 105. *Compliance With Treasury Regulations.*

It is anticipated that the Company will be treated as a partnership for federal income tax purposes and, accordingly, the partnership tax provisions of the Code shall apply to the Company and its Members. It is the intent of the Members that each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined and allocated in accordance with Article 5 and this Appendix B to the fullest extent permitted by Section 704(b) of the Code. In order to preserve and protect the determinations and allocations provided for in Article 5 and this Appendix B, the Members are authorized and directed to allocate income, gain, loss, deduction, or credit (or item thereof) arising in any year differently than otherwise provided for in this Appendix B to the extent that allocating income, gain, loss, deduction, or credit (or item thereof) in the manner provided for in this Appendix B would cause the determinations and allocations of each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) not to be permitted by Section 704(b) of the Code and applicable Treasury Regulations. Any allocation made pursuant to this Section shall be deemed to be a complete substitute for any allocation otherwise provided for in Article 5 and no amendment of this Agreement or approval of any Member shall be required. The terms used in this Appendix B shall have the same meaning as in such Treasury Regulations.

### 106. *Only Required Modifications.*

In making any allocation (the "new allocation") under this Appendix B, the Members are authorized to act only after having been advised by the Company's accountants that, under Section 704(b) of the Code and the Treasury Regulations thereunder (i) the new allocation is necessary, and (ii) the new allocation is the minimum modification of the allocations otherwise provided for in this Appendix B necessary in order to assure that, either in the then current year or in any preceding year, each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) is determined and allocated in accordance with this Appendix B to the fullest extent permitted by Section 704(b) of the Code and the Treasury Regulations thereunder.

### 107. *Company Minimum Gain Chargeback.*

If there is a net decrease in Company Minimum Gain during a Company Fiscal Year so that an allocation is required by Treas. Reg. § 1.704-2(f), then each Member shall be specially allocated items of income and gain for such year (and, if necessary, subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain as determined by Treas. Reg. § 1.704-2(g)(2). Such allocations shall be made in a manner and at a time which will satisfy the requirements of Treas. Reg. § 1.704-2(f)(1) and shall be interpreted consistently therewith.

### 108. *Member Minimum Gain Chargeback.*

If there is a net decrease in the Member Nonrecourse Debt Minimum Gain during any Fiscal Year, any Member who has a share of such Member Nonrecourse Debt Minimum Gain (as determined in the same manner as partner nonrecourse debt minimum gain under Treas. Reg. § 1.704-2(i)(5)) shall be specially allocated items of income or gain for such year (and, if necessary, subsequent Fiscal Years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain in the manner and to the extent required by Treas. Reg. § 1.704-2(i)(4) and shall be interpreted consistently therewith.

### 109. *Qualified Income Offset.*

If a Member unexpectedly receives an adjustment, allocation, or distribution described in Treas. Reg. § 1.704-1(b)(2)(ii)(d)(4), (5) or (6), any of which causes or increases an Adjusted Deficit Capital Account Balance in such Member's capital account, then he will be specially allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance created or increased by such adjustment, allocation, or distribution as quickly as possible; provided, however, an allocation pursuant to this Section will be made if and only to the extent that such Member would have an Adjusted Deficit Capital Account Balance after all other allocations provided for in Article 5 and this Appendix B have been tentatively made as if this Section were not in the Agreement.

Page 26 of 29

**110. *Gross Income Allocation.***

If a Member has an Adjusted Deficit Capital Account Balance at the end of a Company taxable year, such Member shall be allocated items of income and gain in the amount of such Adjusted Deficit Capital Account Balance as quickly as possible in order to eliminate it.

**111. *Nonrecourse Deductions.***

Nonrecourse Deductions shall be allocated among the Members in proportion to their respective Membership Percentages.

**112. *Member Nonrecourse Deductions.***

Any Member Nonrecourse Deductions shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treas. Reg. § 1.704-2(i)(1).

**113. *Curative Allocations.***

If the Members are required by Sections 105, 107, 108, 109, 110, 111 or 112 of this Appendix B to make any new allocation in a manner other than as provided for in this Article without regard thereto, then the Members are authorized and directed, insofar as it is permitted to do so by Section 704(b) of the Code, to allocate income, gain, loss, deduction, or credit (or item thereof) arising in the current Fiscal Year (or subsequent Fiscal Years, if necessary) in such manner so as to bring the proportions of income, gain, loss, deduction, or credit (or item thereof) allocated to the Members as nearly as possible to the proportion otherwise contemplated by this Article without regard thereto; provided, however, that Nonrecourse Deductions shall not be taken into account except to the extent that there has been a reduction in Company Minimum Gain and Member Nonrecourse Deductions shall not be taken into account except to the extent that there has been a reduction in Member Minimum Gain and provided further that such Nonrecourse Deductions and Member Nonrecourse Deduction shall not in any event be taken into account to the extent that the Members reasonably determine that such allocations are likely to be offset by subsequent allocations under Sections 107 or 108 of this Appendix B.

**114. *Advice of Accountants.***

Allocations made by the Members under this Article in reliance upon the advice of the Company's accountants shall be deemed to be made pursuant to the fiduciary obligation of the Members to the Company and the Members.

**115.** *Section 754 Election.*

If an adjustment to the adjusted tax basis of any Company asset under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreased such basis). Such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Treasury Regulations.

**116.** *Imputed Interest.*

If any Member makes a loan to the Company, or the Company makes a loan to any Member, and interest in excess of the amount actually payable is imputed under Code Sections 7872, 483, or 1271 through 1288 or corresponding provisions of subsequent Federal income tax law, then any item of income or expense attributable to any such imputed interest shall be allocated solely to the Member who made or received the loan and shall be credited or charged to his capital account, as appropriate.

**117.** *Contributed Property.*

Income, gain, loss or deduction with respect to any property contributed by a Member shall, solely for tax purposes, be allocated among the Members, to the extent required by Code Section 704(c) and the related Treasury Regulations, to take account of the variation between the adjusted tax basis of such property and its Book Value at the time of contribution to the Company. If the Book Value of any Company property is adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv), subsequent allocations of income, gain, loss and deduction and the Book Value of such property shall be adjusted as provided in Code Section 704(c) and the related Treasury Regulations. The Members shall determine which alternative method of making the required allocations permitted under Treas. Reg. § 1.704-3 shall be used. Allocations under this subsection are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, or other items or distributions under any provision of this Agreement.

**118.** *Share of Excess Nonrecourse Liabilities.*

For purposes of calculating the Members' shares of "excess nonrecourse liabilities" of the Company (within the meaning of Treas. Reg. § 1.752-3(a)(3)), the Members intend that they be considered as sharing profits of the Company in proportion to their respective Membership Percentages.

## APPENDIX C

| **INITIAL** | **CAPITAL** | **MEMBERSHIP** |
| **MEMBER** | **CONTRIBUTION** | **PERCENTAGE** |

Ted Doukas and Giselle Teixeira, as   $1,000.00              100.00%*
tenants by the entirety

## 2015 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L14000084018

**Entity Name:** HERMES HIALEAH WAREHOUSE LLC

**Current Principal Place of Business:**

19202 CLOISTER LAKE LANE
BOCA RATON, FL 33498

**Current Mailing Address:**

19202 CLOISTER LAKE LANE
BOCA RATON, FL 33498 US

**FEI Number: NOT APPLICABLE**

**Name and Address of Current Registered Agent:**

GOLDSTEIN, GARY A ESQUIRE
1710 LANDS END ROAD
MANALAPAN, FL 33462 US

**FILED**
**Apr 20, 2015**
**Secretary of State**
**CC3010371351**

**Certificate of Status Desired:** No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                                    Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGRM |
| Name | DOUKAS, TED |
| Address | 19202 CLOISTER LAKE LANE |
| City-State-Zip: | BOCA RATON FL 33498 |

**EXHIBIT D**

Case: 3BCHI 2014003400256-LP   Document #: 1   Filed: 03/28/2022   Page 50 of 242   495

**MARGINAL NOTATION FORM**

LAUDERDALE COUNTY, MS Clerk's Office

Honorable CAROLYN MOONEY

| Instrument Type | Instrument# | Book | Page | Lot/SubDivision | Date | Deputy Clerk |
|---|---|---|---|---|---|---|
| RELEASE | 2019007957 | 2090 | 331 | LEGACY NO SUBDIVISION | 8/29/2019 | Conversion |

**EXHIBIT E**

This Instrument is Prepared By:

**Ted Doukas**
**Hermes Hialeah Warehouse, LLC.**
**4713 Villa Mare Lane**
**Naples, Florida 34103**
**516-589-0599**

Lauderdale County Mississippi
Chancery Clerk, Carolyn Mooney
Inst. 2016008343 8 DT   2833 P    455
SEPTEMBER  9 2016   10:48:00AM
Total   $    17.00

After Recording Return to:

**Ted Doukas**
**Hermes Hialeah Warehouse, LLC.**
**4713 Villa Mare Lane**
**Naples, Florida 34103**
**516-589-0599**



---

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

---

**STATE OF MISSISSIPPI**

                                    :ss

**COUNTY OF LAUDERDALE**

**THIS DEED OF TRUST COVERS GOODS WHICH ARE OR ARE TO BECOME FIXTURES, IS EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING AND IS TO BE FILED IN THE REAL ESTATE RECORDS**

| | |
|---|---|
| **Address of Grantor:** | 70 Split Rock Road, Syosset, New York 11791<br>Telephone: (631) 845-1200 |
| **Address of Grantee:** | 4713 Villa Mare Lane, Naples, Florida 34103<br>Telephone: (516) 589-0599 |
| **Address of Trustee:** | 1710 Lands End Road, Manalapan, Florida 33462<br>Telephone: (561) 373-0327 |

      **THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING** ("Deed of Trust") is made and entered into as of August ___, 2016, by and among **2 LISA COURT CORP.,** a New York Corporation with a principal place of business at 70 Split Rock Road, Syosset, New York 11791 ("Grantor") in favor of **GARY A. GOLDSTEIN,** as Trustee ("Trustee") and **HERMES HIALEAH**



**WAREHOUSE, LLC**, a Florida Limited Liability Company, with its principal place of business at 4713 Villa Mare Lane, Naples, Florida 34103 ("Lender")

# R E C I T A L S

Inst. 2016008343 B DT  2833 P   456

A.   Lender is the assignee of debt due and owing from Grantor which has been consolidated and memorialized in a Consolidated Promissory Note dated August 24, 2016, which has a principal balance due of Eight Hundred Thousand Dollars ($800,000.00) in accordance with the terms of said Consolidated Promissory Note.

B.   The Grantor is a Borrower under the Consolidated Promissory Note and, as such, is required by the Consolidated Promissory Note to execute and deliver this Deed of Trust as security for the Secured Obligations (as defined herein), which the Grantor is willing to do in consideration of the extended payout of the monies due Lender, as assignee, and the agreement of the Lender and the Grantor under the terms of the Consolidated Promissory Note.

NOW THEREFORE, in consideration of the above recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor irrevocably grants, mortgages, warrants, bargains, sells, pledges, remise, aliens, assigns, conveys, transfers and sets over to the Trustee, in trust, for the benefit of the Lender WITH POWER OF SALE, and with all other statutory rights and covenants and subject to the further terms of this Deed of Trust, all of the Grantor's right, title and interest in the following described property:

BEGINNING at the Northeast corner of Section 22, Township 6 North, Range 15 East, Lauderdale County, Mississippi, run thence South 0 degrees, 27 minutes 36 seconds East 1,827.7 feet along the second line to the North right of way of the Y & M V Railroad; run thence South 73 degrees 01 minutes 24 seconds West along the North right of way of the Y & M V Railroad 959.62 feet to the point of beginning of the land herein conveyed, which is the Southwest corner of the Shell Oil Company property; and from said beginning point run thence North 0 degrees 23 minutes 36 seconds West 1,388.67 feet; thence run South 89 degrees 36 minutes 24 seconds West 420 feet; thence South 0 degrees 23 minutes 36 seconds East 1,513.74 feet to the North right of way of the Y & M V Railroad; thence North 73 degrees 1 minute 24 seconds East 438.23 feet to the point of beginning, said property comprising 14.0 acres, more or less, and being in a part of the Northeast Quarter of Section 22, Township 6 North, Range 15 East, Lauderdale County, State of Mississippi.

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.   All replacements and additions shall also be covered by this Security Instrument.   All of the foregoing is referred to in this Security Agreement as the "Property".

TO HAVE AND TO HOLD the same, together will all privileges, hereditaments, easements, and appurtenances thereunto belonging, to the Trustee for the benefit of the Lander as security for the Secured Obligations.

Inst. 2016008343 B DT   2833 P   457

As additional security for the Secured Obligations, the Grantor hereby transfers and assigns to the Lender and grants to the Lender a security interest under the Uniform Commercial Code (as defined herein) in all right, title and interest of the Grantor in and to all of the following:

(1)     All security deposits, rents, issues, profits and revenues, including, without limitation, rights to payment earned under leases for any portion of the Improvements on the Premises from time to time accruing ("Rents and Profits") and all existing and future leases, subleases, licenses and other agreements for the use and occupancy of all or part of the Premises, together with all guarantees of the lessees' obligations thereunder ("Leases"), whether oral or written, for a definite term or month-to-month. This assignment shall extend to and cover any and all extensions and renewals and future Leases and to any and all present and future rights against guarantor(s) of any such obligations and to any and all Rents and Profits collected under the Leases or derived from the Premises. In pursuant of this assignment or not in lieu hereof, the Grantor shall, upon request from the Lender, execute and deliver to the Lender separate and specific assignments of rents and leases covering some or all of the Leases, the terms of such assignments being incorporated herein by reference. This assignment is absolute and effective immediately and without possession; however, the Grantor shall have a revocable license to receive, collect and enjoy the Rents and Profits accruing from the Premises until an Event of Default exists. During the existence of any Event of Default, the license shall be revoked automatically, without need of notice, possession, foreclosure or any other act or procedure, and all Rents and Profits assigned hereby shall thereafter be payable to Lender, PROVIDED ALWAYS, however, that if Borrowers, Guarantors or Grantor shall completely, fully and finally pay, perform, discharge and satisfy each and all of the Secured Obligations, then this assignment and the estates and interests hereby granted and created shall terminate.

.     (2)     All insurance policies and proceeds thereof, condemnation awards, any and all leases of personal property (including equipment leases), rental agreements, sales contracts, management contracts, franchise agreements, construction contracts, architects' contracts, technical services agreements and other contracts, licenses and permits now or hereafter affecting the Premises, all accounts with respect to the Premises (including rights to payment for goods sold or leased or to be sold or leased or for services rendered or to be rendered), escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the Uniform Commercial Code in effect in the State of Mississippi, as amended from time to time ("Uniform Commercial Code") and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications, designs, drawings, permits, licenses, contract rights (including, without limitation, any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair or other work upon the Premises, and any contract for management or any other provision of service in connection with the Premises), approvals, actions, refunds of real estate taxes and assessments and any other governmental impositions related to the Premises, approvals, actions and causes of action that now or hereafter relate to, are derived from or are used in connection with the Premises, or the use, operation, maintenance, occupancy or enjoyment thereafter or the conduct of any business or activities thereon ("Intangible Personalty") or any part thereof, and the Grantor agrees to execute and deliver to the Lender such

additional instruments, in form and substance reasonably satisfactory to the Lender, as may hereafter be reasonably requested by the Lender to evidence and confirm said assignment; provided, however, that acceptance of such assignment shall not be construed as a consent by the Lender to use any lease, rental agreement, management, contract, franchise agreement, construction contract, technical services agreement or other contract, license or permit, or to impose upon the Lender any obligation with respect thereto.

(3)     All proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

All the Tangible Personalty that comprises a part of the Premises, shall, as far as permitted by law, be deemed to be "fixtures" affixed to the aforesaid Land and conveyed therewith. As to the balance of the Tangible Personalty and the Intangible Personalty, this Deed of Trust shall be considered to be a security agreement that creates a security interest in such items for the benefit of the Lender. In that regard, the Grantor grants to the Lender all of the rights and remedies of a secured party under the Uniform Commercial Code and grants to the Lender a security interest in all of the Tangible Personalty and Intangible Personalty.

The Grantor, and by acceptance hereof the Trustee and Lender, covenant, represent and agree as follows:

## ARTICLE I
## SECURED OBLIGATIONS

Section 1.01.  *Secured Obligations*.  This Deed of Trust secures all of the following, whether now existing or hereafter incurred ("Secured Obligations"): all of the Obligations, now existing or hereafter arising pursuant to the Loan Documents, owing from any Loan Party to the Lender, howsoever evidenced, created, incurred or acquired, whether primary, secondary, direct, contingent, or joint and several, including without limitation, all liabilities arising upon Swap Agreements between any Loan Party and any Lender or Affiliate of a Lender, all obligations under and liabilities incurred in connection with collecting and enforcing the foregoing. The Secured Obligations, if not sooner paid, shall be due and payable no later than August 24, 2021.

Section 1.02.  *Future Advances*.  Pursuant to the Consolidated Promissory Note and the other Loan Documents, the Lender may advance or loan additional sums ("Future Advances") to the Borrowers. This Deed of Trust shall secure not only existing indebtedness, but also such Future Advances, with interest thereon as provided in the Consolidated Promissory Note, whether such advances are obligatory or to be made at the option of the Lender or otherwise, to the same extent as if such Future Advances were made on the date of the execution of this Deed of Trust.

**ARTICLE II**    Inst. 2016008343 8 DT   2833 P   459
**GRANTORS COVENANTS, REPRESENTATIONS AND AGREEMENTS**

*Section 2.01.  Title to Premises.*  The Grantor represents and warrants to the Lender that (i) it is the fee simply owner of that tract or parcel of land and other real property interests described above, and is the owner of the balance of the Premises and has the right to convey the same; (ii) that as of the date hereof title to the Premises is free and clear of all encumbrances except for matters of record as referenced in the description of the Property above, and such other matters as are expressly permitted by the Consolidated Promissory Note ("Permitted Encumbrances").  The Grantor shall warrant and defend the title to the Premises except for the Permitted Encumbrances against the claims of all Persons.

*Section 2.02.  Taxes and Other Charges.*  The Grantor will pay all taxes, general and special assessments, insurance premiums, permit fees, inspection fees, license fees, water and sewer charges, franchise fees and equipment rents and any other charges or fees against it or the Premises (and the Grantor, upon request by the Lender, will submit to the Lender receipts evidencing said payments) in accordance with the Consolidated Promissory Note.

*Section 2.03.  Reimbursement.*  The Grantor agrees that if it shall fail to pay on or before the date that same become delinquent any tax, assessment or charge levied or assessed against the Premises (except to the extent the Grantor is contesting such tax, assessment, or levy), or any utility charge, whether public or private, or any insurance premium, or if it shall fail to procure the insurance coverage and the delivery of the insurance certificates, required hereunder, or if it shall fail to pay any other charge or fee described herein, then the Lender, at its option, may pay or procure the same and will give the Grantor prompt notice of any such expenditures.  The Grantor will reimburse the Lender upon demand for any sums of money paid by the Lender pursuant to this section together with interest on each such payment at the applicable default rate of interest set forth in the Consolidated Promissory Note, and all such sums and interest thereon shall be secured hereby.

*Section 2.04.  Additional Documents.*  The Grantor agrees to execute and deliver to the Lender, concurrently with the execution of this Deed of Trust and upon the request of the Lender from time to time hereafter, all financing statements and other documents reasonably required to perfect and maintain the security interest created hereby.  The Grantor hereby irrevocably makes, constitutes and appoints the Lender as the true and lawful attorney of the Grantor to sign the name of the Grantor on any financing statement, continuation of financing statement, or similar document required to perfect or continue such security interests.

*Section 2.05.  Sale or Encumbrance.*   Except as permitted by the Consolidated Promissory Note, the Grantor will not sell, encumber or otherwise dispose of any Tangible Personalty except to incorporate such into the Improvements or replace such with goods of quality and value at least equal to that replaced.  In the event the Grantor sells or otherwise disposes of any of the Tangible Personalty in contravention of the foregoing sentence, the Lender's security interest in the proceeds of the Tangible Personalty shall continue pursuant to this Deed of Trust.

Inst. 2016008343 B DT   2833 P   460

Section 2.06.  *Fees and Expenses*.  The Grantor will promptly pay upon demand any and all reasonable costs and expenses of the Lender, (a) as required under the Consolidated Promissory Note and (b) as necessary to protect the Premises, the Rents and Profits or the Intangible Personalty or to exercise any rights or remedies under this Deed of Trust or with respect to the Premises, Rents and Profits or Intangible Personalty.  All of the foregoing costs and expenses shall be Secured Obligations.

Section 2.07.  *Maintenance of Premises*.  The Grantor will abstain from and will not permit the commission of waste in or about the Premises and will maintain, or cause to be maintained (subject to reconstruction periods after the occurrence of an Act of God), the Premises in good condition and repair for its intended purposes, reasonable wear and tear excepted.

Section 2.08.  *Insurance*.  The Grantor shall maintain insurance for the Premises.  In addition, if any part of the Improvements is located in an area having "special flood hazards" as defined in the Federal Flood Disaster Protection Act of 1973, a flood insurance policy as may be required by law naming the Lender as mortgagee must be submitted to the Lender.  The policy must be in such amounts, covering such risks and liabilities and with such deductibles or self-insurance retentions as are in accordance with normal industry practice.

Section 2.09.  *Eminent Domain*.  The Grantor assigns to the Lender any proceeds or awards that become due by reason of any condemnation or other taking for public use of the whole or any part of the Premises or any rights appurtenant thereto to which the Grantor is entitled; provided, that in the absence of an Event of Default, proceeds received in respect of a taking shall be paid and applied in accordance with the terms of the Consolidated Promissory Note.  The Grantor agrees to execute such further assignments and agreements as may be reasonably required by the Lender to assure the effectiveness of this section.  In the event any Governmental Authority shall require or commence any proceedings for the demolition of any buildings or structures comprising a part of the Premises, or shall commence any proceedings to condemn or otherwise take pursuant to the power of eminent domain a material portion of the Premises, the Grantor shall promptly notify the Lender of such requirement or commencement of proceedings for demolition, condemnation, or taking.

Section 2.10.  *Releases and Waivers*.  The Grantor agrees that no release by the Lender of any portion of the Premises, the Rents and Profits or the Intangible Personalty, no subordination of any Lien, no forbearance on the part of the Lender to collect on the Secured Obligations, or any part thereof, no waiver of any right granted or remedy available to the Lender and no action taken or not taken by the Lender shall in any way have the effect of releasing the Grantor from full responsibility to the Lender for the complete discharge of each and every of the Grantor's obligations hereunder, except to the extent of such release or waiver.

Section 2.11.  *Licenses*.  All material certifications, permits, licenses and approvals, including, without limitation certificates of completion and occupancy, licenses, permits required for the legal use, occupancy and operation of the Premises have been obtained and are in full force and effect.  The Premises is free of material damage and is in good repair, and to Grantor's

Inst. 2016008343 B DT   2933 P   461

knowledge there is no proceeding pending for the total or partial condemnation of, or affecting the Premises.

### Section 2.12.  *Assignment of Leases and Grantor Collection of Rents and Profits*.

(a)      The Grantor hereby authorizes and directs any lessees or tenants of the Premises that, upon written notice from the Lender, all Rents and Profits from all payments required under the Leases, or in any way respecting same, shall be made directly to the Lender as they become due.  The Grantor hereby relieves said lessees and tenants from any liability to the Grantor by reason of said payments being made to the Lender.  Nevertheless, until the Lender notifies in writing said lessees and tenants to make such payments to the Lender, the Grantor shall be entitled to collect all such Rents and Profits and/or payments.  The Lender is hereby authorized to give such notification during the existence of any Event of Default.

(b)      Any and all Rents and Profits collected by the Lender shall be applied in the manner set forth in the Consolidated Promissory Note.  Receipt by the Lender of such Rents and Profits shall not constitute a waiver of any right that the Lender may enjoy under this Deed of Trust, the Consolidated Promissory Note or under the laws of the State of Mississippi nor shall the receipts and application thereof cure any default hereunder nor affect any foreclosure proceeding or any sale authorized by this Deed of Trust, the Consolidated Promissory Note and the laws of the State of Mississippi.

### Section 2.13.  *Security Agreement*.

(a)      Insofar as the fixtures and articles of personal property either referred to or described in this Deed of Trust are in any way connected with the use and enjoyment of the Premises, this Deed of Trust is hereby made and declared to be a security agreement, encumbering each and every item of personal property included herein, in compliance with the provisions of the Uniform Commercial Code as enacted in the State of Mississippi.  A financing statement or statements reflecting the grant of security interest by this Deed of Trust and affecting all of said personal property may be filed by Lender without, to the extent permitted by applicable law, Grantors signature thereon.  The mention in any such financing statement(s) of the rights in and to (i) the proceeds of any fire or hazard insurance policy or (ii) any award in eminent domain proceedings for taking or for loss of value or (iii) the Grantor's interest as lessor in any present or future lease or rights to income growing out of use or occupancy of the Premises shall never be construed an in any manner altering any rights of the Grantor or Lender as determined by the Consolidated Promissory Note or this instrument or impugning the priority of the Lender's Lien granted hereby or by any other recorded document, but such mention in such financing statement(s) is declared to be for the protection of the Lender in the event any court shall at any time hold with respect to the foregoing (i) or (ii) or (iii) that for the priority of the Lender's security interest to be effective against a particular class of persons, notice of such security interest must be filed in the Uniform Commercial Code records, provided, that if there is a conflict between the terms of this paragraph and the terms of the Security Agreement, the Security Agreement shall govern.  The remedies for any violation of the covenants, terms and conditions of the security agreement herein contained shall be (A) as prescribed herein or in the Security Agreement or the other Loan Documents or (B) as prescribed by general law or by the specific statutory consequences now or hereafter enacted and specified in said Uniform Commercial Code, at the Lender's sole election.

Inst. 2016008343 B DT   2833 P   462

(b)      The Grantor warrants that the names and addresses set forth in the first paragraph hereof may be used on such financing statements and a statement indicating the types, or describing the items, of Collateral, is set forth hereinabove.  The location of the Collateral which is Tangible Personalty is upon the Land.  The Grantor agrees to furnish the Lender with notice of any change in the name, identity, company structure, residence, principal place of business or mailing address of the Lessor or the Grantor within ten (10) days of the effective date of any such change and the Grantor will promptly execute and/or deliver any financing statements or other instruments deemed necessary by the Lender to prevent any filed financing statement from becoming misleading or losing its effective status.

*Section 2.14.   Fixture Filing*.   It is intended by Grantor and Lender that this Deed of Trust be effective as a financing statement filed with the real estate records of Lauderdale County, Mississippi as a fixture filing.  For the purpose of this filing, the "Debtor" is the Grantor and the "Secured Party" is the Lender.  A description of the Land which relates to the fixtures is set forth above.  Grantor is the record owner of the Land.

### ARTICLE III
### EVENT OF DEFAULT

*Section 3.01.   Event of Default*.   An event of default ("Event of Default") shall exist under the terms of this Deed of Trust during the existence of an Event of Default under the terms of the Consolidated Promissory Note.

### ARTICLE IV
### ACCELERATION; FORCLOSURE

*Section 4.01.   Acceleration of Secured Obligations*.   During the existence of an Event of Default, the Lender may declare the entire balance of all or any portion of the Secured Obligations, including all accrued interest to be immediately due and payable, as provided in the Consolidated Promissory Note.

*Section 4.02.   Foreclosure*.
(a)      During the existence of an Event of Default and otherwise in compliance with the Consolidated Promissory Note, the Lender may foreclose or cause the Trustee to foreclose the Lien of this Deed of Trust by judicial or nonjudicial proceeding in a manner permitted by applicable law. The Grantor acknowledges that the power of sale herein granted may be exercised by the Lender without prior judicial hearing.  The Grantor hereby waives any statutory right of redemption in connection with such foreclosure proceeding.

(b)      If the Lender invokes the power of sale, the Trustee shall send to the Grantor, in the manner provided herein, notice of the Lender's election to cause the Premises to be sold. The Trustee shall give notice of sale and shall sell the Premises according to the laws of the State of Mississippi.  The Trustee may sell the Premises at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as the Trustee may determine.  The Trustee may postpone the sale of all or any parcel of the Premises by public

Inst. 2016008343 B DT   2833 P   463

announcement at the time and place of any previously scheduled sale. The Lender or the Lender's designee may purchase the Premises at any sale.

(c)      The Trustee shall deliver to the purchaser a Trustee's deed conveying the Premises so sold without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of statements made therein.

(d)      The Grantor waives the provisions of Section 89-1-55 of the Mississippi Code of 1972, as amended, if amended, as far as this section restricts the right of the Trustee to offer at sale more than 160 acres at a time, and the Trustee may offer the Premises herein conveyed as a whole, regardless of who it is described.

*Section 4.03.  Proceeds of Sale.*  Following a foreclosure sale, the proceeds of such sale shall, subject to applicable law, be applied in accordance with the Consolidated Promissory Note.

*Section 4.04.  Delivery of Possession After Foreclosure.*  In the event there is a foreclosure sale hereunder and at the time of such sale, the Grantor or the Grantor's heirs, devisees, representatives, successors or assigns are occupying or using the Premises, or any part thereof, each and all immediately shall become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day to day, terminable at the will of either landlord or tenant, at a reasonable rental per day based on the value of the property occupied, such rental to be due daily to the purchaser, and to the extent permitted by applicable law, the purchaser at such sale, notwithstanding any language herein to the contrary, shall have the sole option to demand possession immediately following the sale or to permit the occupants to remain as tenants at will. In the event the tenant fails to surrender possession of said property upon demand, the purchaser shall be entitled to institute and maintain a summary action for possession of the property (such as an action for forcible detainer) in any court having jurisdiction.

## ARTICLE V
## ADDITIONAL RIGHTS AND REMEDIES OF LENDER

*Section 5.01.  Rights Upon Maturity or an Event of Default.*  During the existence of an Event of Default, the Lender, immediately and without additional notice and without liability therefor to the Grantor and to the extent permitted by law, except for its own gross negligence or willful misconduct, may do or cause to be done any or all of the following: (a) take physical possession of the Premises; (b) exercise its right to collect the Rents and Profits; (c) enter into contracts for the completion, repair and maintenance of the Improvements thereon; (d) expend loan funds and any income or Rents and Profits derived from the Premises for payment of any taxes, insurance premiums, assessments and charges for completion, repair and maintenance of the Improvements, preservation of the Lien of this Deed of Trust and satisfaction and fulfillment of any liabilities or obligations of the Grantor arising out of or in any way connected with the construction of this Deed of Trust; (e)  enter into leases demising the Premises or any part

Inst. 2016008343 8 DT   2833 P   464

thereof; (f) take such steps to protect and enforce the specific performance of any covenant, condition or agreement in the Note, this Deed of Trust, the Consolidated Promissory Note or the other Loan Documents, or to aid the execution of any power herein granted; (g) generally supervise, manage and contract with reference to the Premises as if the Lender were equitable owner of the Premises; (h) seek the appointment of a Receiver as provided in Section 5.02 below; (i) exercise any or all of the remedies available to a secured party under the Uniform Commercial Code, including, but not limited to, selling, leasing or otherwise disposing of any fixtures or personal property which is encumbered hereby at public sale, with or without having such fixtures or personal property at the place of sale, and upon such terms and in such manner as the Lender may determine; (j) exercise any or all of the remedies of a Secured Party under the Uniform Commercial Code with respect to the Tangible Personalty and Intangible Personalty, and (k) enforce any or all of the assignments or collateral assignments made in this Deed of Trust as additional security for the Secured Obligations. The Grantor also agrees that any of the foregoing rights and remedies of the Lender may be exercised at any time independently of the exercise of any other such rights and remedies, and the Lender may continue to exercise any or all such rights and remedies until the Event(s) of Default are cured and such cure has been acknowledged in writing by the Lender or waived in writing by the Lender or until foreclosure and the conveyance of the Premises or until the Secured Obligations are satisfied or paid in full and all Commitments are terminated.

Section 5.02. *Appointment of Receiver*. If any of the Secured Obligations are not paid upon maturity or during the existence of an Event of Default, the Lender as a matter of right shall be entitled to the appointment of a Receiver or receivers for all or any part of the Premises, to take possession of and to operate the Premises, and to collect the rents, issues, profits and income thereof, all expenses of which shall become Secured Obligations, whether such receivership be incident to a proposed sale (or sales) of such property, or otherwise, and without regard to the value of the Premises or the solvency of an Person or Persons liable for the payment of any Secured Obligations, and, to the extent permitted by applicable law, the Grantor hereby irrevocably consents to the appointment of such receiver or receivers, waives any and all defenses to such appointment, and agrees not to oppose any application therefor by the Lender. Nothing herein is to be construed to deprive the Lender of any other right, remedy or privilege it may have under the law to have a receiver appointed. Any money advanced by the Lender in connection with any such receivership shall be a demand obligation (which obligation the Grantor hereby promises to pay) owing by the Grantor to the Lender pursuant to this Deed of Trust.

Section 5.03. *Waivers*. No waiver of any Event of Default shall at any time thereafter be held to be a waiver of any rights of the Lender stated anywhere in the Note, this Deed of Trust, the Consolidated Promissory Note or any of the other Loan Documents (except to the extent of such waiver), nor shall any waiver of a Prior Event of Default operate to waive any subsequent Event of Default. All remedies provided in this Deed of Trust, in the Note, in the Consolidated Promissory Note and in the other Loan Documents are cumulative and may, at the election of the Lender, be exercised alternatively, successively, or in any matter and are in addition to any other rights provided by law.

Inst. 2016008343 B DT   2833 P   465

*Section 5.04.  Marshalling.*  The Grantor hereby waives, in the event of foreclosure of this Deed of Trust or the enforcement by the Lender of any other rights and remedies hereunder, any right otherwise available to it with regard to the marshalling of its assets which secure the Loan and any other indebtedness secured hereby or to require the Lender to pursue its remedies against any other such assets.

*Section 5.05.  Protection of Premises.*  If Grantor fails to perform the covenants and agreements contained in this Deed of Trust, the Consolidated Promissory Note, or any of the other Loan Documents, and such failure continues beyond any applicable grace periods, except in the case of an emergency in which event Lender may act immediately, then Lender may take such actions, including, but not limited to disbursements of such sums, as Lender in its sole reasonable discretion deems necessary to protect Lender's interest in the Premises.

## ARTICLE VI
## GENERAL CONDITIONS

*Section 6.01.  Terms.*  The singular used herein shall be deemed to include the plural, the masculine deemed to include the feminine and neuter, and the named parties deemed to include their heirs, successors and assigns.  The term "Lender" shall include any of the Persons identified as a "Lender" on the signature pages to the Consolidated Promissory Note, and any Person that may become a Lender by way of assignment in accordance with the terms of the Consolidated Promissory Note, together with their successors and permitted assigns.

*Section 6.02.  Notices.*  All notices and other communications required to be given hereunder shall have been duly given if given in accordance with the requirements of the Consolidated Promissory Note.  All notices or other communications to Trustee hereunder shall be given in accordance with the requirements of the Consolidated Promissory Note to:

> Hermes Hialeah Warehouse, LLC
> 4713 Villa Mare Lane
> Naples, Florida 34103

*Section 6.03.  Severability.*  If any provision of this Deed of Trust is determined to be illegal, invalid or unenforceable, such provision shall be fully severable and the remaining provisions shall remain in full force and effect and shall be construed without giving effect to the illegal, invalid or unenforceable provisions.

*Section 6.04.  Headings; Recitals.*  The captions and headings herein are inserted as a matter of convenience and for reference and in no way define, limit or describe the scope of this Deed of Trust nor the intent of any provision hereof.  The Recitals set forth above are incorporated herein.

*Section 6.05.  Conflicting Terms.*  In the event the terms and conditions of this Deed of Trust conflict with the terms and conditions of the Consolidated Promissory Note, the terms and conditions of the Consolidated Promissory Note shall control and supersede the provisions of this Deed of Trust with respect to such conflicts.

Inst. 2016008343 B DT   2833 P   466

Section 6.06.   *Governing Law*.  This Deed of Trust shall be governed by and construed in accordance with the laws of the State of Mississippi, without regard to conflicts of laws principles.

Section 6.07.   *Application of the Foreclosure Law*.  If any provision in this Deed of Trust shall be inconsistent with any provision of the foreclosure laws of the State of Mississippi, the provisions of such laws shall take precedence over the provisions of this Deed of Trust, but shall not invalidate or render unenforceable any other provision of this Deed of Trust that can be construed in a manner consistent with such laws.

Section 6.08.   *WRITTEN AGREEMENT*

(a)     **THE RIGHTS AND OBLIGATIONS OF THE GRANTOR AND THE LENDER SHALL BE DETERMINED SOLELY FROM THIS WRITTEN DEED OF TRUST AND THE OTHER LOAN DOCUMENTS, AND ANY PRIOR ORAL OR WRITTEN AGREEMENTS BETWEEN THE LENDER AND THE GRANTOR CONCERNING THE SUBJECT MATTER HEREOF AND OF THE OTHER LOAN DOCUMENTS ARE SUPERSEDED BY AND MERGED INTO THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS.**

(b)     **THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS MAY NOT BE VARIED BY ANY ORAL AGREEMENTS OR DISCUSSIONS THAT OCCUR BEFORE, CONTEMPORANEOUSLY WITH OR SUBSEQUENT TO THE EXECUTION OF THIS DEED OF TRUST OR THE OTHER LOAN DOCUMENTS.**

(c)     **THIS WRITTEN DEED OF TRUST AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENTS BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Section 6.09.   *WAIVER OF JURY TRIAL*.  **EACH PARTY TO THIS DEED OF TRUST HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS DEED OF TRUST OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRSENTED EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Inst. 2016008343 8 OT  2833 P  467

*Section 6.10.  Substitution of Trustee.*  If, for any reason, with or without cause, the Lender shall elect to substitute a Trustee for the trustee herein named (or for any successor to said trustee), the Lender shall have the right to appoint a Successor Trustee(s), which appointment may be effected without conveyance of the Premises, and except where required by applicable law, without the need to execute or record any instrument evidencing such appointment. Each new Trustee shall immediately upon such appointment become successor in title to the Premises for the uses and purposes of this Deed of Trust, without conveyance of the Premises, with all the powers, duties and obligations conferred on the Trustee in the same manner and to the same effect as though he were named herein as the Trustee. If more than one Trustee has been appointed, each of such Trustee and each Successor thereto shall be and hereby is empowered to act independently.

*Section 6.11.  Release.*  Upon payment of all sums secured hereby, the Lender or the Trustee shall cancel this Deed of Trust. If the Trustee is required to cancel this Deed of Trust, all notes evidencing the indebtedness secured hereby shall be surrendered to the Trustee. The Grantor shall pay the Trustee's or Lender's reasonable costs incurred in canceling this Deed of Trust

IN WITNESS WHEREOF, the Grantor has executed this Deed of Trust on the date of acknowledgment below to be effective as of the above written date.

**GRANTOR:**

2 LISA COURT CORP.

by: Ted Doukas, as its President

## ACKNOWLEDGEMENT

STATE OF FLORIDA

:ss

COUNTY OF COLLIER

Personally appeared before me, the undersigned Notary Public in and for said County and State on this ⟨6⟩ day of September, 2016, the within named Ted Doukas, who acknowledged himself/herself to be the President of 2 LISA COURT CORP., and in that representative capacity executed the above and foregoing instrument in such capacity and on behalf of 2 LISA COURT CORP., and did so of his own free act and deed.



LAUREN PEREZ
Notary Public - State of Florida
Commission # GG 016216
My Comm. Expires Jul 27, 2020

Notary Public
My Commission Expires: July 27th, 2020.

Page **13** of **13**

This instrument was prepared by and return to:

Ted Doukas

4713 Villa Mare Lane

Naples, Florida 34103

(516) 589-0599

Indexing instructions:

NE ¼ of Section 22, T6N, R15E

Lauderdale, Mississippi

---

STATE OF MISSISSIPPI

COUNTY OF LAUDERDALE     **QUITCLAIM DEED**

Lauderdale County Mississippi
Chancery Clerk, Carolyn Mooney
Inst. 2016009343 B D    2826 P    488
OCTOBER   10 2016   08:02:00AM
Total  $    12.00

For and in consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency whereof is hereby acknowledged, that 2 LISA COURT CORP., a New York Corporation, 70 Split Rock Road, Syosset, NY 11791 (516) 589-0599

Grantor, do hereby convey and quitclaim unto, Hermes Hialeah Warehouse LLC, Grantee, a Florida limited liability company 4713 Villa Mare Lane, Naples FL 34103 33498 (516) 589-0599

the following described property lying and being situated in Lauderdale County, Mississippi, to-wit:

Beginning at the Northeast corner of Section 22, Township 6 North, Range 15 East, Lauderdale County, Mississippi, run thence South 0 degrees 27 minutes 36 seconds East 1,827.7 feet along the section line tc the North right of way of the Y & M V Railroad; run thence South 73 degrees 01 minutes 24 seconds West along the North right of way of the Y & M V Railroad 959.62 feet to the point of beginning of the land herein conveyed, which is the Southwest corner of the Shell Oil Company property; and from said beginning point run thence North 0 degrees 23

**EXHIBIT F**

Case 3:22-cv-00215-TSL-MTP   Document 1-1   Filed 04/21/22   Page 67 of 100
Case: 38CH1:22-cv-00256-LP   Document #: 1   Filed: 03/23/2022   Page 65 of 242
Inst. 2016009343 B D    2826 P    489

minutes 36 seconds West 1,388.67 feet; thence run South 89 degrees 36 minutes 24 seconds West 420 feet; thence South 0 degrees 23 minutes 36 seconds East 1,513.74 feet to the North right of way of the Y & M VF Railroad; thence North 73 degrees 1 minute 24 seconds East 438.23 feet to the point of beginning, said property comprising 14.0 acres, more or less, and being a part of the Northeast Quarter of Section 22, Township 6 North, Range 15 East, Lauderdale County, State of Mississippi.

TED DOUKAS FOR 2 LISA
COURT CORP

STATE OF FLORIDA

COUNTY OF

     Personally appeared before me, the undersigned notary public in and for said county and state aforesaid, on this     day of October, 2016 within my jurisdiction, the within named, who acknowledged before me that he executed the above and foregoing instrument on behalf of the corporate grantor, whom he is duly authorized to act on behalf of.

Notary Public

DUKENS PIERRE
Notary Public - State of Florida
Commission # FF980030
My Comm. Expires Apr 7, 2020

From: Recepcion 103    Fax: (305) 252-5505    To:    Fax: (850) 617-6383    Page 2 of 6  06/22/2018 1:47 PM



**Florida Department of State**
Division of Corporations
Electronic Filing Cover Sheet

Note: Please print this page and use it as a cover sheet. Type the fax audit number (shown below) on the top and bottom of all pages of the document.

(((H18000186361 3)))



H18000186361 3ABC1

Note: DO NOT hit the REFRESH/RELOAD button on your browser from this page. Doing so will generate another cover sheet.

```
To:
        Division of Corporations
        Fax Number    : (850)617-6383

From:
        Account Name  : VALEZAR & ASSOCIATES
        Account Number : I20150000092
        Phone         : (305)252-5505
        Fax Number    : (888)346-7187

**Enter the email address for this business entity to be used for future
  annual report mailings. Enter only one email address please.**

        Email Address:_____
```

## LLC AMND/RESTATE/CORRECT OR M/MG RESIGN
## HERMES HIALEAH WAREHOUSE LLC

| | |
|---|---|
| Certificate of Status | 0 |
| Certified Copy | 0 |
| Page Count | 01 |
| Estimated Charge | $25.00 |

Electronic Filing Menu        Corporate Filing Menu        Help

JUN 2 5 2018
J. HARRIS

**EXHIBIT G**

From: Reception 103    Fax: (305) 252-5505    To:1    Fax  (850) 817-6383    Page  3  of  6  06/22/2018 1:47 PM

H I8000 I8605 I 3

## COVER LETTER

**TO:**    **Registration Section**
           **Division of Corporations**

           Hennes Hialeah Warehouse LLC
**SUBJECT:** _____
                    Name of Limited Liability Company

The enclosed Articles of Amendment and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

                    Mirtha Almanzar
           _____
                            Name of Person

                    Valezar & Associates
           _____
                            Firm/Company

                    12485 SW 137th Ave Ste-206
           _____
                                Address

                    Miami, FL 33186
           _____
                        City/State and Zip Code

                    mirtha@valezar.com
           _____
                    E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

Mirtha Almanzar                              305        252-5505
_____  at ( ___ ) _____
        Name of Person                       Area Code    Daytime Telephone Number

Enclosed is a check for the following amount:

☒ $25.00 Filing Fee    ☐ $30.00 Filing Fee &      ☐ $55.00 Filing Fee &       ☐ $60.00 Filing Fee,
                          Certificate of Status        Certified Copy              Certificate of Status &
                                                        (additional copy is enclosed)   Certified Copy
                                                                                    (additional copy is enclosed)

           **MAILING ADDRESS:**              **STREET/COURIER ADDRESS:**
           Registration Section              Registration Section
           Division of Corporations          Division of Corporations
           P.O. Box 6327                      Clifton Building
           Tallahassee, FL 32314             2661 Executive Center Circle
                                             Tallahassee, FL 32301

From: Reception 103      Fax: (305) 252-5505      To      Fax: (850) 817-6383      Page 4 of 8 08/22/2018 1:47 PM

H18000186361 3 **ARTICLES OF AMENDMENT**
**TO**
**ARTICLES OF ORGANIZATION**
**OF**

Hermes Hialeah Warehouse LLC
<u>(Name of the Limited Liability Company as it now appears on our records.)</u>
(A Florida Limited Liability Company)

The Articles of Organization for this Limited Liability Company were filed on <u>05/23/2014</u>                and assigned
Florida document number <u>L14000084018</u>           .

This amendment is submitted to amend the following:

A. If amending name, <u>enter the new name of the limited liability company here</u>:

The new name must be distinguishable and contain the words "Limited Liability Company," the designation "LLC" or the abbreviation "L.L.C."

**Enter new principal offices address, if applicable:**

*(Principal office address MUST BE A STREET ADDRESS)*

**Enter new mailing address, if applicable:**

*(Mailing address MAY BE A POST OFFICE BOX)*

B. If amending the registered agent and/or registered office address on our records, <u>enter the name of the new</u>
<u>registered agent and/or the new registered office address here</u>:

Name of New Registered Agent:

New Registered Office Address:
Enter Florida street address

                                , Florida
City                                              Zip Code

New Registered Agent's Signature, if changing Registered Agent:

*I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent as provided for in Chapter 605, F.S. Or, if this document is being filed to merely reflect a change in the registered office address, I hereby confirm that the limited liability company has been notified in writing of this change.*

If Changing Registered Agent, <u>Signature of New Registered Agent</u>

Page 1 of 3

H18000186361 3

From: Reception 103      Fax: (305) 252-5505            To:            Fax: (850) 817-6383          Page 5 of 8  06/22/2018 1:47 PM

**If amending Authorized Person(s) authorized to manage, <u>enter the title, name, and address of each person  being added or removed from our records</u>:**

**MGR =   Manager**
**AMBR = Authorized Member**

| <u>Title</u> | <u>Name</u> | <u>Address</u> | <u>Type of Action</u> |
|---|---|---|---|
| MGMR | Hellenic Petroleum LLC | 7000 W Palmetto Park RD | ☒ Add |
| | | Suite 302 | ☐ Remove |
| | | Boca Raton, FL 33433 | ☐ Change |
| | | | ☐ Add |
| | | | ☐ Remove |
| | | | ☐ Change |
| | | | ☐ Add |
| | | | ☐ Remove |
| | | | ☐ Change |
| | | | ☐ Change |
| | | | ☐ Add |
| | | | ☐ Remove |
| | | | ☐ Change |
| | | | ☐ Add |
| | | | ☐ Remove |
| | | | ☐ Change |

H 1 8000 18 63613

From: Reception 103     Fax: (305) 252-5505     To:     Fax: (850) 617-6383     Page 6 of 8   06/22/2018 1:47 PM

**D. If amending any other information, enter change(s) here:** *(Attach additional sheets, if necessary.)*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**E. Effective date, if other than the date of filing:** _____ (optional)

(If an effective date is listed, the date must be specific and cannot be prior to date of filing or more than 90 days after filing.) Pursuant to 605.0207 (3)(b)
**Note:** If the date inserted in this block does not meet the applicable statutory filing requirements, this date will not be listed as the document's effective date on the Department of State's records.

If the record specifies a delayed effective date, but not an effective time, at 12:01 a.m. on the earlier of:
(b)   The 90th day after the record is filed.

Dated _OG- 21 · 201 8·_

_____

Signature of a member or authorized representative of a member

Helleris Petroleum LLC

Typed or printed name of signee

**Page 3 of 3**

**Filing Fee: $25.00**

H 18000 186 361 3

## 2018  FLORIDA LIMITED LIABILITY COMPANY AMENDED ANNUAL REPORT

DOCUMENT# L14000084018

**Entity Name:** HERMES HIALEAH WAREHOUSE LLC

**Current Principal Place of Business:**

4713 VILLA MARE LANE
NAPLES, FL  34103

**Current Mailing Address:**

4713 VILLA MARE LANE
NAPLES, FL  34103  US

**FEI Number: APPLIED FOR**

**Name and Address of Current Registered Agent:**

DOUKAS, TED
4713 VILLA MARE LANE
NAPLES, FL  34103  US

**FILED**
**Oct 05, 2018**
**Secretary of State**
**CC6824963643**

**Certificate of Status Desired:** No

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:  TED DOUKAS                                                    10/05/2018

Electronic Signature of Registered Agent                                Date

**Authorized Person(s) Detail :**

Title               MGRM

Name             DOUKAS, TED

Address          4713 VILLA MARE LANE

City-State-Zip:  NAPLES  FL  34103

**EXHIBIT H**

## 2019 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L14000084018

**Entity Name:** HERMES HIALEAH WAREHOUSE LLC

**FILED**
**Apr 30, 2019**
**Secretary of State**
**0313772576CC**

**Current Principal Place of Business:**

4713 VILLA MARE LANE
NAPLES, FL 34103

**Current Mailing Address:**

4713 VILLA MARE LANE
NAPLES, FL 34103 US

**FEI Number: APPLIED FOR**

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

DOUKAS, TED
4713 VILLA MARE LANE
NAPLES, FL 34103 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:  TED DOUKAS                                                                04/30/2019

       Electronic Signature of Registered Agent                                              Date

**Authorized Person(s) Detail :**

Title             MGRM

Name           DOUKAS, TED

Address        4713 VILLA MARE LANE

City-State-Zip:  NAPLES FL 34103

# EXHIBIT I

9/19/2019



Florida Department of State
Division of Corporations
Electronic Filing Cover Sheet

---

**Note: Please print this page and use it as a cover sheet.** Type the fax audit number
(shown below) on the top and bottom of all pages of the document.

(((H19000281494 3)))

H190002814943ABC5

**Note: DO NOT** hit the REFRESH/RELOAD button on your browser from this page.
Doing so will generate another cover sheet.

---

To:
      Division of Corporations
      Fax Number      : (850)617-6383

From:
      Account Name    : VALEZAR & ASSOCIATES
      Account Number  : I20150000092
      Phone           : (305)252-5505
      Fax Number      : (888)346-7187

**\*\*Enter the email address for this business entity to be used for future
annual report mailings. Enter only one email address please.\*\***

      Email Address:_____

---

## LLC AMND/RESTATE/CORRECT OR M/MG RESIGN
## HERMES HIALEAH WAREHOUSE LLC

| | |
|---|---|
| Certificate of Status | 0 |
| Certified Copy | 0 |
| Page Count | 04 |
| Estimated Charge | $25.00 |

SEP 20 2019

M. SOLOMON

Electronic Filing Menu      Corporate Filing Menu        Help

**EXHIBIT J**

H190002814943

## COVER LETTER

TO:     Registration Section
        Division of Corporations

SUBJECT:     Hermes Ibaleud Warehouse LLC
        _____
             Name of Limited Liability Company

The enclosed Articles of Amendment and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

             Cynthia Vazquez
        _____
                    Name of Person

             Valezar & Associates
        _____
                    Firm/Company

             12435 SW 137th Ave
        _____
                    Address

             Suite 206
        _____
                    City/State and Zip Code

             martha@valezar.com
        _____
             E-mail address (to be used for future annual report notification)

For further information concerning this matter, please call:

Martha Almanza                   305      252-5505
_____     at _____
        Name of Person           Area Code    Daytime Telephone Number

Enclosed is a check for the following amount:

☎ $25.00 Filing Fee    ☐ $30.00 Filing Fee &    ☐ $35.00 Filing Fee &    ☐ $60.00 Filing Fee,
                          Certificate of Status      Certified Copy           Certificate of Status &
                                                      (additional copy is enclosed)   Certified Copy
                                                                                (additional copy is enclosed)

MAILING ADDRESS:                    STREET/COURIER ADDRESS:
Registration Section                Registration Section
Division of Corporations            Division of Corporations
P.O. Box 6327                       Clifton Building
Tallahassee, FL 32314               2661 Executive Center Circle
                                    Tallahassee, FL 32301

H190002814943

From: Cynthia Mangual   Fax 1-305-757-8245   To: Document #: 1   Fax 4-28-2019 4:38 PM

H190002814943

# ARTICLES OF AMENDMENT
## TO
## ARTICLES OF ORGANIZATION
### OF

Hermes Hialeah Warehouse LLC
_____
(Name of the Limited Liability Company as it now appears on our records.)
(A Florida Limited Liability Company)

The Articles of Organization for this Limited Liability Company were filed on 05/23/2014 _____ and assigned
Florida document number L14000083018

This amendment is submitted to amend the following:

**A.** If amending name, **enter the new name of the limited liability company here:**

_____
The new name must be distinguishable and contain the words "Limited Liability Company," the designation "L.L.C" or the abbreviation "L.L.C."

Enter new principal offices address, if applicable:          7000 West Palmetto Park Rd
*(Principal office address MUST BE A STREET ADDRESS)*       Suite 302

                                                            Boca Raton, FL 33433

Enter new mailing address, if applicable:                   7000 West Palmetto Park Rd
*(Mailing address MAY BE A POST OFFICE BOX)*                Suite 302

                                                            Boca Raton, FL 33433

**B.** If amending the registered agent and/or registered office address on our records, **enter the name of the new registered agent and/or the new registered office address here:**

Name of New Registered Agent:        Valezar & Associates Inc
_____

New Registered Office Address:       12485 SW 137th Ave Ste-206
_____
                                     *Enter Florida street address*

                                     Miami _____. Florida 33186
                                            Cit.                                Zip Code

**New Registered Agent's Signature, if changing Registered Agent:**

*I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent as provided for in Chapter 605, F.S. Or, if this document is being filed to merely reflect a change in the registered office address, I hereby confirm that the limited liability company has been notified in writing of this change.*

_____
If Changing Registered Agent, Signature of New Registered Agent

Page 1 of 3

H190002814943



H19000281494З

If amending Authorized Person(s) authorized to manage, enter the title, name, and address of each person being added or removed from our records:

MGR = Manager
AMBR = Authorized Member

| Title | Name | Address | Type of Action |
|---|---|---|---|
| AMBR | Hellenic Petroleum LLC | 7000 West Palmetto Park Rd | ■ Add |
| | | Suite 302 | ☐ Remove |
| | | Boca Raton, FL 33433 | ☐ Change |
| MGRM | Ted Doukas | 4713 Villa Mare Lane | ☐ Add |
| | | Naples, FL 34103 | ■ Remove |
| | | | ☐ Change |
| | | | ☐ Add |
| | | | ☐ Remove |
| | | | ☐ Change |
| | | | ☐ Add |
| | | | ☐ Remove |
| | | | ☐ Change |
| | | | ☐ Add |
| | | | ☐ Remove |
| | | | ☐ Change |
| | | | ☐ Add |
| | | | ☐ Remove |
| | | | ☐ Change |

2019 SEP 19 PM 2:51

H19000281494З

H19000281494 3

D. If amending any other information, enter change(s) here: *(Attach additional sheets, if necessary.)*
FIN Number 47-2279947

2019 SEP 19 PM 2:51

E. Effective date, if other than the date of filing: ______________________ (optional)
(If an effective date is listed, the date must be specific and cannot be prior to date of filing or more than 90 days after filing.) Pursuant to 605.0207 (3)(b)
Note: If the date inserted in this block does not meet the applicable statutory filing requirements, this date will not be listed as the document's effective date on the Department of State's records.

If the record specifies a delayed effective date, but not an effective time, at 12:01 a.m. on the earlier of:
(b) The 90th day after the record is filed.

Dated 09/19/2019

Signature of a member or authorized representative of a member

Typed or printed name of signee: Managing Director

Filing Fee: $25.00

H19000281494 3

Lauderdale County Mississippi
Chancery Clerk, Carolyn Mooney
Inst. 2019009364 B DT   3007 P   55
OCTOBER  28 2019   12:27:00PM
Total   $    46.00

**Prepared by:**

William S. Mendenhall (MSB #2869)
Baker Donelson Bearman Caldwell &
Berkowitz, PC
100 Vision Drive, Ste. 400
Jackson, Mississippi 39211
(601) 969-4647

**Return to:**

William S. Mendenhall
Baker Donelson Bearman Caldwell &
Berkowitz, PC
100 Vision Drive, Ste. 400
Jackson, Mississippi 39211
(601) 969-4647

**INDEXING INSTRUCTIONS:**  Part of the NE 1/4 of Section 22, Township 6 North, Range 15 East, Lauderdale County, State of Mississippi.

**This Deed of Trust serves as a fixture filing under the Mississippi Uniform Commercial Code.**

## DEED OF TRUST, SECURITY AGREEMENT, FIXTURE FILING AND ASSIGNMENT OF LEASES AND RENTS

THIS DEED OF TRUST, SECURITY AGREEMENT, FIXTURE FILING AND ASSIGNMENT OF LEASES AND RENTS (this "Deed of Trust") is made as of October ___, 2019, by **HERMES HIALEAH WAREHOUSE, LLC**, a Florida limited liability company, as grantor ("Grantor"), whose address and phone number are 7000 W Palmetto Park Rd, Suite 302, Boca Raton, FL 33433 (561)931-2196 , to William S. Mendenhall, as trustee ("Trustee"), for the benefit of **GFE NY, LLC**, a New York limited liability company, its successors and assigns, as beneficiary ("Beneficiary"), whose address and phone number are 27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101, (347) 809-6111.

### WITNESSETH:

**WHEREAS**, pursuant to a certain Merchant Agreement by and between Grantor and Beneficiary dated of even date herewith, the provisions of which are incorporated herein by reference to the same extent as if fully set forth herein (with any and all extensions and renewals thereof, amendments thereto and substitutions and replacements therefor is referred to herein as the "Merchant Agreement," and any terms not defined herein shall have the meanings ascribed to such terms in the Merchant Agreement), Beneficiary has agreed to purchase from Grantor and Hellenic Petroleum, LLC, a Florida limited liability company ("Hellenic" and collectively with Grantor "Merchant"),  all of Merchant's  future accounts, contract rights and other entitlements

1

4840-1500-0745v3

## EXHIBIT K

arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business, for payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount of $1,521,540.00, (the "Purchased Amount") has been delivered by or on behalf of Merchant to Beneficiary (the foregoing, together with all other obligations and responsibilities created under the Merchant Agreement, the "Obligations"). The Obligations are finally due and payable in full on July 27, 2020 (the "Maturity Date, except as such date may be accelerated pursuant to the terms hereof or of any other Document (as hereinafter defined) or as may be extended pursuant to the terms of the Merchant Agreement. This Deed of Trust encumbers certain real estate located in Lauderdale County, Mississippi, legally described on Exhibit A attached hereto, and payment of the Obligations is secured by this Deed of Trust, financing statements and other security documents. This Deed of Trust, the Merchant Agreement, and all other documents evidencing or securing the Obligations (as amended, modified, replaced or restated from time to time) are collectively referred to as the "Documents."

**WHEREAS**, Grantor is owned by or is under common control with Hellenic, and Grantor acknowledges that Grantor will benefit financially and receive substantial consideration and substantially equal value from Hellenic's execution and performance of the Merchant Agreement;

**NOW, THEREFORE**, to secure (i) the payment and performance by Hellenic of the Obligations, (ii) the performance and observance of the covenants and agreements contained in this Deed of Trust, the Merchant Agreement, and any and all other Documents, Grantor does hereby irrevocably GRANT, BARGAIN, SELL, CONVEY, TRANSFER, WARRANT, ASSIGN, PLEDGE and CONFIRM unto Trustee, its successors and assigns, in trust, with the Power of Sale, for the benefit of Beneficiary, and its successors and assigns, a security interest in, all and singular the right, title and interest of Grantor in and to the properties, rights, interests and privileges, whether now owned or hereafter acquired, described in Granting Clauses I, II, III, IV, V, VI, VII, VIII and IX below, all of same being collectively referred to herein as the "Trust Property":

## GRANTING CLAUSE I:

THE LAND located in Lauderdale County, Mississippi, which is legally described on **Exhibit A** attached hereto and made a part hereof (the "Land").

## GRANTING CLAUSE II:

TOGETHER WITH all buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Land, including all extensions, additions, improvements, betterments, renewals, substitutions and replacements to or for any such buildings, structures and improvements and all of the right, title and interest of Grantor now or hereafter acquired in and to any of the foregoing, including without limitation those certain improvements to be constructed on the Land in accordance with the Merchant Agreement (the "Improvements").

2

Inst. 2019009364 B DT   3007 P   57

### GRANTING CLAUSE III

TOGETHER WITH all easements, rights of way, strips and gores of land, streets, ways, alleys, sidewalks, vaults, passages, sewer rights, waters, water courses, water drainage and reservoir rights and powers (whether or not appurtenant), all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments, easements, franchises, appendages and appurtenances whatsoever, in any way belonging, relating or appertaining to the Land or the Improvements, whether now owned or hereafter acquired by Grantor, including, without limitation, all existing and future mineral, oil and gas rights which are appurtenant to or which have been used in connection with the Land, all existing and future water stock relating to the Land or the Improvements, all existing and future share of stock respecting water and water rights pertaining to the Land or the Improvements or other evidence of ownership thereof, and the reversions and remainders thereof (the "Appurtenant Rights").

### GRANTING CLAUSE IV

TOGETHER WITH all machinery, apparatus, equipment, fittings and fixtures of every kind and nature whatsoever, and all furniture, furnishings and other personal property now or hereafter owned by Grantor and forming a part of, or used or obtained for use in connection with, the Land or the Improvements or any present or future operation, occupancy, maintenance or leasing thereof; including, but without limitation, any and all heating, ventilating and air conditioning equipment and systems, antennae, appliances, apparatus, awnings, basins, bathtubs, bidets, boilers, bookcases, cabinets, carpets, communication systems, coolers, curtains, dehumidifiers, dishwashers, disposals, doors, drapes, drapery rods, dryers, ducts, dynamos, elevators, engines, equipment, escalators, fans, fittings, floor coverings, furnaces, furnishings, furniture, hardware, heaters, humidifiers, incinerators, lighting, machinery, motors, ovens, pipes, plumbing and electric equipment, pool equipment, pumps, radiators, ranges, recreational facilities and equipment, refrigerators, screens, sprinklers, stokers, stoves, shades, shelving, sinks, security systems, toilets, ventilators, wall coverings, washers, windows, window covering, wiring, and all extensions, renewals or replacements thereof or substitutions therefor or additions thereto, whether or not the same are or shall be attached to the Land or the Improvements in any manner (collectively, the "Fixtures"); it being agreed that all of said property owned by Grantor and placed on the Land or on or in the Improvements (whether affixed or annexed thereto or not) shall, so far as permitted by law, conclusively be deemed to be real property and conveyed hereby for purposes of this Deed of Trust.

### GRANTING CLAUSE V

TOGETHER WITH the following:

All personal property of every nature whatsoever now or hereafter owned by Grantor or used in connection with the Land or the improvements thereon, including all extensions, additions, improvements, betterments, renewals, substitutions and replacements thereof and all of the right, title and interest of Grantor in and to any such personal property together with the benefit of any deposits or payments now or hereafter made on such personal property by Grantor or on its behalf, including, without limitation, any and all Goods, Investment Property, Instruments, Chattel Paper, Documents, Letter of Credit Rights, Accounts, Deposit Accounts, Commercial

3

Tort Claims and General Intangibles, each as defined in the Uniform Commercial Code of the State of Mississippi and all of Grantor's and Hellenic's future accounts, accounts receivable, contract rights and other entitlements arising from or relating to the payment of monies from Grantor's customers' and those of Hellenic, and/or other third party payors, of Grantor or Hellenic, wherever located, which are now or in the future owned by Grantor or Hellenic and used or obtained for use in connection with the Land or the Improvements, or otherwise, or any present or future operation, occupancy, maintenance or leasing thereof, or any construction on or at the Land or the Improvements, or otherwise.

All proceeds of the foregoing, including, without limitation, all judgments, awards of damages and settlements hereafter made resulting from condemnation proceeds or the taking of the Land or improvements thereon or any portion thereof under the power of eminent domain, any proceeds of any policies of insurance, maintained with respect to the Land or improvements thereon or proceeds of any sale, option or contract to sell the Land or improvements thereon or any portion thereof.

Any and all additions and accessories to all of the foregoing and any and all proceeds (including proceeds of insurance, eminent domain or other governmental takings and tort claims), renewals, replacements and substitutions of all of the foregoing.

All of the books and records pertaining to the foregoing (all of the foregoing items listed in this Granting Clause V collectively being referred to as the "Personal Property").

### GRANTING CLAUSE VI

TOGETHER WITH all right, title and interest which Grantor hereafter may acquire in and to all leases and other agreements now or hereafter entered into for the occupancy or use of the Land, the Appurtenant Rights, the Improvements, the Fixtures and the Personal Property (herein collectively referred to as the "Premises") or any portion thereof, whether written or oral (herein collectively referred to as the "Leases"), and all rents, issues, incomes and profits in any manner arising thereunder (herein collectively referred to as the "Rents"), and all right, title and interest which Grantor now has or hereafter may acquire in and to any bank accounts, security deposits, and any and all other amounts held as security under the Leases, reserving to Grantor any statutory rights.

### GRANTING CLAUSE VII

TOGETHER WITH any and all Awards and Insurance Proceeds, as each are hereinafter respectively defined, or proceeds of any sale, option or contract to sell the Premises or any portion thereof (provided that no right, consent or authority to sell the Trust Property or any portion thereof shall be inferred or deemed to exist by reason hereof); and Grantor hereby authorizes, directs and empowers the Beneficiary, at its option, on Grantor's behalf, or on behalf of the successors or assigns of Grantor, to adjust, compromise, claim, collect and receive such proceeds; to give acquittances therefor; and, after deducting expenses of collection, including reasonable attorneys' fees, costs and disbursements, to apply the Net Proceeds, as hereinafter defined, to the extent not utilized for the Restoration of the Trust Property as provided in Section 7 or 8 hereof, to payment of the Obligations, notwithstanding the fact that the same may not then

4

be due and payable or that the Obligations are otherwise adequately secured; and Grantor agrees to execute and deliver from time to time such further instruments as may be requested by the Beneficiary to confirm such assignment to the Beneficiary of any such proceeds.

## GRANTING CLAUSE VIII

TOGETHER WITH all estate, right, title and interest, homestead or other claim or demand, as well in law as in equity, which Grantor now has or hereafter may acquire of, in and to the Premises, or any part thereof, and any and all other property of every kind and nature from time to time hereafter (by delivery or by writing of any kind) conveyed, pledged, assigned or transferred as and for additional security hereunder by Grantor or by anyone on behalf of Grantor to the Beneficiary.

## GRANTING CLAUSE IX

TOGETHER WITH all rights and interests of Grantor in and under any and all service and other agreements relating to the development, operation, management, maintenance and repair of the Trust Property or the buildings located thereon whether now owned by Grantor or hereafter acquired or arising.

TO HAVE AND TO HOLD the Trust Property, unto the Trustee, and its successors and assigns, in trust, for the benefit of Beneficiary, IN FEE SIMPLE forever; subject, however, to those encumbrances which the Beneficiary has approved in the Merchant Agreement or has otherwise approved in writing (the "Permitted Exceptions").

UPON CONDITION that, subject to the terms hereof and until the occurrence of an Event of Default hereunder, Grantor shall be permitted to possess and use the Trust Property.

SUBJECT to the covenants and conditions hereinafter set forth.

PROVIDED, NEVERTHELESS, that if Grantor shall pay and perform in full when due the Obligations and shall duly and timely perform and observe all of the covenants and conditions herein and in the other Documents required to be performed and observed by Grantor, then the Beneficiary and/or Trustee shall execute and deliver to Grantor such instruments as may be reasonably requested by Grantor which are sufficient to reconvey this Deed of Trust.

GRANTOR FURTHER COVENANTS AND AGREES AS FOLLOWS:

1.    Representations of Grantor. Grantor hereby represents and warrants to the Beneficiary as follows:

(a)    Grantor (i) is a limited liability company duly formed and validly existing under the laws of the State of Florida, and has complied with all conditions prerequisite to its doing business in the State of Mississippi; (ii) has the power and authority to own its property and to carry on its business as now being conducted; (iii) is qualified to do business in every jurisdiction in which the nature of its business or its property makes

5

such qualification necessary; and (iv) is in compliance with all laws, regulations, ordinances and orders of public authorities applicable to it.

(b)    Grantor has good and marketable title to an indefeasible fee simple estate in the Premises, subject to no liens, charges or encumbrances, other than the Permitted Exceptions; that it has good, right and lawful authority to mortgage the Trust Property in the manner and form herein provided; that this Deed of Trust is and shall remain a valid and enforceable lien on the Trust Property subject only to the Permitted Exceptions; that Grantor and its successors and assigns shall defend the same and the priority of this lien forever against the lawful claims and demands of all persons whomsoever, and that this covenant shall not be extinguished by any foreclosure hereof but shall run with the Land.

(c)    As of the date hereof, there has been no material change in the financial condition of Grantor or any Guarantor from that set forth in Grantor's most recent financial statement, and, to the best of Grantor's knowledge, the financial statements of such Guarantor, and the financial information contained therein was true and correct on the date the statements were issued and there has been no material adverse change as of the date hereof.

(d)    There are no suits or proceedings pending, or to the knowledge of Grantor, threatened against or affecting Grantor, which, if adversely determined, would have a material adverse effect on the financial condition or business of Grantor or its ability to perform its obligations under this Deed of Trust or any of the other Documents executed by it, and there are no proceedings by or before any court, governmental commission, board, bureau, or other administrative agency pending or, to the knowledge of Grantor, threatened against Grantor, which, if adversely determined, would have a material adverse effect on the financial condition or business of Grantor or its ability to perform its obligations under this Deed of Trust or any of the other Documents executed by it.

(e)    The Trust Property complies with all requirements of law, municipal ordinances and restrictions and covenants of record with respect to the Trust Property and the use thereof.

(f)    Grantor has and shall maintain title to the collateral for the Obligations, including any additions or replacements thereto, free of all security interests, liens and encumbrances, other than the security interest hereunder.

(g)    No person who owns twenty percent (20%) or more of the equity interests in Grantor, or otherwise controls Grantor or any of its subsidiaries, is listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, and the proceeds of the Obligations will not violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto.

(h)    Grantor is able to pay its debts as such debts become due, and has capital sufficient to carry on its present businesses and transactions and all businesses and

6

Inst. 2019009364 8 DT   3007 P   61

transactions in which it is about to engage. Grantor (i) is not bankrupt or insolvent, (ii) has not made an assignment for the benefit of its creditors, (iii) has not had a trustee or receiver appointed, (iv) has not had any bankruptcy, reorganization or insolvency proceedings instituted by or against it, or (v) shall not be rendered insolvent by its execution, delivery or performance of the Documents or by the transactions contemplated thereunder.

2.      Grantor's Covenants.

        (a)     Payment and Performance of Obligations. Grantor shall, prior to the expiration of any grace period: (i) pay and perform the Obligations when due, and (ii) duly and punctually perform and observe all of the covenants and conditions to be performed or observed by Grantor as provided in the Merchant Agreement, this Deed of Trust and the other Documents.

        (b)     Repair/Maintenance. Grantor shall (i) promptly repair, restore, replace or rebuild any portion of the Premises which may be damaged or destroyed whether or not Insurance Proceeds (as hereinafter defined) are available or sufficient for that purpose, provided that if any Insurance Proceeds are available, Beneficiary has made such Insurance Proceeds available to Grantor pursuant to and in accordance with the terms of this Deed of Trust; (ii) keep the Premises in good condition and repair, free from waste; (iii) pay all operating costs and expenses of the Premises when due; (iv) comply with all legal requirements applicable to all or any portion of the Premises, or the use and occupancy, thereof (subject to the right of Grantor to contest the enforceability or applicability of any such legal requirements in good faith, diligently and at its expense by appropriate proceedings which shall not subject Grantor, the Beneficiary or the Trustee to any risk of civil or criminal liability and which shall operate during the pendency thereof to prevent the imposition or foreclosure of any lien upon, or any interference with the availability, use or occupancy of, the Trust Property or any part thereof), and observe and comply with any conditions and requirements necessary to preserve and extend any and all rights, licenses, permits (including, without limitation, zoning variances, special exceptions and nonconforming uses), privileges, franchises and concessions that are applicable to all or any portion of the Premises or the use and occupancy thereof; (v) refrain from any action, and correct any condition known to Grantor, which would materially increase the risk of fire or other hazard to the Premises or any portion thereof; and (vi) cause the Premises to be managed in a competent and professional manner.

        (c)     Alteration of Trust Property. Without the prior written consent of the Beneficiary, Grantor shall not cause, suffer or permit (i) any material alteration of the Premises, except as required by any applicable legal requirement or as otherwise provided for in the Merchant Agreement; (ii) any change in the zoning classification or intended use or occupancy of the Premises, including, without limitation, any change which would increase any fire or other hazard; (iii) any change in the identity of Grantor or the person or entity responsible for managing the Premises; or (iv) any modification of the licenses, permits, privileges, franchises, covenants, conditions or declarations of use

7

Inst: 2019009364 B DT   3007 P   62

applicable to the Premises, except as required to operate the Premises in the manner required hereunder.

(d)     [Reserved.]

(e)     <u>Continuing Existence</u>. Grantor, without the prior written consent of the Beneficiary, shall not (i) permit itself to be dissolved or its existence terminated, or (ii) amend or modify its organizational documents if such amendment or modification could have a material adverse effect on (A) Grantor's ability to perform its obligations under any of the Documents, or (B) the validity or priority of the Beneficiary's liens or security interests under the Documents.

(f)     <u>Compliance with Laws</u>. Grantor shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental authority or court applicable to Grantor or to the Premises or any part thereof.

(g)     <u>Operating and Reserve Accounts</u>. To the extent required by the Merchant Agreement, Grantor shall maintain the operating, escrow, reserve and other accounts, if any, for the Premises with the Beneficiary and shall pledge the same to Beneficiary as additional security for the Obligations.

3.     <u>Liens, Contest and Defense of Title</u>.

(a)     Grantor shall not create or suffer or permit any lien, charge or encumbrance to attach to or be filed against the Trust Property or any part thereof, or interest thereon, or any other rights and properties conveyed, mortgaged, transferred and granted hereunder, whether such lien, charge or encumbrance is on a parity, inferior or superior to the lien of this Deed of Trust, including liens for labor or materials with respect to the Premises ("<u>Mechanic's Liens</u>").

(b)     Notwithstanding paragraph (a) of this Section, Grantor may in good faith and with reasonable diligence contest the validity or amount of any Mechanic's Liens and defer payment and discharge thereof during the pendency of such contest, provided that: (i) such contest shall prevent the sale or forfeiture of the Trust Property, or any part thereof or any interest therein, to satisfy such Mechanic's Liens and shall not result in a forfeiture or impairment of the lien of this Deed of Trust; and (ii) within ten (10) days after Grantor has been notified of the filing of any such Mechanic's Liens, Grantor shall have notified the Beneficiary in writing of Grantor's intention to contest such Mechanic's Liens, or to cause such other party to contest such Mechanic's Liens, and shall have obtained a title insurance endorsement over such Mechanic's Liens in form and substance reasonably satisfactory to the Beneficiary, insuring the Beneficiary against loss or damage by reason of such Mechanic's Liens; provided that in lieu of such title insurance endorsement Grantor may deposit and keep on deposit with the Beneficiary (or such depositary as may be designated by the Beneficiary) a sum of money sufficient, in the judgment of the Beneficiary, to pay in full such Mechanic's Liens and all interest thereon. Any such deposits are to be held without any allowance of interest and may be used by the Beneficiary in its sole discretion to protect the priority of this Deed of Trust. In case

8

Case 3:22-cv-00215-TSL-MTP   Document 1-1   Filed 04/21/22   Page 88 of 100
Case: 38CH1:22-cv-00256-LP   Document #: 1   Filed: 03/23/2022   Page 86 of 242

Inst. 2019009364 B DT   3007 P   63

Grantor shall fail to maintain such title insurance or deposit, or to prosecute or cause the prosecution of such contest with reasonable diligence, or to pay or cause to be paid the amount of the Mechanic's Lien, plus any interest finally determined to be due upon the conclusion of such contest; then the Beneficiary may, at its option, apply any money and liquidate any securities then on deposit with the Beneficiary (or other depositary designated by the Beneficiary) in payment of or on account of such Mechanic's Liens, or that part thereof then unpaid, together with all interest thereon according to any written bill, notice or statement, without inquiring into the amount, validity or enforceability thereof. If the amount of money so deposited shall (in the Beneficiary's reasonable judgment) be insufficient for the payment in full of such Mechanic's Liens, together with all interest thereon, then Grantor shall forthwith, upon demand, deposit with Beneficiary (or other depositary designated by Beneficiary) the sum which shall (in Beneficiary's reasonable judgment, when added to the funds then on deposit with Beneficiary) be necessary to make such payment in full (or such other security as shall be reasonably satisfactory to Beneficiary). If a Mechanic's Lien claim is ultimately resolved in the claimant's favor, then the monies so deposited shall be applied in full payment of such Mechanic's Lien or that part thereof then unpaid, together with all interest thereon (provided no Event of Default shall then exist) when Beneficiary has been furnished with satisfactory evidence of the amount of payment to be made. Any excess monies remaining on deposit with Beneficiary (or other depositary) under this Section 3(b) shall be paid to Grantor, provided that no Event of Default shall then exist.

(c)     If the lien and security interest of Beneficiary in or to the Trust Property, or any part thereof, shall be endangered or shall be attacked, directly or indirectly, Grantor shall immediately notify Beneficiary and shall appear in and defend any action or proceeding purporting to affect the Trust Property, or any part thereof, and shall file and prosecute such proceedings and take all actions necessary to preserve and protect such title, lien and security interest in and to the Trust Property.

4.     Payment and Contest of Taxes.

(a)     Grantor shall pay or cause to be paid when due and before any penalty attaches, all general and special taxes, assessments, water charges, sewer charges, and other fees, taxes, charges and assessments of every kind and nature whatsoever levied or assessed against the Trust Property, or any part thereof, or any interest therein, or any income or revenue therefrom, or any obligation or instrument secured hereby, and all installments thereof (collectively, the "Taxes"), on or before the date such Taxes are due; and Grantor shall discharge any claim or lien relating to Taxes upon the Premises. Grantor shall provide Beneficiary with copies of paid receipts for Taxes, if requested by Beneficiary, within ten (10) days after being requested to do so by Beneficiary.

(b)     Notwithstanding paragraph (a) of this Section, Grantor may, in good faith and with reasonable diligence, contest or cause to be contested the validity or amount of any such Taxes, provided that: (i) no Event of Default has occurred; (ii) such proceeding shall stay the collection of the applicable Taxes from Grantor and from the Premises or Grantor shall have paid all of the applicable Taxes under protest, (iii) such proceeding

9

shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Grantor is subject and shall not constitute a default thereunder, (iv) neither the Premises nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost so long as the contest is being pursued, and (v) Grantor shall have deposited with Beneficiary adequate reserves for the payment of the applicable Taxes, together with all interest and penalties thereon, unless Grantor has paid all of the applicable Taxes under protest, or Grantor shall have furnished such other security as may be accepted by Beneficiary, in its sole and absolute discretion, to insure the payment of any contested Taxes, together with all interest and penalties thereon. If Grantor fails to prosecute such contest with reasonable diligence or fails to maintain sufficient funds as hereinabove provided, Beneficiary may, at its option, liquidate any securities and apply the monies then on deposit with Beneficiary (or other depositary), in payment of, or on account of, such Taxes, or any portion thereof then unpaid, including all penalties and interest thereon according to any written bill, notice or statement, without inquiry as to the amount, validity or enforceability thereof. If the amount of money and any such security so deposited shall (in Beneficiary's reasonable judgment) at any time be insufficient for the payment in full of such Taxes, together with all penalties and interest which are or might become due thereon, Grantor shall forthwith, upon demand, either deposit with Beneficiary (or other depositary designated by Beneficiary) a sum (or such other security as shall be reasonably satisfactory to Beneficiary) which when added to the funds then on deposit, shall (in Beneficiary's reasonable judgment) be sufficient to make such payment in full, or, if Beneficiary (or other depositary) has applied funds so deposited on account of such Taxes, restore such deposit to an amount satisfactory to Beneficiary. After final disposition of such contest and upon Grantor's written request and delivery to Beneficiary of an official bill for such Taxes, Beneficiary (or other depositary) shall liquidate any securities and apply the monies, if any, then on deposit under this Section 4 to the payment of such Taxes or that part thereof then unpaid and the balance, if any, in excess of the amount required to be on deposit with Beneficiary (or other depositary) under Section 27 hereof shall be refunded to Grantor after such final disposition, provided that no Event of Default shall then exist.

5.      Change in Tax Laws.

(a)      If, by the laws of the United States of America, or of any state or municipality having jurisdiction over Beneficiary, Grantor or the Trust Property, any tax is imposed or becomes due in respect of the Merchant Agreement, this Deed of Trust (excluding income, excise or franchise taxes imposed upon Beneficiary, except as provided in Section 5(c) below), or any liens on the Trust Property created thereby, then Grantor shall pay such tax in the manner required by such law.

(b)      If any law, statute, rule, regulation, order or court decree effects a deduction from the value of the Trust Property for the purpose of taxation by creating any lien thereon, or imposing upon Beneficiary or the Trustee, any liability for the payment of all or any part of the Taxes required to be paid by Grantor, or changing in any way the laws relating to the taxation of mortgages or deeds of trusts or debts secured by mortgages or deeds of trust or the interest of Beneficiary in the Trust Property, or the

4840-1500-0745v3

manner of collection of Taxes so as to adversely affect this Deed of Trust, the Obligations, Beneficiary, or the Trustee, then, and in any such event, Grantor, upon demand by Beneficiary, shall pay such Taxes, or reimburse Beneficiary therefor on demand, unless Beneficiary determines, in Beneficiary's sole judgment, that such payment or reimbursement by Grantor is unlawful or that the payment might, in Beneficiary's judgment, constitute usury or render the Obligations wholly or partially usurious; in which event Beneficiary may elect to declare the Obligations to be due and payable within the lesser of (i) thirty (30) days after written notice, or (ii) such shorter period as may be required to ensure compliance by Beneficiary with applicable law.

(c)      Nothing contained herein shall require Grantor to pay any income, franchise or excise tax imposed upon Beneficiary, excepting only such income, franchise or excise tax which may be levied against the income of Beneficiary as a complete or partial substitute for Taxes required to be paid by Grantor hereunder.

6.      Insurance Coverage. For so long as this Deed of Trust is in effect, Grantor shall continuously maintain insurance in accordance with the following provisions:

(a)      Grantor shall obtain and maintain at all times during the term of the Obligations the insurance required by Beneficiary pursuant to **Exhibit B** attached hereto. In addition, Grantor shall cause Beneficiary to be named as an additional insured under the insurance policies required by Beneficiary and Beneficiary shall be identified in each policy as follows: GFE NY, LLC, its successors and/or assigns as their respective interests may appear. Grantor shall provide Beneficiary with evidence of all such insurance required hereunder.

(b)      The policies of insurance to be obtained and maintained by Grantor under the provisions of this Deed of Trust shall be issued by responsible insurance carriers with a Best's rating of no less than A/VII, licensed to do business in the State of Mississippi, who are acceptable to Beneficiary and shall be in such form and with such endorsements (including a mortgagee clause in favor of Beneficiary), waivers and deductibles (in no event to exceed Twenty-Five Thousand and No/100 Dollars ($25,000.00)) as Beneficiary shall designate or approve. Without limitation on the foregoing:

(i)      All policies shall name Grantor as the insured, and (with the exception of policies for workmen's compensation insurance) shall name Beneficiary as mortgagee and as an additional insured (under a standard non-contributing mortgagee protection clause, in form reasonably satisfactory to Beneficiary, attached to such policy or policies whenever applicable, and providing, among other matters, that all insurance proceeds shall be paid to Beneficiary).

(ii)      All policies shall contain: (1) the agreement of the insurer to give Beneficiary at least 30 days' written notice prior to cancellation or expiration of or change in such policies, or any of them; (2) a waiver of subrogation rights against Beneficiary and, if available, Grantor; (3) an agreement that such policies are primary and non-contributing with any insurance that may be carried by

11

Beneficiary; (4) [reserved]; and (5) if obtainable, a provision that no act or omission of Grantor shall affect or limit the obligation of the insurance carrier to pay the amount of any loss sustained. As of the date hereof, and subject to any changes in such requirements which Beneficiary may, in its discretion, make from time to time pursuant to its rights under this Section 6, each policy of property insurance hereunder shall contain a lender's loss payable endorsement, mortgagee clause, or other non-contributory mortgagee clause of similar form and substance acceptable to Beneficiary in favor of Beneficiary as a first mortgagee.

(c)     Concurrently herewith, Grantor shall deliver to Beneficiary original policies or certificates with premiums prepaid evidencing the insurance required hereunder. Grantor shall procure and pay for renewals of such insurance (or shall cause the procurement and payment) from time to time before the expiration thereof, and Grantor shall deliver to Beneficiary such original renewal policies or certificates with premiums prepaid at least ten (10) days prior to the renewal date of any existing policy.

(d)     Grantor, for itself, and on behalf of its insurers, hereby releases and waives any right to recover against Beneficiary on any liability for damages for injury to or death of persons; any loss or damage to property, including the property of any occupant of the Premises; any loss or damage to buildings or other improvements comprising the Premises; any other direct or indirect loss or damage caused by fire or other risks, which loss or damage is or would be covered by the insurance required to be carried hereunder by Grantor, or is otherwise insured; or claims arising by reason of any of the foregoing, except to the extent caused solely by the gross negligence or willful misconduct of Beneficiary.

(e)     Beneficiary shall not, by reason of accepting, rejecting, obtaining or failing to obtain insurance, incur any liability for (i) the existence, non-existence, form, amount or legal sufficiency thereof, (ii) the solvency or insolvency of any insurer, or (iii) the payment of losses. All insurance required hereunder or carried by Grantor shall be procured at Grantor's sole cost and expense. Grantor shall deliver to Beneficiary receipts satisfactory to Beneficiary evidencing full prepayment of the premiums therefor, except to the extent Beneficiary makes payments with Grantor's deposits under Section 27 hereof (for the periods and payments so covered by such payments). In the event of foreclosure on, or other transfer of title in lieu of foreclosure of, the Premises, all of Grantor's interest in and to any and all insurance policies in force shall pass to Beneficiary, or the transferee or purchaser as the case may be, and Beneficiary is hereby irrevocably authorized to assign in Grantor's name to such purchaser or transferee all such policies, which may be amended or rewritten to show the interest of such purchaser or transferee.

(f)     If Grantor fails to procure, pay the premiums for, or deliver to Beneficiary any of the Policies or renewals as required herein, Beneficiary may elect, but shall not be obligated, to obtain such insurance and pay the premiums therefor. Grantor shall pay to Beneficiary on demand any premiums so paid with interest thereon at the Default Rate,

Case 3:22-cv-00215-TSL-MTP   Document 1-1   Filed 04/21/22   Page 92 of 100
Case: 38CH1:22-cv-00256-LP   Document #: 1   Filed: 03/23/2022   Page 90 of 242

Inst. 2019009364 B DT   3007 P   67

from the time of the advance for such payment by Beneficiary, and said advance and interest shall be part of the Obligations.

(g)     Approval by Beneficiary of any policies of insurance ("Policies") shall not be deemed a representation by Beneficiary as to the adequacy of coverage of such Policies or the solvency of the insurer.

7.     Casualty Loss; Proceeds of Insurance.

(a)     Grantor will give Beneficiary prompt written notice of any loss or damage to the Premises, or any part thereof, by fire or other casualty.

(b)     So long as no Event of Default has occurred and is then continuing, in case of loss or damage covered by any one of the Policies in an amount equal to or less than Five Hundred Thousand and No/100 Dollars ($500,000.00), Grantor may settle and adjust and settle such claim under such Policies upon consultation with, but without requiring the consent of, Beneficiary.  In case of loss or damage covered by any one of the Policies in excess of Five Hundred Thousand and No/100 Dollars ($500,000.00), Beneficiary is hereby authorized to settle and adjust any claim under such Policies (and after the entry of a decree of foreclosure, or a sale or transfer pursuant thereto or in lieu thereof, the decree creditor or such purchaser or transferee, as the case may be, are hereby authorized to settle and adjust any claim under such Policies) upon consultation with, but without requiring the consent of, Grantor; and Beneficiary shall, and is hereby authorized to, collect and receipt for any and all proceeds payable under such Policies in connection with any such loss (collectively, the "Insurance Proceeds"). Grantor hereby irrevocably appoints Beneficiary as its attorney-in-fact for the purposes set forth in the preceding sentence. Each insurance company is hereby authorized and directed to make payment (i) of one hundred percent (100%) of all such losses (if such loss exceeds said amount) directly to Beneficiary alone, provided that if such proceeds are made payable jointly to Grantor and Beneficiary, Grantor shall turn over such proceeds to Beneficiary for application as provided herein), and (ii) of one hundred percent (100%) of all such losses (if such loss is less than or equal to said amount) directly to Grantor alone, and in no case to Grantor and Beneficiary jointly. All reasonable costs and expenses incurred by Beneficiary in the adjustment and collection of any such Insurance Proceeds (including, without limitation, reasonable attorneys' fees and expenses) shall be so much additional Obligation, and shall be reimbursed to Beneficiary upon demand or may be paid and deducted by Beneficiary from such Insurance Proceeds prior to any other application thereof.  Beneficiary shall not be responsible for any failure to collect any Insurance Proceeds due under the terms of any policy regardless of the cause of such failure, other than the gross negligence or willful misconduct of Beneficiary.

(c)     Net Insurance Proceeds received by Beneficiary under the provisions of this Deed of Trust or any instrument supplemental hereto or thereto or any policy or policies of insurance covering any improvements on the Trust Property or any part thereof shall be applied by Beneficiary at its option as and for a prepayment on the Merchant Agreement, without a prepayment fee (whether or not the same is then due or otherwise adequately secured), or shall be disbursed for restoration of such improvements

13

Inst. 2019009364 B DT   3007 P   68

("Restoration"), in which event Beneficiary shall not be obligated to supervise Restoration work nor shall the amount so released or used be deemed a payment of the Obligations evidenced by the Merchant Agreement. If Beneficiary elects or is required herein to permit the use of Insurance Proceeds to restore such improvements it shall do all necessary acts to accomplish that purpose, including advancing additional funds and all such additional funds shall constitute part of the Obligations. If Beneficiary elects or is required herein to make the Insurance Proceeds available to Grantor for the purpose of effecting the Restoration, or, following an Event of Default, elects to restore such improvements, any excess of Insurance Proceeds above the amount necessary to complete the Restoration (including payment or reimbursement for all loss of rents and other expenses and losses ancillary to such damage and/or Restoration) shall be applied as and for a prepayment on the Merchant Agreement, without a prepayment fee or premium. No interest shall be payable to Grantor upon Insurance Proceeds held by Beneficiary.

(d)     Notwithstanding the provisions of subsection 7(c) above, Beneficiary agrees to allow the Insurance Proceeds to be disbursed for Restoration provided (i) no Event of Default, and no Unmatured Default, shall have occurred; (ii) Beneficiary shall be satisfied in its sole and absolute discretion, that by expenditure of the Insurance Proceeds hereunder the Premises damaged or destroyed shall be fully restored within a reasonable period of time to the condition and value contemplated by this Deed of Trust and the Restoration Plans (as hereinafter defined), and all payments required under the Obligations will continue to be paid as and when the same become due and payable; (iii) in Beneficiary's good faith judgment, such work of repair and restoration can be completed in the ordinary course of business not later than the earlier of (A) six (6) months prior to the Maturity Date; (B) the outside date, if any, under any Lease; (iv) no Lease may be terminated as a result of the casualty or other event resulting in the claim for payment of such Insurance Proceeds; (v) the Trust Property (taking into account any rent loss or business interruption proceeds) continues to comply with requirements set forth in the Merchant Agreement for the applicable period, if any; (vi) Beneficiary shall have reviewed and approved Grantor's plans and specifications for the repair and restoration of the Trust Property involving costs in excess of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "Restoration Plans"), Grantor's architect and any general contractors, subcontractors and material suppliers employed to perform such work; (vii) [reserved]; (viii) if the net Insurance Proceeds available are insufficient for payment of the full cost of restoration or repair and the payments under the Obligations during the completion period, as estimated by Beneficiary, then Grantor shall have deposited with Beneficiary sufficient additional funds to insure payment of all such costs, or made arrangements acceptable to Beneficiary for such sufficient additional funds; (ix) rent loss or business interruption insurance is available to cover the full amount of any loss of income from the Premises during its repair and restoration; (x) Grantor shall provide evidence of the implementation of builder's risk coverage for the Premises with coverage and in such amounts as Beneficiary shall request and which otherwise complies with the insurance requirements set forth in Section 6 hereof; and (xi) Grantor shall certify to Beneficiary that each Lease remains in effect and has not been cancelled and

14

Case 3:22-cv-00215-TSL-MTP   Document 1-1   Filed 04/21/22   Page 94 of 100
Case: 38CH1:22-cv-00256-LP     Document #: 1     Filed: 03/23/2022     Page 92 of 242

Inst. 2019009364 B DT  3007 P   69

each Tenant shall agree to continue to remain in possession of the its leased premises at
the Premises under the terms of such Lease after completion of the repair or restoration.

(e)      So long as any Obligation shall be outstanding and unpaid, and whether or
not Insurance Proceeds are available or sufficient therefor, Grantor shall promptly
commence and complete, or cause to be commenced and completed, with all reasonable
diligence, the Restoration of the Premises as nearly as possible to the same value,
condition and character which existed immediately prior to such loss or damage in
accordance with the Restoration Plans and in compliance with all legal requirements.
Any Restoration shall be effected in accordance with procedures to be first submitted to
and approved by Beneficiary in accordance with Section 9 hereof. Grantor shall pay all
costs of such Restoration to the extent Insurance Proceeds are unavailable or are
insufficient (provided that Beneficiary has made available to Grantor all Insurance
Proceeds that are otherwise available from the applicable carriers pursuant to the terms of
this Deed of Trust).

8.      Condemnation and Eminent Domain.

(a)      Any and all awards (the "Awards") in excess of Five Hundred Thousand
and No/100 Dollars ($500,000.00) heretofore or hereafter made or to be made to Grantor
(or any subsequent owner of the Premises, or any part thereof) by any governmental or
other lawful authority for the taking, by condemnation or eminent domain, of all or any
part of the Premises (including any award from the United States government at any time
after the allowance of a claim therefor, the ascertainment of the amount thereto, and the
issuance of a warrant for payment thereof), are hereby assigned by Grantor to
Beneficiary, which Awards Beneficiary is hereby authorized to collect and receive from
the condemnation authorities, and Beneficiary is hereby authorized to appear in and
prosecute, in the name of and on behalf of Grantor, any action or proceeding to enforce
any such cause of action in which an award in excess of $500,000.00 is sought and to
make any compromise or settlement in connection therewith and to give appropriate
receipts and acquittance therefor in the name and in behalf of Grantor.  Grantor shall
retain the right to make appearances and prosecute claims on its own behalf any Award
equal to or less than $500,000.00.  Grantor shall give Beneficiary immediate notice of the
actual or threatened commencement of any condemnation or eminent domain
proceedings affecting all or any part of the Premises and shall deliver to Beneficiary
copies of any and all papers served in connection with any such proceedings. All
reasonable costs and expenses incurred by Beneficiary in the adjustment and collection of
any such Awards (including, without limitation, reasonable attorneys' fees and expenses)
shall be so much additional Obligation, and shall be reimbursed to Beneficiary from any
Award prior to any other application thereof. Grantor further agrees to make, execute and
deliver to Beneficiary, at any time upon request, free, clear, and discharged of any
encumbrance of any kind whatsoever (other than Permitted Exceptions), any and all
further assignments and other instruments deemed necessary by Beneficiary for the
purpose of validly and sufficiently assigning all Awards in excess of Five Hundred
Thousand and No/100 Dollars ($500,000.00) and other compensation heretofore and
hereafter made to Grantor for any permanent taking, under any such proceeding.

15

Case 3:22-cv-00215-TSL-MTP   Document 1-1   Filed 04/21/22   Page 95 of 100
Case: 38CH1:22-cv-00256-LP   Document #: 1   Filed: 03/23/2022   Page 93 of 242

Inst. 2019009364 B DT  3007 P  70

(b)     The proceeds of any Award received by Beneficiary under the provisions of this Deed of Trust or any instrument supplemental hereto shall be applied by Beneficiary at its option as and for a prepayment of the Obligations, without a prepayment fee (whether or not the same is then due or otherwise adequately secured); provided, that, such proceeds shall be disbursed for Restoration of the Premises upon satisfaction of the terms and conditions set forth in Section 8(c) below, in which event Beneficiary shall not be obligated to supervise Restoration work nor shall the amount so released or used be deemed a payment of the Obligations. If Beneficiary elects or is required pursuant to this Deed of Trust to permit the use of the proceeds of an Award to restore such improvements it may do all necessary acts to accomplish that purpose, including advancing additional funds, all such additional funds to constitute part of the Obligations. If Beneficiary elects or is required to make the proceeds of an Award available to Grantor for the purpose of effecting the Restoration, or, following an Event of Default, elects to restore such improvements, any excess of such proceeds above the amount necessary to complete the Restoration (including payment or reimbursement for all loss of rents and other expenses and losses ancillary to such damage and/or Restoration) shall be applied as and for a prepayment of the Obligations, without a prepayment fee or premium. No interest shall be payable to Grantor upon such proceeds held by Beneficiary.

(c)     Notwithstanding the provisions of subsection 8(b) above, Beneficiary agrees to allow the Award to be disbursed for Restoration provided: (i) all conditions to the use of casualty proceeds under subsection 7(d) have been satisfied, and (ii) the condemnation, in the judgment of Beneficiary, shall have no material adverse effect on the operation or value of the Premises remaining after the condemnation is completed.

(d)     So long as any of the Obligations shall be outstanding and unpaid, and whether or not Awards are available or sufficient therefor, Grantor shall promptly commence and complete, or cause to be commenced and completed, with all reasonable diligence the Restoration of the portion of the Premises not so taken as nearly as possible to the same value, condition and character, which existed immediately prior to such taking in compliance with all legal requirements. Any Restoration of the Premises involving costs in excess of Five Hundred Thousand and No/100 Dollars ($500,000.00) shall be effected in accordance with Restoration Plans to be first submitted to and approved by Beneficiary as provided in Section 9 hereof. Grantor shall pay all costs of such Restoration to the extent the Award is insufficient (provided that Beneficiary has made available to Grantor all proceeds of such Award received by Beneficiary for Restoration as provided in subsection 8(c) above).

9.     Disbursement of Insurance Proceeds and Awards.

(a)     All Insurance Proceeds and/or Awards received by Beneficiary as provided in Section 7 or Section 8 hereof shall, after payment or reimbursement therefrom of all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Beneficiary in the adjustment and collection thereof (collectively, the "Net Proceeds"), shall be deposited with Beneficiary, or such

16

Inst. 2019009364 B DT    3007 P    71

other depositary as may be designated by Beneficiary, and applied as provided in this Section.

(b)    Subject to Sections 7(d) and 8(c) hereof, Beneficiary may elect to apply the Net Proceeds to prepayment of the Obligations, whether then due or not. If the Obligations are not prepaid in full, then the Net Proceeds shall be applied to the installments of principal and interest in the inverse order of maturity.

(c)    All Net Proceeds which are not applied to the payment of the Obligations shall be applied to fund the payment of the costs, fees and expenses incurred for the Restoration of the Premises as required under Section 7 or Section 8 hereof and such Net Proceeds shall be disbursed through the title company which has insured the lien of the Deed of Trust to complete the Restoration; provided that Beneficiary shall receive the following:

(i)    Restoration Plans (unless the costs involved in such Restoration shall not exceed $500,000.00), which shall be subject to the reasonable approval of Beneficiary prior to the commencement of the Restoration.

(ii)    Such architect's and engineer's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, plats of survey, and such other evidences of cost, payment and performance as Beneficiary may reasonably require and approve.

(d)    If Grantor shall fail to commence Restoration within thirty (30) days after the settlement of the claim involving loss or damage to the Premises and diligently proceed to complete Restoration in accordance with the Restoration Plans and Applicable Laws, or if any other Event of Default shall occur hereunder at any time (whether before or after the commencement of such Restoration), all or any portion of the Obligations may be declared to be immediately due and payable and such Net Proceeds, or any portion thereof, then held, or subsequently received, by Beneficiary or other depositary hereunder may be applied, at the option and in the sole discretion of Beneficiary, to the payment or prepayment of the Obligations in whole or in part, or to the payment and performance of such obligations of Grantor as may then be in default hereunder.

(e)    Any surplus which may remain out of such Net Proceeds after payment of all costs, fees and expenses of such Restoration shall be applied to prepayment of the Obligations, without the payment of a prepayment fee or prepayment premium.

10.    Beneficiary's Performance of Grantor's Obligations.

(a)    Upon the occurrence of an Event of Default hereunder, Beneficiary may, but without any obligation to do so, upon simultaneous notice to Grantor, make any payment or perform any act which Grantor is required to make or perform hereunder or under any other Document (whether or not Grantor is personally liable therefor) in any form and lawful manner deemed expedient to Beneficiary, including, without limitation, the right to enter into possession of the Premises, or any portion thereof, and to take any

17

Inst. 2019009364 8 DT   3007 P   72

action (including without limitation the release of any information regarding the Premises, Grantor and the obligations secured hereby) which Beneficiary deems necessary or desirable in connection therewith, all at the sole cost and expense of Grantor. Beneficiary, in addition to any rights or powers granted or conferred hereunder but without any obligation to do so, may complete construction of, rent, operate, and manage the Premises, or any part thereof, including payment of management fees and other operating costs and expenses, of every kind and nature in connection therewith, so that the Premises shall be operational and usable for their intended purposes. All monies paid, and all reasonable expenses paid or incurred in connection therewith, including but not limited to reasonable costs of surveys, evidence of title, court costs and attorneys' fees and expenses and other monies advanced by Beneficiary to protect the Premises and the lien hereof, to complete construction of, rent, operate and manage the Premises or to pay any such operating costs and expenses thereof or to keep the Premises operational and usable for their intended purposes shall be so much additional Obligation, and shall become immediately due and payable on demand, and with interest thereon at the Default Rate.

(b)     Beneficiary, in making any payment, may do so according to any written bill, notice, statement or estimate, without inquiry into the amount, validity or enforceability thereof.

(c)     Nothing contained herein shall be construed to require Beneficiary to advance or expend monies for any purpose mentioned herein, or for any other purposes.

11.     <u>Security Agreement</u>.

(a)     <u>Grant of Security Interest</u>. Grantor hereby grants to Beneficiary a security interest in the Personal Property to secure the Obligations. This Deed of Trust constitutes a security agreement with respect to all Personal Property in which Beneficiary is granted a security interest hereunder, and Beneficiary shall have all of the rights and remedies of a secured party under the Uniform Commercial Code of Mississippi, as the same may be amended from time to time (the "<u>Code</u>"), as well as all other rights and remedies available at law or in equity.

(b)     <u>Perfection</u>. Grantor hereby consents to any instrument that may be requested by Beneficiary to publish notice or protect, perfect, preserve, continue, extend, or maintain the security interest and lien, and the priority thereof, of this Deed of Trust or the interest of Beneficiary in the Trust Property, including, without limitation, deeds of trust, security agreements, financing statements, continuation statements, and instruments of similar character, and Grantor shall pay or cause to be paid (i) all filing and recording taxes and fees incident to each such filing or recording, (ii) all expenses, including, without limitation, actual attorneys' fees and costs (of both in house and outside counsel), incurred by Beneficiary in connection with the preparation and acknowledgement of all such instruments, and (iii) all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessments, and charges arising out of or in connection with the delivery of such instruments. Grantor hereby consents to, and hereby ratifies, the filing of any financing statements relating to the Obligations made prior to the date hereof.

18

Inst. 2019009364 8 DT  3007 P    73

Grantor hereby irrevocably constitutes and appoints Beneficiary as the attorney-in-fact of Grantor, to file with the appropriate filing office any such instruments. In addition, Grantor hereby authorizes Beneficiary to cause any financing statement or fixture filing to be filed or recorded without the necessity of obtaining the consent of Grantor.

(c)     Place of Business. Grantor maintains its chief executive office as set forth as the address of Grantor in Section 32 below, and Grantor will notify Beneficiary in writing of any change in its place of business within five (5) days of such change.

(d)     Fixture Filing. This Deed of Trust is intended to be a financing statement within the purview of Section 9-502(b) of the Code and will be recorded as a "fixture filing" in accordance with the Code.

(e)     Representations and Warranties. Grantor represents and warrants that (i) Grantor is the record owner of the Trust Property; (ii) Grantor's chief executive office is located in the State of Florida; (iii) Grantor's state of organization is the State of Florida; (iv) Grantor's exact legal name is as set forth on Page 1 of this Deed of Trust; (v) Grantor is duly authorized to transact business in the State of Mississippi as a foreign limited liability company; (vi) Grantor is the owner of the Personal Property subject to no liens, charges or encumbrances other than the lien hereof, (vii) the Personal Property will not be removed from the Trust Property without the consent of Beneficiary, and (viii) no financing statement covering any of the Personal Property or any proceeds thereof is on file in any public office except pursuant hereto.

12.     Restrictions on Transfer.  For the purpose of protecting Beneficiary's security, and keeping the Premises free from subordinate financing liens, Grantor agrees that it, the members of Grantor, and the members, partners or stockholders of any entity controlling, directly or indirectly, Grantor, will not, except for any Permitted Transfers (as defined in the Merchant Agreement):

(a)     Sell, assign, transfer, hypothecate, grant a security interest in or convey title to (i) the Premises or any part thereof, or (ii) any ownership interest in Grantor, or (iii) any membership interest, partnership interest or stock in any entity controlling, directly or indirectly, Grantor;

(b)     other than the Obligations, obtain any financing, all or a part of which, will be secured by (i) the Premises, or (ii) any ownership interest in Grantor, or (iii) any membership interest, partnership interest or stock in any entity controlling, directly or indirectly, Grantor; or

(c)     convert Grantor from one type of legal entity into another type of legal entity;

without, in each instance, Beneficiary's prior written consent. Any violation of this Section 12 shall be deemed a "Prohibited Transfer."

19

Inst. 2019009364 B DT  3007 P   74

13.  <u>Events of Default</u>. Any one or more of the following events shall constitute an "<u>Event of Default</u>" under this Deed of Trust:

(a)   If Grantor shall fail (i) to make or deliver any payment under the Merchant Agreement when due, and such failure continues for ten (10) days following the due date thereof, or (ii) to make any other payment under the Documents within ten (10) days of the date when due or, if no date is stated, ten (10) days after demand (or such shorter period as may be expressly provided for herein or therein); or

(b)   If Grantor shall fail to maintain the insurance coverages in effect as required in Section 6 hereof; or

(c)   If a Prohibited Transfer shall occur; or

(d)   If any event designated as an "Event of Default" occurs under the Merchant Agreement or under any other Document.

14.  <u>Remedies</u>. Upon the occurrence of an Event of Default (regardless of the pendency of any proceeding which has or might have the effect of preventing Grantor from complying with the terms of this instrument), and in addition to such other rights as may be available under any other Document or under applicable law, but subject at all times to any mandatory legal requirements:

(a)   <u>Acceleration</u>. Beneficiary may declare the outstanding principal balance of the Merchant Agreement and all unpaid Obligations of Grantor hereby secured, including interest then accrued thereon, to be forthwith due and payable, whereupon the same shall become and be forthwith due and payable, without other notice or demand of any kind; <u>provided, however</u>, upon the occurrence of an Event of Default pursuant to [Section 8(f)] of the Merchant Agreement, all unpaid Obligations of Grantor hereby secured shall be immediately due and payable without any action by Beneficiary.

(b)   <u>Uniform Commercial Code</u>. Beneficiary shall, with respect to the Personal Property, have all the rights, options and remedies of a secured party under the Code, including, without limitation, the right to the possession of any such property or any part thereof, and the right to enter with legal process any premises where any such property may be found. Any requirement of said Code for reasonable notification shall be met by mailing written notice to Grantor at its address set forth in Section 32 hereof at least ten (10) days prior to the sale or other event for which such notice is required. Any such sale may be held as part of and in conjunction with any foreclosure sale of the other properties and rights constituting the Trust Property in order that the Trust Property, including the Personal Property, may be sold as a single parcel if Beneficiary elects. Grantor hereby agrees that if Beneficiary demands or attempts to take possession of the Personal Property or any portion thereof in exercise of its rights and remedies hereunder, Grantor will promptly turn over and deliver possession thereof to Beneficiary, and Grantor authorizes, to the extent Grantor may now or hereafter lawfully grant such authority, Beneficiary, its employees and agents, and potential bidders or purchasers to enter upon the Premises or any other office, building or property where the Personal Property or any

20

portion thereof may at the time be located (or believed to be located) and Beneficiary may (i) remove the same therefrom or render the same inoperable (with or without removal from such location); (ii) repair, operate, use or manage the Personal Property or any portion thereof; (iii) maintain, repair or store the Personal Property or any portion thereof; (iv) view, inspect and prepare the Personal Property or any portion thereof for sale, lease or disposition; (v) sell, lease, dispose of or consume the same or bid thereon; or (vi) incorporate the Personal Property or any portion thereof into the Land or the Improvements or Fixtures and sell, convey or transfer the same. The expenses of retaking, selling and otherwise disposing of the Personal Property, including reasonable attorneys' fees and legal expenses incurred in connection therewith, shall constitute so much additional Obligation and shall be payable upon demand with interest at the Default Rate.

(c)   Foreclosure.

(1)   Non-Judicial Foreclosure. Beneficiary may require Trustee to sell all or part of the Trust Property, at public sale under the power of sale herein granted. Sale of the Trust Property shall be advertised for three (3) consecutive weeks preceding the sale in a newspaper published in the county where the Trust Property is situated, or if none is so published, then in some newspaper having a general circulation therein, and by posting a notice for the same time at the courthouse of the same county. The notice and advertisement shall disclose the name of Grantor as the original grantor in this Deed of Trust. Grantor waives the provisions of Section 89-1-55 of the Mississippi Code of 1972, as amended, if any, as far as this section restricts the right of Trustee to offer at sale more than 160 acres at a time, and Trustee may offer the Trust Property as a whole, regardless of how it is described. If the Trust Property is situated in two (2) or more counties, or in two (2) judicial districts of the same county, the Trustee shall have full power to select in which county, or judicial district, the sale of the Trust Property is to be made, and the Trustee's selection shall be binding upon Grantor and Beneficiary. Should Beneficiary be a corporation or an unincorporated association, then any officer thereof may declare Grantor to be in default and request Trustee to sell the Trust Property. Trustee may sell all or any portion of the Trust Property, together or in lots or parcels, and shall execute and deliver to the purchaser or purchasers of such property good and sufficient deeds of conveyance of fee simple title with covenants of general warranty made on behalf of Grantor. In no event shall Trustee be required to exhibit, present or display at any such sale any of the personalty described herein to be sold at such sale. Trustee making such sale shall receive the proceeds thereof and shall apply the same as follows: (i) first, he shall pay the reasonable expenses of Trustee and a reasonable Trustee's fee or commission; (ii) second, he shall pay, so far as may be possible, the Liabilities, discharging first that portion of the Liabilities arising under the covenants or agreements herein contained and not evidenced by the Financing Agreements; (iii) third, he shall pay the residue, if any, to the persons legally entitled thereto. Payment of the purchase price to Trustee shall satisfy the obligation of the purchaser at such sale therefor, and such purchaser shall not be

21