**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| **HERMES HIALEAH WAREHOUSE, LLC** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No.:** |
| **v.** ) | |
| ) | **3:22-cv-00215-TSL-MTP** |
| **GFE NY, LLC;  BORIS MUSHEYEV;** ) | |
| **VIACHESLAV ELIYAYEV; JAN** ) | |
| **WIMPFHEIMER;  DANNY FULDA and** ) | |
| **JOHN DOES 1 through 20.** ) | |
| ) | |
| **Defendants** ) | |

## FIRST AMENDED COMPLAINT

**COMES NOW** Plaintiff Hermes Hialeah Warehouse, LLC ("Hermes") and files this

Amended Complaint[1] against the Defendants for temporary restraining order, injunction, usury,

violations of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et*

*seq.*, and certain business discovery as set forth in the request for relief below. In support hereof,

Hermes would show the Court the following, to wit:

### I. The Parties

1.    Plaintiff Hermes is a limited liability company formed under the laws of Florida.

2.    Defendant GFE NY, LLC ("GFE" or the "Defendant") is a New York limited

liability company.

3.    Defendant BORIS MUSHEYEV is an individual resident of New York.

4.    Defendant VIACHESLA ELIYAYEV is an individual resident of New York.

---

[1] The allegations that are unchanged have previously been verified by affiant, Ted Doukas. Further, the exhibits
referenced herein that were previously filed with the Original Complaint will not be re-filed in the court record, but
identified by reference.

5.      Defendant JAN WIMPFHEIMER is an individual citizen of Israel.

6.      Defendant DANNY FULDA is an individual citizen of Dubai.

7.      JOHN DOES 1 through 20 are the other various members, officers, owners investors, managers and/or employees of GFE who participated in this illegal scheme and whose identities will be sought during the course of discovery in this case.

8.      Musheyev, Eliyayev, Wimpfheimer, Fulda and John Does 1 through 20 shall be collectively referred to as the "GFE Individual Defendants."

## II. Venue and Jurisdiction

9.      The amount in controversy herein exceeds the sum of $75,000, exclusive of interests and costs.

10.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 on grounds of complete diversity of citizenship between Plaintiff and Defendants and because the amount in controversy requirement is met.

## III. Factual Overview

11.     A company owned and controlled by Ted Doukas ("Mr. Doukas"), and/or his wife, has continuously owned the property located at 6522 North Frontage Road, Meridian, Mississippi ("the Subject Property"), commonly known as the "Mid-Continental Terminal," for over 13 years.

12.     The Subject Property was first acquired by 2 Lisa Court Corp. (one of Mr. Doukas' companies) for approximately $350,000 via a Special Warranty Deed from the Meridian Terminal Trust, a liquidation trust established under the Amended Plan of Liquidation *In Re: Mid Continental Systems, Inc.*, United States Bankruptcy Court for the Southern District of Mississippi, Case No. 8701827JC. A true and correct copy of the Special Warranty Deed is attached to the original Complaint as **Exhibit A**.

49091714 v1

13.     Hermes, which was formed in May 2014, is a company owned 100% by Mr. Doukas and his wife, Giselle Teixera Doukas ("Mrs. Doukas"). True and correct copies of Hermes' Articles of Organization and Operating Agreement are attached to the original Complaint as **Exhibit B** and **Exhibit C**, respectively.

14.     Each year between 2015 and 2018, Hermes filed its Annual Report with the Florida Department of State, Division of Corporations, and, each time, identified only Mr. Doukas as the Manager/Managing Member. True and correct copies of Hermes' 2015 to 2018 Annual Reports are collectively attached to the original Complaint as **Exhibit D**.

15.     Mr. Doukas, through companies he controls, including Hermes, infused over $800,000 into the Subject Property for rehabilitation and environmental work/studies.

16.     On or about September 6, 2016, to memorialize and secure the funds that Hermes advanced to 2 Lisa Court Corp. to rehabilitate the Subject Property, 2 Lisa Court Corp. executed and delivered to Hermes a Deed of Trust for the principal amount of $800,000. A true and correct copy of the Deed of Trust is attached to the original Complaint as **Exhibit E**.

17.     Shortly thereafter, in October 2016, 2 Lisa Court Corp. transferred the Subject Property to Hermes, via Quitclaim Deed, to satisfy the inter-company loans from Hermes to 2 Lisa Court Corp. A true and correct copy of the Quitclaim Deed is attached to the original Complaint as **Exhibit F**.

A.     Mr. Kechagias Never Owned or had Corporate Authority Over Hermes.

18.     Sometime in 2018, Mr. Doukas was approached by a fellow businessman named Panagiotis Kechagias (hereafter referred to by his nickname, "Panos"). Panos stated his desire to purchase the Subject Property either via a new company or a company Panos controlled called Hellenic Petroleum, LLC ("Hellenic").

49091714 v1

19.     While Mr. Doukas and Panos had discussions regarding the Subject Property, no money was ever paid by Panos or Hellenic Petroleum for the Subject Property and the Subject Property was never conveyed to Panos or any company he controlled (including, but not limited to Hellenic Petroleum).

20.     In June 2018, without authorization from Mr. Doukas, Panos and Hellenic filed an Amended Annual Report with the Florida Department of State, Division of Corporations claiming that Hellenic Petroleum was the managing member of Hermes. A true and correct copy of the Unauthorized 2018 Amended Annual Report is attached to the original Complaint as **Exhibit G**.

21.     As soon as Mr. Doukas found out this was done, he immediately (in October 2018) filed another Amended Annual Report making it clear that he was the only Managing Member or Manager of Hermes and making sure that any reference to Panos or Hellenic Petroleum as parties who controlled Hermes was not shown in the current company records on file with the Florida Department of State, Division of Corporations. A true and correct copy of the Corrected 2018 Amended Annual Report is attached to the original Complaint as **Exhibit H**.

22.     When it was time to submit the 2019 Annual Report for Hermes, Mr. Doukas once again filed the 2019 Annual Report listing himself as the only authorized representative of Hermes. A true and correct copy of the Hermes' 2019 Annual Report filed by Mr. Doukas is attached to the original Complaint as **Exhibit I**.

23.     Then, in September 2019, again unbeknownst to Mr. Doukas, Panos and Hellenic filed an Amended Annual Report wrongfully and fraudulently claiming that Hellenic (and not Mr. Doukas) controlled Hermes. A true and correct copy of the Unauthorized 2019 Amended Annual Report is attached to the original Complaint as **Exhibit J**.

B.      GFE's Unauthorized Deeds of Trust on Hermes' Property Based on Unenforceable/Usurious Merchant Agreements.

24.     Approximately 30 days later, also unbeknownst to Mr. Doukas and without authorization, Panos executed a Deed of Trust, purportedly acting on behalf of Hermes (the owner of the Subject Property) to secure an obligation allegedly owed by Hellenic Petroleum to GFE, in the amount of $1,521,540 (the "First Unauthorized Deed of Trust"). A true and correct copy of the First Unauthorized Deed of Trust is attached to the original Complaint as **Exhibit K**.

25.     Neither Mr. Doukas, Mrs. Doukas, nor any other person or company authorized to act on behalf of Hermes executed the First Unauthorized Deed of Trust.

26.     Panos was not authorized to act or sign any document on behalf of Hermes and certainly was not authorized to execute the First Unauthorized Deed of Trust.

27.     The address shown for Hermes on the First Unauthorized Deed of Trust was never the address for Hermes.

28.     Hermes did not receive any funds advanced to Hellenic Petroleum by GFE, as referenced in the First Unauthorized Deed of Trust (assuming any funds were, in fact, advanced or paid at all).

29.     Even the most basic due diligence (if any was performed) by GFE would have shown that Panos inserted his and Hellenic Petroleum's names on the records of Hermes only weeks before execution of the First Unauthorized Deed of Trust and the advancement of funds (assuming any funds were, in fact, advanced or paid at all), and that Mr. Doukas was the only managing member since Hermes was formed in 2014.

30.     On November 13, 2020, approximately one year later, also unbeknownst to Mr. Doukas and without authorization, Panos executed another Deed of Trust, purportedly acting on behalf of Hermes (the owner of the Subject Property) to secure an obligation allegedly owed by Hellenic Petroleum to GFE, in the amount of $1,521,450 (the "Second Unauthorized Deed of

Trust"). A true and correct copy of the Second Unauthorized Deed of Trust is attached to the original Complaint as **Exhibit L.**

31.     Neither Mr. Doukas, Mrs. Doukas, nor any other person or company authorized to act on behalf of Hermes executed the Second Unauthorized Deed of Trust.

32.     Panos was not authorized to act or sign any document on behalf of Hermes and certainly was not authorized to execute the Second Unauthorized Deed of Trust.

33.     The address shown for Hermes on the Second Unauthorized Deed of Trust was never the address for Hermes.

34.     Hermes did not receive any funds advanced to Hellenic Petroleum by GFE, as referenced in the Second Unauthorized Deed of Trust (assuming any funds were, in fact, advanced or paid at all).

35.     On June 22, 2021, approximately six months later, also unbeknownst to Mr. Doukas and without authorization, Panos executed another Deed of Trust, purportedly acting on behalf of Hermes (the owner of the Subject Property) to secure an obligation allegedly owed by Hellenic Petroleum to GFE, in the amount of $750,000.00 (the "Third Unauthorized Deed of Trust" and together with the First Unauthorized Deed of Trust and the Second Unauthorized Deed of Trust, the "Unauthorized Deeds of Trust"). A true and correct copy of the Third Unauthorized Deed of Trust is attached to the original Complaint as **Exhibit M**.

36.     Neither Mr. Doukas, Mrs. Doukas, nor any other person or company authorized to act on behalf of Hermes executed this Third Unauthorized Deed of Trust.

37.     Panos was not authorized to act or sign any document on behalf of Hermes and certainly was not authorized to execute this Third Unauthorized Deed of Trust.

49091714 v1

38.     The address shown for Hermes on the Third Unauthorized Deed of Trust was never the address for Hermes.

39.     Hermes did not receive any funds advanced to Hellenic by GFE, as referenced in the Third Unauthorized Deed of Trust (assuming any funds were, in fact, advanced or paid at all).

40.     The first page of each of the Unauthorized Deeds of Trust provide that:

WHEREAS, pursuant to a certain Merchant Agreement **by and between Grantor** (Hermes) **and Beneficiary** (GFE) dated of even date herewith […] Beneficiary (GFE) **has agreed to purchase from Grantor** (Hermes) [….] all of Merchant's accounts future accounts, contract rights and other entitlements [. . .] until the [Purchased Amount][ has been delivered by or on behalf of Merchant to Beneficiary.

*Id.* [emphasis added].

41.     Of course, Hermes never participated in or benefitted in any manner from these Merchant Agreements.

42.     Also unbeknownst to Mr. Doukas and without any authorization, Panos and Hellenic Petroleum filed the annual reports for Hermes in 2020 and 2021. Mr. Doukas controls about eighteen (18) different companies and did not realize that his office was not filing the annual reports for Hermes in 2020 and 2021 because notice would be sent by the State of Florida to the last known contact email/address, which here (albeit incorrectly and fraudulently) was listed as the address of Panos/Hellenic Petroleum.

43.     When reviewing his records in 2022, Mr. Doukas realized what had occurred pertaining to the annual reports and made sure that the 2022 Annual Report had the correct information:  Mr. Doukas as the manager and his home and office address listed at the address for Hermes. A true and correct copy of the Correct 2022 Annual Report is attached to the original Complaint as **Exhibit N**.

44.     During the entire existence of Hermes, Mr. Doukas submitted Federal Tax Returns for Hermes to the IRS. These included for the years 2019 and 2020 (2021 tax returns have not yet been filed). In all years, including 2019 and 2020, the sole members listed on the K-1s for Hermes are Mr. Doukas and Mrs. Doukas. The tax returns for Hermes never identify Panos or Hellenic Petroleum as having any ownership/membership interest because they had none. Redacted excerpts from Hermes' 2019 and 2020 tax return forms are collectively attached to the original Complaint as **Exhibit O**.

45.     Moreover, to further demonstrate that Mr. Doukas always owned and controlled Hermes exclusively (and was unaware that Panos/Hellenic Petroleum had attempted to hijack Hermes to obtain money by using the Subject Property as collateral), Mr. Doukas (through his office) was solely responsible for submitting **<u>monthly</u>** Network Discharge Monitoring Reports as required by the United States Environmental Protection Agency and the Mississippi Department of Environmental Quality. Mr. Doukas is the only party authorized to sign these monthly reports and the only party who has signed these reports for the last several years including during all months in 2019, 2020 and 2021. Had Hellenic Petroleum or Panos had any control or ownership interest in the Subject Property, they would have been responsible for signing and submitting these monthly environmental reports. Had Mr. Doukas known that Hellenic Petroleum or Panos owned the Subject Property during these periods, he would not have filed those monthly reports or continued to file Federal Income Tax Returns for Hermes. Redacted copies of the November 2019, 2020 and 2021 Network Discharge Monitoring Reports are collectively attached to the original Complaint as **Exhibit P** as examples of these monthly submissions.

46.     On the afternoon of March 21, 2022, Hermes determined through a notice in the Meridian Star that GFE intended to conduct a foreclosure sale on the Subject Property on March

8

24, 2022 at 11:00 am. A screenshot of the notice is attached to the original Complaint as **Exhibit Q**.

47.     GFE never sent notice of the foreclosure sale to Hermes via its registered agent on file with the Florida Department of State, Division of Corporations (Mr. Doukas), or otherwise.

48.     The injunctive relief requested herein relates to any attempt by GFE to foreclose on the Subject Property, where the Unauthorized Deeds of Trust were executed by an individual who had no authority to do so, where the underlying indebtedness the Unauthorized Deeds of Trusts are premised in is illegal and unenforceable, and where GFE has no lending transaction identified in the Unauthorized Deeds of Trust, much less a bonafide lending transaction with the true owner of the Subject Property.

49.     Under the trustee's stated parameters for the sale, Hermes' rights will be obfuscated by any foreclosure and unauthorized acquisition of the Subject Property that Hermes invested in and improved.

50.     GFE's actions, including its attempted foreclosure, have damaged and continue to damage Hermes, including obviation of its ownership interest in the Subject Property or its ability to realize any value from the Subject Property.

51.     Any such foreclosure sale should be enjoined until the matters in this Amended Complaint are fully adjudicated and the rights of the various parties have been determined by the Court.

C.     GFE Produces the "Merchant Agreements" in this Matter Which Purport to Bind Hermes and the Subject Property.

52.     On June 6, 2022, GFE filed its Answer and Counterclaim in this matter. [Doc. 5]. GFE attached multiple documents to the Counterclaim entitled "Merchant Agreements." The Merchant Agreements that GFE alleges bind Hermes and the Subject Property are Exhibits A-D

to the Counterclaim. The Deed of Trust that purportedly binds the Subject Property and which GFE alleges secures the debt owed under the Merchant Agreements is Exhibit E to the Counterclaim.

D.   The GFE Individual Defendants' Actions including, *inter alia*, Entering into the Merchant Agreements with Hellenic and Attempting to Foreclose on Hermes' Property Violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"),  18 U.S.C. § 1961 *et seq.*

53.   Each of the Merchant Agreements provide that New York law applies. Further, a review of the Merchant Agreements show them to be the very type agreements that are being held unenforceable under New York law by federal courts that have recently decided the issue.

54.   The GFE Individual Defendants, through the Enterprise GFE and possibly other companies, offer funding in the form of so-called "merchant cash advances" or "MCAs."  These merchant advances are, in fact, usurious and fraudulent loans with interest rates many times greater than the maximum rate permissible for a loan under New York law.

55.   The GFE Individual Defendants loan money to merchants, like Hellenic, under the guise of a merchant cash advance, which they describe as a "purchase and sale of future receivables."

56.   As a general matter, an issuer of a merchant cash advance provides a merchant with a lump sum payment in exchange for a share of the merchant's future sales income/receipts, or "receivables," up to a certain total repayment amount. As a result, unlike a loan, a lawful merchant cash advance does not guarantee an issuer with a regular payment or a fixed, finite term.  Instead, payment amounts may vary through a "reconciliation" process in which the issuer "reconciles" the merchant's payment amounts in accordance with the merchant's actual receivables.  Because payment amounts vary, the lengths of repayment terms also vary. This variability and lack of security create certain risks for issuers but also create certain protections for merchants by being able to reduce required payments when business is slow.

57.     In contrast, a traditional closed-end installment loan has a fixed regular payment amount and a finite repayment term.  In exchange for the certainty this structure provides for creditors (and the rigidity it imposes on borrowers), New York law guarantees certain protections to loan borrowers, including a maximum annual interest rate of 16%. The law also imposes certain regulations on loan issuers, including the requirement of specialized licenses and regular oversight by governmental entities.

58.     To evade applicable usury statutes, each of the GFE loans were disguised by the GFE Individual Defendants as a purchase and sale of future receivables agreement, but its terms, conditions and Defendants' actions demonstrate that despite the agreement's form, no sale of receivables took place. Rather, each agreement was intended to be a loan from inception.

59.     The Merchant Agreements contain, among other false provisions, the following false statements: (1) that the transaction is not a loan; (2) that the purchase price equals the fair market value of Hellenic's daily receipts; and (3) that the automated ACH program is "labor intensive and is not an automated process," requiring the Defendants to charge an exorbitant fee to cover their costs.  As described *infra*, the Unauthorized Deeds of Trust that were filed in order to secure the indebtedness of the Merchant Agreements also state that each correspondent Merchant Agreement was entered into "by and between Grantor and Beneficiary" and that "Beneficiary purchased from Grantor." Both statements are also untrue.

60.     In form, substance and in every conceivable way, each of the Merchant Agreements function as repayable loans with interest rates exceeding usurious levels.

61.     The GFE Individual Defendants market and collect upon their cash advances as loans. Here, they required Hellenic to repay the loans through fixed daily or weekly payments, which are debited from the merchant's bank accounts at thousands of dollars per day. Under New

49091714 v1

York law, a loan is usurious if the interest rate exceeds "six per centum per annum," N.Y. Gen. Oblig. L. § 5-501 and criminally usurious if it has an interest rate "exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period," N.Y. Penal Law § 190.40. They require the loans to be repaid in short terms at annual interest rates well above the threshold that defines usury under New York law.

62.     The Merchant Agreements also contain numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the MCA agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

63.     Despite their documented form, the transactions are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

> a.    The daily or weekly payments required by the Merchant Agreements were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws. Rather, just like any other loan, the purchased amount was to be repaid within a specified time;
>
> b.    The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the purchased amount. The loans sought to obligate the merchants to ensure sufficient funds were maintained in a designated account to make the payments and, after a certain number of instances of insufficient funds being maintained in the account, the merchants were in default and, upon default, the outstanding balance of the purchased amount became immediately due and owing;
>
> c.    While the Merchant Agreements purported to "assign" all of the merchant's future account receivables to GFE until the purchased amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to

collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, GFE merely acquired a security interest in the merchant's accounts to secure payment of the purchased amount;

d.   Unlike true receivable purchase transactions, the Merchant Agreements were underwritten based upon an assessment of the merchant's credit worthiness not the creditworthiness of any account debtor;

e.   The amount of the payments was determined based upon when GFE wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

f.   GFE assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

g. GFE required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

h.   GFE required that the merchant grant it a security interest in its receivables and other intangibles (including, the Subject Property) in order to secure the indebtedness under the Merchant Agreements, and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which GFE knew were breached from day one.

64.   In other words, the facts surrounding these Merchant Agreements plainly demonstrate that the Enterprise of GFE and the GFE Individual Defendants are not actually purchasing receivables or future receipts but using this false construct to hide a loan transaction. In fact, the GFE transactions function as loans, and, as a result, anyone they are seeking to enforce this indebtedness[2] against is entitled to the protections afforded to borrowers under New York law.

---

[2] Again, Hermes is not bound by the Merchant Agreements because no one authorized by Hermes signed the Agreement. Still these protections should be afforded Hermes because (1) GFE seeks to impose its rights against

13

65.     GFE and the GFE Individual Defendants went a step further than merely collecting on these Merchant Agreements, they sought to enforce their rights under the Merchant Agreements by, *inter alia*, foreclosing on the Subject Property owned by Hermes.

66.     Any rights provided GFE to the Subject Property pursuant to the Deed of Trust are tied wholly to its right to enforce these Merchant Agreements. Accordingly, GFE and the GFE Individual Defendants cannot foreclose on alleged security interests premised on an unenforceable and unlawful debt.

67.     GFE's actions to collect under the Merchant Agreements, including its attempt to foreclose on the Subject Property, have damaged and continue to damage Hermes, including falsely clouding and harming its title and interest in the Subject Property, and forcing it to incur the costs and expense of this litigation.

## IV.  Claims for Relief

### Count I – Injunctive Relief

68.     Hermes reasserts the allegations made in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

69.     GFE and its agents plan to foreclose on and sell the Subject Property in violation of the rights of Hermes, who has not authorized the grant or assignment of any interest in the Subject Property to GFE.

70.     GFE and its agents' actions in unlawfully conducting the foreclosure sale are causing, and will continue to cause, irreparable harm to Hermes.

---

Hermes as if it were a party to the Merchant Agreement and (2) GFE is seeking to take and sell the Subject Property owned by Hermes.

49091714 v1

71.     Were this sale cancelled until such time as the Court can make a determination as to the Subject Property and the validity of the Unauthorized Deeds of Trust, no, or substantially less, harm would be visited upon GFE.

72.     Further, it is in the public interest that the GFE not be allowed to conduct a foreclosure that wipes out the legitimate property ownership of Hermes, who has not authorized the transfer of any rights to GFE.

73.     Accordingly, Hermes is entitled to immediate and permanent injunctive relief. The balance of the equities and of relative hardships between the parties favors the grant of injunctive relief.

74.     For the reasons stated, Hermes submits that it has satisfied the four factor test for granting injunctive relief, and that it is entitled to a permanent temporary restraining injunction enjoining GFE and its agents, trustees, and affiliates from selling the property at 6522 North Frontage Road, Meridian, Mississippi, via foreclosure sale or otherwise, until such time as this Court has decided the matter on the merits.

**Count II– Declaratory Judgment**

75.     Hermes reasserts the allegations made in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

76.     The Unauthorized Deeds of Trust in the Subject Property were not granted by anyone with corporate authority for Hermes.

77.     The Unauthorized Deeds of Trust are also premised on an indebtedness that is illegal and unenforceable.

78.     The Unauthorized Deeds of Trust are not supported by any enforceable lending relationship by and between GFE and Hermes.

15

79.     Defendants have no relationship with Hermes, and have not provided Hermes or the Subject Property any benefit.

80.     Hermes requests that this Court enter a judgment declaring that the Unauthorized Deeds of Trust are not enforceable Agreements, that Defendants have no rights against the Subject Property, and that Hermes is entitled to its use and enjoyment of the Property without further interference or cloud.

### Count III – False Lien Filing in Land Records

81.     Hermes reasserts the allegations made in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

82.     GFE and the GFE Individual Defendants filed the Unauthorized Deeds of Trust in the land records of Lauderdale County, Mississippi in order to secure Hellenic's purported indebtedness through Hermes' Subject Property.  They did so all-the-while knowing of their illegal activities and that the foundation of the deeds of trust and lien filings was false.

83.     The filing of these Unauthorized Deeds of Trust constitute a fraudulent filing in the land records, and warrant penalty and treble damages under Mississippi law.

### Count IV - RICO: 18 U.S.C. § 1962

84.     Hermes reasserts the allegations made in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

85.     GFE was formed and utilized by the GFE Individual Defendants who are each a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that they are individuals capable of holding a legal interest in property.

86.     GFE and the GFE Individual Defendants constitute an association-in-fact Enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

16

49091714 v1

87.     GFE and the GFE Individual Defendants are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise (the "Enterprise). Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

88.     Upon information and belief, since at least 2019 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through shared personnel, shared offices in New York, and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States, including Hellenic.

89.     Any debt evidenced by the Merchant Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate.

90.     The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts.

91.     Upon information and belief, the GFE Individual Defendants solicit the merchants and GFE underwrites, funds, collects and enforces the usurious loans. Musheyev directs and controls the entire Enterprise. At all times material hereto, the Individual GFE Defendants were responsible for: (i) locating and soliciting merchants, (ii) offering funding and (iii) providing the merchants with so-called merchant agreements on behalf of the Enterprise.

92.     In this matter, orally and in writing, GFE and the GFE Individual Defendants have repeatedly and persistently engaged in fraud against Hellenic (and Hermes, via the Unauthorized

Deeds of Trust) by, *inter alia*, misrepresenting the nature of their cash advances when they are in fact loans; misrepresenting that their merchant agreements are enforceable when in fact they are usurious and thus void under New York law; misrepresenting the basis of the fees they deduct from merchant cash advances; and misrepresenting in the Unauthorized Deeds of Trust that Hermes and its property were bound by the Merchant Agreements or derived some benefit under them, when they were not and have not.

93.     The GFE Individual Defendants ultimately benefit from the Enterprise's unlawful activity by receiving a fee paid from the proceeds of the unlawful debt collected by Enterprise from Hellenic and other merchants.

94.     The GFE Individual Defendants have been and continue to be responsible for: (i) determining the form of the Merchant Agreements used by the Enterprise; (ii) underwriting the Merchant Agreements; (iii) determining the Purchase Price and daily and weekly payments under the Agreements; (iv) approving the Enterprise's entry into the Merchant Agreements; (v) funding the usurious loans entered into by the Enterprise; (vi) servicing the usurious loans and (vii) collecting upon the unlawful debt.

95.     Upon information and belief, Musheyev is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, and the ultimate payment terms, amount and period of each usurious loan.

96.     In his capacity as the day-to-day leader of the Enterprise, Musheyev is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase

agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the amount and repayment period of the usurious loans extended by the Enterprise to merchants; and (iii) the method of collecting the daily payments via ACH withdrawals. All such forms were used to make and collect upon the unlawful loans.

97.     Musheyev has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing members of the Enterprise to make loans to merchants, to fund only certain amounts of those loans and to collect upon the unlawful loans.

98.     In this case, Musheyev: (i) approved the Enterprise's entry into the Merchant Agreements and the payment terms thereunder; (ii) authorized the ACH withdrawals used by the Enterprise to collect payments under the Merchant Agreements, including the withdrawals of the excess and usurious funds; (iii) authorized the Unauthorized Deeds of Trust to be entered and filed against the Subject Property and (iv) authorized the foreclosure and ongoing effort to foreclose against the Subject Property.

99.     Through salary, bonuses, profits or other distributions by GFE, Musheyev has ultimately benefited from the Enterprise.

100.     The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

101.     Specifically, members of the Enterprise maintain offices in New Jersey and New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to a company in Florida and have now taken action to foreclose against property in Mississippi. Needless to say, the Enterprise operates throughout the

United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

102.    In the present case, all communications between the members of the Enterprise and Hellenic were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Merchant Agreements, fund the advance under the Merchant Agreements and collect payment via interstate electronic ACH debits.

103.    Hermes has and will continue to be injured in its business and property by reason of these violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial. The injuries to Hermes directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, the cloud in title placed, at the direction of Musheyev, on account of the usurious and otherwise unenforceable Deeds of Trust begotten by fraudulent, usurious and unenforceable Merchant Agreements, as well as attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting these unlawful activities.

104.    Pursuant to 18 U.S.C. § 1964(c), Hermes is entitled to treble damages, plus costs and attorneys' fees from GFE and the GFE Individual Defendants.

**Count V - Conspiracy under 18 U.S.C. § 1962(d))**

105.    Hermes reasserts the allegations made in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

106.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

107.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

108.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

109.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

110.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

111.    Hermes has been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

112.    The injuries to Hermes directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

113.    Hermes has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

114.    Pursuant to 18 U.S.C. § 1964(c), Hermes is entitled to treble damages, plus costs and attorneys' fees from GFE and the GFE Individual Defendants.

### Count VI– Clear Title

115.    Hermes reasserts the allegations made in the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

116.    The claims of GFE to the Subject Property as set forth in the Unauthorized Deeds of Trust interfere with the Hermes' free and full use and enjoyment of the premises herein described, and constitutes a cloud on the title thereto.

117.    Hermes alleges that any claims which the Defendant may assert as to the Subject Property are invalid and are of no force and effect and that all such claims have been wholly or effectually extinguished and barred by subsequent acts and occurrences and that the Plaintiff is seized and possessed of the Subject Property and free of, and wholly discharged from, any and every such claim, demand or encumbrance.

118.    A cloud exists on the title to the Subject Property, and the cloud cannot be removed without judicial intervention. Hermes is being damaged as a result of the cloud on the Subject Property's title.

119.    All persons who have or claim any interest which would be affected by this proceeding have been made parties to this lawsuit.

120.     No other persons or entities assert a claim of ownership or a lien (other than ad valorem taxes) in the Subject Property, beyond the parties to this action.

121.     This Court has jurisdiction to declare the rights, status and remove clouds on title.

WHEREFORE, PREMISES CONSIDERED, Hermes Hialeah Warehouse, LLC respectfully requests that this Honorable Court provide the following relief:

(a)     enter Judgment for Hermes and against the Defendants;

(b)     issue a Permanent Injunction, providing the following:

    (i)     enjoining GFE, including, but not limited to, all agents, trustees, and affiliates thereof, from selling the Subject Property at 6522 North Frontage Road, Meridian, Mississippi, via foreclosure sale or otherwise, until such time as this Court may decide the merits of this suit; and

    (ii)     granting Hermes immediate access to all documents and corporate records GFE maintains related to the Subject Property and Hermes.

(c)     enter Declaratory Judgment as follows:

    (i)     that Unauthorized Deeds of Trust in the Subject Property are void;

    (ii)     declaring that the Defendant, both individually, and all agents, trustees, and affiliates thereof, be forever barred from all claims to an interest in the Subject Property;

(d)     order Defendants to file papers sufficient to terminate all liens or security interests related to the Merchant Agreements;

(e)     order Defendants to pay full restitution and damages to Hermes including those not identified at the time of the order;

(f)     order Defendants to disgorge all profits from the fraudulent and illegal practices alleged herein;

(g)     grant Hermes compensatory and punitive damages for all actions and conduct of the Defendants, including damages for fraudulent filing of the deeds of trust and clouding its title pursuant to unenforceable Merchant Agreements;

(h)     award Hermes its reasonable attorneys' fees and costs;

49091714 v1

(i)      enter Judgment that title be quieted so that the Hermes is deemed to be the lawful owner of the Subject Property and be vested with an absolute and unencumbered fee to the Subject Property at 6522 North Frontage Road, Meridian, Mississippi and more specifically described below:

> Beginning at the Northeast corner of Section 22, Township 6 North, Range 15 East, Lauderdale County, Mississippi, run thence South 0 degrees 27 minutes 36 seconds East 1,827.7 feet along the section line to the North right of way of the Y & M V Railroad; run thence South 73 degrees 01 minutes 24 seconds West along the North right of way of the Y & M V Railroad 959.62 feet to the point of beginning of the land herein conveyed, which is the Southwest corner of the Shell Oil Company property; and from said beginning point run thence North 0 degrees 23 minutes seconds West 1,388.67 feet; thence run South 89 degrees 36 minutes 24 seconds West 420 feet; thence South 0 degrees 23 minutes 36 seconds East 1,513.74 feet to the North right of way of the Y & M V Railroad; thence North 73 degrees 1 minutes 24 seconds East 438.23 feet to the point of beginning, said property comprising 14.0 acres, more or less, and being a part of the Northeast Quarter of Section 22, Township 6 North, Range 15 East, Lauderdale County, State of Mississippi;

(j)      and to provide such other relief as may be deemed just and proper in these premises, including equitable relief and damages to be proven.

Respectfully submitted, this the 22nd day of September, 2022.

/s/ John M. Lassiter
John M. Lassiter (MS Bar #102355)
Joshua W. Stover (MS Bar #105472)
Attorney for Plaintiff  Hermes Hialeah Warehouse, LLC

**OF COUNSEL:**
BURR & FORMAN LLP
The Pinnacle at Jackson Place
190 E. Capitol Street, Suite M-100
Jackson, MS 39201
Telephone:  601-355-3434
Facsimile:  601-355-5150
jlassiter@burr.com
jstover@burr.com

49091714 v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document has been served on the party listed below by

Notice of Electronic Filing or, if the party served does not participate in Notice of Electronic Filing,

by U.S. First Class Mail, hand delivery, fax or email on this, the 22nd day of September, 2022:

Alan L. Smith
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
P.O. Box 14167
Jackson, MS  39236-4167
asmith@bakerdonelson.com
*Attorney for Defendant GFE NY, LLC*

*/s/ John M. Lassiter*
OF COUNSEL

25

49091714 v1